ACCEPTED
05-14-01495-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
7/27/2015 12:00:00 AM
LISA MATZ
CLERK

FILED: 07/31/2015
13:18:41
5th Court of Appeals
Lisa Matz, Clerk

CAUSE NO. 05-14-01495-CV

RECEIVED IN
5th COURT OF APPEALS
DALLAS, TEXAS
7/27/2015 10:58:00 AM
LISA MATZ
Clerk

# In the
# COURT OF APPEALS
# FIFTH DISTRICT OF TEXAS
# DALLAS, TEXAS

---

## IN THE MATTER OF THE GUARDIANSHIP OF DORIS L. TIPPS

---

## Appealed from Cause No. PR-13-03072-3
## In the Probate Court No. 3 of Dallas County, Texas
## Honorable Judge Michael E. Miller, Presiding

---

### APPELLANT'S COMBINED REPLY BRIEF

FIRST, APPELLEE REPLY BRIEF – THOMAS TIPPS
SECOND, APPELLEE REPLY BRIEF – CUMBERLAND TRUST, AND
THIRD, APPELLEE REPLY BRIEF – SENIOR CITIZENS
OF GREATER DALLAS  d/b/a/ "SENIOR SOURCE"

---

Steven Tipps, Pro Se Appellant
5015 Addison Circle
Addison, Texas  75001
(214) 223 6358
Fax (254) 731 2522
Email:  casingscientific@gmail.com
        casing@prodigy.net

Page i of **103**

# IDENTITY OF PARTIES AND COUNSEL

The following is a list of all parties as well as the names and addresses of all counsel.

| *Appellant* | *Counsel:* |
|---|---|
| Steven Tipps | Steven Tipps, Pro Se Party<br>5015 Addison Circle<br>Addison, Texas 75001 |
| *Appellant:* | *Counsel:* |
| Doris L. Tipps | W. Thomas Finley<br>Finley Law Group,<br>5500 Preston Road, Suite 390<br>Dallas, Texas 75290 |
| Cumberland Trust & Investment Co. | *Counsel:* |
| *Appellee:* | Alvin J. Golden<br>Laurellen Ratliff<br>Ickard Golden Jones, P.C.<br>400 West 15th Street, Suite 975<br>Austin, Texas 78701-1646 |
| Senior Citizens of Greater Dallas, | *Counsel:* |
| *d/b/a Senior Source* | John H. Phillips<br>Boone, Boone, & Phillips |
| *Appellee:* | 4313 Lovers Lane<br>Dallas, Texas 75209 |
| | *Counsel:* |
| Thomas Tipps | Jeffrey Cook<br>Adam Barela<br>Sullivan & Cook, L.L.C. |
| *Appellee:* | 600 E. Las Colinas Blvd<br>Suite 1300<br>Irving, Texas 75039 |

# INDEX OF AUTHORITIES

**CASES -**

*Armstrong v. Manzo*, 380 U. S. 545, 552 (1965) [G v. K] ............3, 14, 35, 68, 77, 167

*Beverly Enterprises-Arkansas, Inc. v. Circuit Court of Independence County* 238 S.W.3d *(2006)*.................................................................................3

Cayton v. Moore, 224 S.W.3d 440 Tex.App. - Dallas 2007, no pet..3, 14, 65,72,167

Champion Int'l Corp. v. Twelfth Court of Appeals, 762 S.W.2d 898, 899 (Tex.App. – Houston [1st Dist. 2006, no pet.].................................3, 16, 67, 72, 167

Clarendon Nat'l Ins. Co. v. Thompson, 199 S.W.3d 482, 494 (Tex.App. – Houston [1st Dist. 2006, no pet].........................................................3, 35, 65, 167

Cran v. Hale, 745 S.W.2d 129 (1988) (Ark).........................................3, 13

*Davidson v. Great Nat'l Life Ins. Co.* S.W. 2nd 312 (TEX. SUP. CT) 1987 ...

Downer v. Aquamarine Operators, Inc. 701 S.W.2d 238, 241-42 (Tex. 1985)

*Goldberg v. Kelly*, 397 US254, 268, 90 S. Ct.....35, 14, 16, 28, 35, 54, 64, 66, 65, 71, 77

*Grannis v. Ordean, 234 U. S.* 385 , 394 (1914).........................................3, 14, 67

*Greene v. McElroy*, 360 U. S. 474, 496-497.........................................3, 15, 69

*ICC v. Louisville & N. R. Co.*, 227 U. S. 88, 93-94 (1913)..................3, 15, 36, 68

*State v. Nelson*, 246 Ark, 210, 438 S.W.2d (1969)................................3, 53, 167

Walker v. Gutierrez, 111 S.W.3d 56, 62 (Tex.2003).....................3, 15, 51, 64, 167

*Willner v. Committee on Character & Fitness*, 373 U. S.96, 103-104........3, 15, 35, 68

TEX. PRACTICE AND REMEDIES CODE, Section 51.014

## State of Texas Due Course of Law Congruent with federal Due Process of Law

*Anthony v. State*, 209 S.W.3d 296 (2006) (37)....................................4, 17, 163

*Brantley v. Texas Youth Commission*, 2011, 365 S.W.3d 89 (2011) (17) ........4, 18, 162

*City of Fort Worth v. Park*, 2011, Tex. APP. LEXIS 5725 (2011) (14) ..4, 17, 67, 77, 162

*Collins v. Texas Natural Resource*, 2002, 94 S.W.3d 876 (2002) (16) .............4, 163

*Dallas County v. Gonzales*, (2006) (17) ........................................... .4, 17, 162

*Ewing v. Act Catastrophe* – Texas LC, 375, S.W.2d 545 (2012) (16) ...........5, 17, 162

*Fleming v. State*, 376 S.W.3rd 854 (2012) (35)....................................4, 17, 162

*Richard v. Dretke*, Tex. App. LEXIS 2261 2009 (20)...........................4, 18, 162

*Tex. Comm. On Env. Quality v. Denbury Onshore*, LLC,

Texas. App. LEXIS 7177 (41)...............................................4, 17, 162

## Texas Procedural Due Process congruent with federal Procedural Due Process

*Brewer v. Austin Indep. Sch. Dist.* 779 F.2d 260, 263 (5th Cir. 1985) ...........4, 19, 160

*Brown v. University of Texas Health Ctr.*, 957 S.W.2d 911, 915 (Tex. App. – Tyler

1997, no writ)...................................................................4, 18, 160

*Gene Harmon Ford v. David McDavid Nissan, Inc.*, 997 S.W.2d 298, 312

(1999) ...................................................................................4, 78

*Price v. City of Junction*, 711 F. 2d 582, 590 (5th Cir. 1983)......................4, 18, 77

*University of Texas Med. Sch. v. Than*, 901 S.W.2d 926, 930-31 (Tex. 1995).....18, 71

## Appealable Orders from Probate Courts in Texas

*Crowson v. Wakeham*, 897 S. W. 2d 7779, 783 (Tex. 1995)........................4, 156

*De Ayala v. Mackie*, 193 S.W.3d 575, 579 (Tex. 2006).....................4, 29, 96, 155

*Estate of Wright*, 676 S.W.2d 161-163 (Tex. App. – Corpus Christi 1984, writ ref'd n.r.e.)...............................................................................

*Huston v. F.D.I.C.,* 800 S.W. 2d 845, 848 (Tex. 1990)...........................156

*Logan v. McDaniel,* 21 S.W.3d 683, 688 (Tex. App. Austin 2000 pet. den)..5, 156

**Original Case References In Appellant Brief**

*Davidson v. Great Nat'l Life Ins. Co.*, 708 S.W.2d 476 .........................3, 5, 96

*Goldberg v. Kelly*, 397 US 254, 268, 90 S. Ct 1011, 25 L. Ed. 2d 287 1970

Great Nat'l Life Ins. V. Davidson 708 S. W.2d 476

*Murray v. Morris*, 17 S.W.2d 110, 111 (Tex.Civ.App)-Amarillo 1928, dism'd .............. .

*Pecos & N.T. Ry. Co. v Porter*, 156 S.W. 267, 274-275 (Tex.Civ.App.)......
    - Amarillo 1913, no writ.))

*Texas Employers Insurance Ass'n v. Garza*, 308 S.W.2nd 521, 527 ................
    (Tex.Civ.App. – Amarillo) 1957 writ ref'd n.r.e.

*Texas & N.O.R. Co. v Barham*, 204 S.W.2d 205, 214 (Tex.Civ.App Waco 1947, writ),...............................................................................

**FEDERAL DOCTRINE**

*Substantive Due Process* .....................................................................

**RULES**

**TEXAS RULES OF APPELLATE PROCEDURE**

TEX. R. AP. Rule 38

TEX. R. AP. Rule 9.4(c)...............................................................……

FED. R. C.P. 51 ...........................................................................5, 14, 47

**TEXAS RULES OF CIVIL PROCEDURE**

TEX. R. Civ. P. 7……………………………….…………………5, 14, 47

**TEXAS CODE OF JUDICIAL CONDUCT**

TEX. CJC. Canon (3)(B)(8) … (*persuasive authority*) ………………..6, 36, 64, 66

**U.S. CONSTITUTIONAL AUTHORITY**

*Due Process Clause* – 5th Amendment – United States Constitution…..

*Due Process Clause* – 14th Amendment – United States Constitution…

Sixth Amendment - United States Constitution ………………………

*Confrontation and Cross Examination Clause(s)*

## TABLE OF CONTENTS

I.      Brief Page…………………………………………………….. *i*

II.     Identity of Parties & Counsel…………………………… 2

III.    Index of Authorities…………………………………… 3-6

IV.     Table of Contents……………………………………… 6-7

V.      Appellant's Reply Brief – Reply Brief of Thomas Tipps……… 8

VI.     Argument and Authorities Section 1.0, Para(s) 1.1 – 1.91…….. 9-61

VII.    Appellant's Reply Brief – Reply Brief of Cumberland Trust….. 62

VIII.   Argument and Authorities Section 2.0, Para(s) 2.0 - 2.21 …...…... 63-78

IX.     Appellant's Reply Brief - Reply Brief of Senior Source……….. 79

X.      Argument and Authorities Section 3.0, Para(s) 3.1 – 3.25……… 80-91

Table of Contents continued

XI.    Certificate of Service…………………………………………… 92-93

XII.   Certificate of Compliance…………………………………… 94-103

XIII.  Conclusion……………………………………………………95

XIV.   Prayer………………………………………………………95

XV.    Index of Appendix……………………………………………96

CAUSE NO. 05-14-01495-CV

---

**In the**
**COURT OF APPEALS**
**FIFTH DISTRICT OF TEXAS**
**DALLAS, TEXAS**

---

IN THE MATTER OF THE GUARDIANSHIP OF DORIS L. TIPPS

---

Appealed from Cause No. PR-13-03072-3
In the Probate Court No. 3 of Dallas County, Texas
Honorable Judge Michael E. Miller, Presiding

---

APPELLANT'S COMBINED REPLY BRIEF
FIRSTAPPELLEE REPLY BRIEF – THOMAS TIPPS

---

TO THE HONORABLE JUSTICES OF THE FIFTH COURT OF APPEALS:

Appellant, Steven Tipps, submits this Appellant Reply Brief, in accordance

with Rule 9.4, 9.4(i)(2)(c), and Rule 38 of the Texas Rules of Appellate Procedure

and all local rules of this Court. In support of this Appeal from Final Judgement,

Appellant respectfully asserts the following:

## 1.0 ARGUMENT AND AUTHORITIES IN REPLY

**1.1** Appellant's Appeal relies upon due course of law clause of the Texas Constitution, the due process clause(s) of the Fifth & Fourteenth Amendments to the U. S. Constitution, and the congruency of common law in each system.

What occurred in the Trial Court was the reverse of fairness and equal treatment of parties? In contrast to the constitutional commands of the Sixth Amendment's *confrontation and cross-examination clause(s)* the Trial Court barred Appellant Steven Tipps from cross-examination of Cumberland Trust & Investment Company's key fact witness, Karen Ashworth. From the Trained Court, these words are clear: "I am going to deny your right to cross-examine". (Appellant Br. Appendix. P 27, a – g, excerpt from (RR. 22, L4-17).

**1.2** In Texas Employers, "This court, as have many others, has held that right to cross-examine a witness is a substantial one, and it is error to so restrict it as to prevent the cross-examining party from going fully into all matters connected with the examination in chief". (*Texas Employers Ins Assoc. v. Garza*, 308 S/W.2d 521, 527 (TEX.CIV.APP) Amarillo 1957, writ ref'd n.r.e.) In Pecos, the court went [*479] on to say, "A witness may be cross-examined as to his examination in chief in all its bearings and as to whatever goes to explain or modify what he has stated in his examination in chief, and prejudice will be presumed where this right is

denied." Pecos & N.T. Ry. Co. v. Porter, 156 S.W. 267, 274-275 (Tex. Civ. App.) – Amarillo 1913, no writ)).

**Appellee Thomas Tipps Replies that:**

**"The trial court did not err by exercising control over Appellant's cross-examination of witnesses (Appellee Thomas Tipps Reply Brief at page 25).**

1.3 With cross examination of Karen Ashworth's testimony denied by the Trial Court, how would it be possible to cross examine the second adverse witness with one or two questions as directed by the Trial Court? (RR. 27, 28). Cross examination is a substantial right and unreasonable constraint of this right also constrains the Trial Record that would otherwise benefit Appellant Steven Tipps. Thus, the Trial Record is a product of the process of which we complain on Appeal.

1.4    Appellant was allowed to address one question to the second fact witness, and, as ordered by the Trial Court, the question was directed to Appellee Thomas Tipps. Appellant stated: "How does the court handle a life estate that is attached to 1844 Hood Street? It is not in the trust(s), it is not transferable under Texas law into the trust(s)?" In any other courtroom in this country, by hypothesis, a Trained Court would have asked: are you addressing this question to the witness, or are you addressing the question to this court? The Trial Court then stated: "I'm not going to give you legal advice." Further questions were denied. (Appellant. Br.

Appendix. PP 28-29, No. 7 (excerpt from Rep. Rec.). *In Murray,* "the purpose of cross-examination is to sift and to modify and to have the witness explain what has been said on his direct examination, and if the witness by this process can be discredited and the weight of his testimony weakened, the right should not be denied." (*Murray v. Morris*, 17 S.W.2d 110, 111 (Tex. Civ. App.) –Amarillo 1928, writ dism'd).

**1.5** That question of the second key fact witness, Appellant Thomas Tipps was the only question allowed by the Trial Court's *undue constraint* of cross-examination?

It was a significant question under those circumstances.

**1.6** The question was central to the controversy over Hood Street where on February 3, 2014, Appellee Thomas Tipps sued Appellant Steven Tipps for forcible detainer. Appellee Cumberland (Karen Ashworth) and Appellee Thomas Tipps were engaged together in a *squeeze play* against Appellant in January and February 2014. (C.R. 217).The litigation brought by Appellee Thomas Tipps together with Cumberland's interference had a pernicious timing. The interference against Appellant Steven Tipps extended, in its effects, to interference with a substantial care giving process for Appellant Doris L. Tipps, in the general time frame of a life threatening emergency that required the substantial attention of Appellant Steven Tipps (Appellant Brief, page 11). (C.R. 217) (Appt. Br. –

Page **11** of **103**

Appendix Item 15 & 16). On February 3, 2014, Appellee Thomas Tipps', role under the Rule 11 Agreement that stipulated his resignation as co-trustee, changed from ministerial duties of paying bills and receiving receipts for the Trust, to the formation of a joint effort with Appellee Cumberland in litigation and harassment of Appellant Steven Tipps. Cumberland was Trustee "in Waiting" during the interval of Thursday January 23, 2014, the date of the Mediation Settlement Agreement, to Monday February 17, 2014, the date of the Trial Court Order that adopted the Mediation Settlement Agreement and installed Cumberland as Trustee of the Tipps Family Trust(s).

1.7 Impeachment through cross-examination of Appellee Cumberland's Karen Ashworth and Appellee Thomas Tipps's testimony would have developed the extent of the respective roles of each individual in the attempted circumvention of the legal life estate (*life tenancy*) attached to Hood Street.   The impingement by the Trial Court, of Appellant's right to cross-examination of adverse witnesses is inconsistent with the procedural due process commands as expressed in *Goldberg v. Kelly* and in *University of Texas Med. Sch. v. Than*? (Federal and State of Texas procedural due process).

**Appellee Thomas Tipps Replies that:**

a. **Appellant did not preserve error with respect to Issues 1 and 2 Appellee Reply Brief Issue 1 and 2, page 25.**

Page **12** of **103**

**1.8** The Sixth Amendment and its confrontation and cross examination clause(s) are mandatory authority in U. S. courts. Through the 14th Amendment, the Fifth and Sixth Amendments of the U. S. Constitution apply to the States. (*Cran v. Hale*, 745 S.W.2d 129 (1988) (Ark. Sup. Ct.) (563). It is a rare circumstance where these rights are quashed by a trial court in the United States. On the face of the Record, the Trained Court excluded Appellant from procedural due process by blocking cross-examination of the first key fact witness and by unduly constraining the cross-examination of the second fact witness to one question. Cross examination of these two witnesses goes straight to the issue of the interaction between the two key fact witnesses. Appellant's answer to citation under the Cumberland Motion was the basis on which cross-examination would have moved forward, but it was impeded when cross-examination was declined. (C.R. 217) (Appt. Br., V – VII, pp 16 – 18). (Appt. Reply Br. I). Due process involves the right to be heard. The Trained Court declined that *substantial right*, including the procedure of cross-examination when it refused to allow cross examination of the first witness. (RR 22). The Trained Court then dismissed the witness. It was ended. That decision terminated discussion between Appellant and the Trained Court on that issue. Each of the two attempts to cross-examine adverse witnesses were either declined or unduly constrained and immediately concluded by the Trained Court. (RR 22, 28). The Trial Court was closed that day to additional presentation of issues

Page **13** of **103**

including the Reimbursement Issue, the Fourth Issue in Appellant's Brief, and preservation. **"If a party does not have an opportunity to object to a ruling or order, the absence of an objection does not later prejudice that party [on appeal]. (*Fed. R. C. P. 51*).** A trial court has no discretion in determining what the law is or in applying the law to the facts. (*Cayton v. Moore*, 224 S.W.3d 440 (Tex. App. – Dallas 2007), no pet. An abuse of discretion occurs if the trial court clearly failed to analyze and determine the law correctly or applied the law incorrectly to the facts. *Id.* A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex.2003).

**In Reply, Appellee Thomas Tipps states:**

**" (b) The trial court properly controlled its docket with respect to Appellant's cross-examination of witnesses." (Appellee Thomas Tipps's Reply Brief at Page 27).**

**1.9** In *Goldberg v. Kelly* (from the majority opinion), as cited *in Davidson v. Great Nat'l Life Ins. Co.,* "The fundamental requisite of due process of law is the opportunity to be heard." (*Grannis v. Ordean*, 234 U. S. 385, 394 (1914). "The hearing must be at a meaningful time and in a meaningful manner". (*Armstrong v. Manzo*). "The opportunity to be heard must be tailored to the [*269] capacities and circumstances of those who are to be heard."

**1.10** "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses."(E. g., ICC v. Louisville & N.R. Co.). (Willner v. Committee on Character & Fitness). "Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed.

**1.11** While this is important in documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. They have ancient roots. They find expression in the Sixth Amendment. This Court has been zealous to protect these rights from erosion. It is spoken out not only in criminal cases … but also in all types of cases where administrative…actions were under scrutiny." (Greene v. McElroy). In Goldberg, we have a federal constitutional mandate for procedural due process: a mandate increasingly shared in parallel with common law in the State of Texas.

**1.12** Given unfettered access, the cross examination of each of the key fact witnesses would have expanded the Trial Record for the benefit of Appellant. In

Issue One and Issue Two of Appellant's Brief, the Trial Record shows that the Trial Court engaged in *manifest abuse of discretion*? The Trial Court had no discretion in voiding, in effect, Tex. R. CP. 7: a codified Texas Statute that clearly establishes the scope of rights of parties with standing and their access to procedural due process that was denied to Appellant by the Trial Court? A trial court has broad discretion and we may not disturb its ruling absent manifest abuse of discretion. (Champion Int'l Corp. v. Twelfth Court of Appeals, 762 S.W. 2d 898,899 (Tex. 1988; TEX.R. P. 320). While Trial Courts, in general, have substantial powers to hear and decide cases, they lack authority to deny the rights delineated above in Goldberg. (*Goldberg v. Kelly*, 397 US 254, 268, 90 S. Ct 1011, 25 L. Ed. 2d 287 1970). (*Davidson v. Great National Life Ins. Co.*, S.W.2d 312 (TEX. SP. CT.) (1987), the rights delineated in the Sixth Amendment confrontation and cross-examination clause(s), the rights established in the fifth and fourteenth amendment due process clauses, and *substantive due process*. From the Trial Record, these words are clear: *"I am going to deny your right to cross examine": a plain, manifest, clear, and gross abuse of discretion?* What is clear is that Appellant's legal standing is broader than the issues of cost reimbursement alone, and included the right to sue Cumberland for its wrongful interference with Appellant Steven Tipps during his Guardianship in early 2014, the attempt by Cumberland to void a legal right connected with Hood Street, and

support of joint action with Appellee Thomas Tipps for the eviction of Appellant from his residency at that address: all of which occurred prior to Appellee Cumberland's final installation as Trustee on February 17, 2014. (C.R. at 217).

## Due process clause(s) of the U. S. Constitution are congruent with the Constitution of the State of Texas Due Course of Law clause.

**1.13** "At a minimum, due process requires a person who may be deprived of a liberty or property interest to be provided notice and an opportunity to be heard at a meaningful time and a meaningful manner". (*Anthony v. State*, 2009 S.W.3d 296).

**1.14** The "due course" clause in our state constitution requires the same level of "due process" as the federal constitution. (City of Fort Worth v. Park, 2011, Tex. APP LEXIS 5725 (2011 (14). While the Texas Constitution is textually different in that it refers to "due course" rather than "due process", we regard these terms as without meaningful distinction. (Fleming v. State, 376 S.W.3d 854 (2012) (35).

**1.15** Due process at a minimum requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner." (*Tex. Comm. On Env. Quality v. Denbury Onshore, LLC,* Texas. App. LEWXIS 7177 (41). In analyzing a claim of deprivation of procedural due process, we apply a two-part test: we must determine (1) whether the plaintiff had a liberty or property interest entitled to procedural due process; and (2) if so, what process is due. (*Dallas County v. Gonzales*, (2006 (17). The Due Process Clause does not mandate the parties be

heard at the arbitration hearing; rather, the Due Process Clause requires that the parties be given a meaningful opportunity to be heard at the arbitration hearing. (*Ewing v. Act Catastrophe – Texas LC*, 375 S.W.2d 545 (2012) (16). [A]lthough [the] Texas Constitution refers to "due course" rather than the U. S. Constitution's "due process", the phrases are not meaningfully distinct and federal *due process* are persuasive authority when interpreting Texas's "due course" guarantee. (*Brantley v. Texas Youth Commission*, 2011, 365 S.W.3d 89 (2011) (17).

**1.16** The Supreme Court of Texas has stated that the language of the Due Course of Law Clause of the Texas Constitution and the Due Process Clause of the United States Constitution is "nearly identical" and that there is no meaningful distinction between due course and due process. (*Richard v. Dretke*) Tex. App. LEXIS 2261 (2009).

**Federal Procedural Due Process congruent with State of Texas Procedural**

**Due Process:**

**1.17** In the area of procedural due process, the protections afforded under the Texas Constitution are congruent with those provided by the federal Constitution. (*Price v. City of Junction*, 711 F.2d 582, 590 (5th Cir. 1983); cf. *University of Texas Med. Sch. v. Than*, 901 S.W.2d 926, 930-31 (Tex. 1995). Generally, procedural due process requires notice of an opportunity to be heard. (*Brown v. University of Texas Health Ctr.*) 957 S.W.2d 298, 312 (Tex. App-Austin 1999, writ

denied). "Procedural due process involves basic notions of justice and fair play" (*Gene Hamon Ford v. David McDavid Nissan*) 997 S.W.2d 298, 312 (Tex. App.-Austin 1999, writ denied). The sufficiency of procedures must be judged in light of the parties, the subject matter and the circumstances involved. Id. (quoting *Brewer v. Austin Indep. Sch. Dist.*, 779 F.2d 260, 263 (5th Cir. 1985).

**1.18** It is now evident to Appellant that each of Appellant's answers to the citations from Cumberland and Senior Source raised questions that seriously opposed the Trial Court's agenda at the hearing. This could not have been known by Appellant prior to the Hearing. (Appt. Reply Br.—Cumberland--, Para 2.5 – 2.6, pp 65-66). (C. R. s 7). (C. R. 217). (Appt. Reply Br. Appendix III).

**1.19** A review of the Record suggests that the Trained Court may have considered eventual positions the case before the Hearing: (Appt. Reply Bf. –Cumberland--, Para 2.5-2.6, pp 65-67.). In addition, the Tipps Family Trust(s) estate plan was incorporated into the trial court Order on February 17, 2014, together and contrasting with the Mediation Settlement Agreement with its independent oversight and accountability. On October 21, 2014, the Cumberland Motion included approval of Appellee Cumberland's unconditional resignation, consideration of the resignation of Appellee Thomas Tipps as co-trustee, and recognition of Appellee Thomas Tipps' self-appointment to the position of Trustee of the Tipps Family Trusts. The replacement of a Trustee was, nominally, effected

by the transition language in the Tipps Family Trust documentation that stated that a Trustee could appoint a replacement trustee for the Tipps Living Trust(s). The Trial Court agreed to accept this arrangement even though these Tipps Family Trust procedures for replacement of Trustees had been *overlaid and superseded* by the covenants in the *uncontested* Mediation Settlement Agreement that required that a corporate trustee must be replaced with another corporate trustee. Cross-examination of the Appellee Cumberland's fact witness Karen Ashworth and of Appellee Thomas Tipps was clearly unwelcome in the Trial Court on that date, at that time, and in that place. There were two courses of action that were before the Trial Court on October 21, 2014: (1) to enforce the *uncontested* Rule 11 Agreement and the *uncontested* Mediation Settlement Agreement with its independent oversight and control or (2) to bypass the ministerial act of enforcing the two contracts and allow Appellee Thomas Tipps to replace Appellee Cumberland as corporate trustee of the Tipps Family Trust(s), by self-appointment. (RR. 26).

**1.20** At the Hearing that occurred on October 21, 2014, there were three closely linked, overlapping, interlocutory phases: each phase involving a discrete issue under the authority of the Trained Court. Given the claim of *Manifest Abuse of Discretion*, there is a question about where abuse of discretion began and where it ended? Did it occur only in the Cumberland Motion, or was it continuous

throughout the Hearing?  Was there cumulative error?  (Appt. Reply Br.—

Cumberland--, Para 2.5-2.6, pp 65-66).

**1.21**  In Phase I, Appellee Thomas Tipps introduced at the hearing, a motion to

show authority that resulted in the isolation of Appellant Doris L. Tipps from her

legal counsel and the striking of Appellant Doris L. Tipps objections in W. Thomas

Finley's pleadings in opposition.  (C.R. s 15).  (C.R. s 42). (Appt. Reply Br.

Appendix, III).  From January 23, 2014 through October 21, 2014, Mr. Finley's

most important and regular role was to urge of Senior Source, as Guardian to

engage Prestonwood Nursing, as agent of the Guardian, to meet their federal and

State mandates of (a) the requirement to provide a safe environment for Appellant

Doris L. Tipps and (b) generally, the obligation to provide prudent care and (c) to

provide timely and decisive responses to Appellant Doris L. Tipps continuing

emergencies while a  resident at Prestonwood.  As a result of the granted Motion to

Show Authority, Appellant was alone in the courtroom against five opposing

lawyers, and they were together against Appellant. (Appt. Br. Appendix - Crises &

Survival, Index Item 10).

1.22   Phase II was initiated by a Appellee Thomas Tipps in which Appellee

requested Appellee Senior Source to file a Petition against Appellant Steven Tipps

for removal of the medical power of attorney from Appellant Steven Tipps, thus

separating Appellant Doris L. Tipps from a known and trusted source of medical

decisions and protection(s) for her life. A by-product of the Phase II termination of Appellant Steven Tipps medical power of attorney, was to legally end Appellant's involvement in Doris L. Tipps health emergencies that were year after year, in favor of her survival. In several of these emergencies her survival was uncertain. In the last series of emergencies in late 2013 and early 2014, on one occasion, it was nearly fatal. (Appt. Br. Appendix – Crises and Survival Index Item 10).

**1.23** <u>In Phase III</u> Appellant Thomas Tipps moved with Cumberland to initiate litigation alleging that Appellant Steven Tipps was responsible for the resignation of Cumberland, that Cumberland. Cumberland--with its right to resign without the Trial Court's permission--chose to seek official court approval of its resignation together with its recommendation that Appellee Thomas Tipps be approved by the Trial Court as the replacement Trustee of the Tipps Family Trust(s). [The latest Tipps Family Trust documents have language that organize a transition for resignation and replacement of Trustees.] In the need that developed with Cumberland's resignation, the party that was more likely than not to benefit from organizing the struggle between Cumberland and Appellant Steven Tipps was likely the party that started the conflict in the first place, considering the outcome of the Trial Court Hearing on October 21, 2014 that removed Cumberland and elevated Appellee Thomas Tipps to the position then held by Cumberland, as

Trustee of the Tipps Family Trust(s)? (C.R. at 217). (C.R. s 15). (C.R. s 42). (Appt. Reply Br. Appendix III).

**1.24** In the October 21, 2014 hearing, the Trial Court decided to disregard the *uncontested* Mediation Settlement Agreement and the *uncontested* Rule 11 Agreement, and to accept Appellee Thomas Tipps's appointment of himself to the position of Trustee of the Tipps Family Trusts, arguing that Trust documentation permitted the appointment of a replacement trustee, including himself. In choosing not to enforce the Mediation Settlement Agreement and the Rule 11 Agreement, the Trial Court failed to consider legal costs and consideration exchanged in finalizing the Mediation Settlement Agreement and the Rule 11 Agreement. Both contracts are enforceable and should be enforced. (C.R. s 15). (Appt. Br. Appendix, III).

**1.25** One of the main elements of the MEDIATION SETTLEMENT AGREEMENT was the release of liability of Appellee Thomas Tipps with respect to any actions taken while serving Co-Trustee. As the only adverse party that was a signatory to the MEDIATION SETTLEMENT AGREEMENT, Appellant's release from liability of Appellee Thomas Tipps was a significant concession, given in the belief that the MEDIATION SETTLEMENT AGREEMENT and the Rule 11 Agreement were in the interest of the Appellant Doris L. Tipps and her family.

**1.26** When the Trial Court elected not to enforce the MEDIATION SETTLEMENT AGREEMENT and the Rule 11 Agreement, Appellee Thomas Tipps retained, and retains, the protections received in the mutual release, while Appellant Steven Tipps released his rights to pursue remedies for specific misdeeds of Appellee during his tenure as Co-Trustee. Further, there were basic protections afforded by the MEDIATION SETTLEMENT AGREEMENT and the Rule 11 agreements: (1) principally, the oversight of the Tipps Family Trusts through an independent corporate trustee, a significant loss of protections for Appellant Doris L. Tipps and (2) given the initial expectations, the benefits of an independent and unbiased guardian. All of the bargained-for potential, with its substantial cost, was lost, when Trial Court decided to affirm the self-appointment of the former Co-Trustee to the position as Trustee of the Tipps Family Trusts.

**1.27** In summary, the Trained Court, having accepted the need for the removal of Appellee Thomas Tipps as co-trustee of the Tipps Living Trust, changed its mind and assisted in Appellee's promotion to the position of Trustee. It was unusual for (1) the first enforceable contract, arising under a trial court agreement to pursue mediation and (2) the Rule 11 Agreement to be so easily set aside by the court that was in supervisory control over the process and the mediation that produced the Mediation Settlement Agreement. All parties were present. Consideration was exchanged. Everyone agreed, and the Trained Court incorporated the

MEDIATION SETTLEMENT AGREEMENT into its Order on Monday, February 17, 2014.

**1.28** The MEDIATION SETTLEMENT AGREEMENT provided a specific procedure to deal with the resignation of a corporate trustee. This procedure required the parties to re-assemble for a special Mediation Conference in order to elect a new corporate trustee. (C.R. s 15). (Appt. Reply Br. Appendix, III)

**1.29** The reinstatement of Appellee Thomas Tipps as Trustee resulted in a new framework that was supported by the allegation of Cumberland that Appellant Steven Tipps "interfered" with Cumberland and caused Cumberland's resignation. The actual details of this interference were never challenged during the Trial Court Hearing, other than in Appellant's answers to the Cumberland Citation in the Trial Court (C.R. at 217). The procedural due process for this kind of confrontation is cross-examination, but this was barred by the Trial Court. There was no contract between Appellant and Cumberland. Why did Cumberland fail to allege **breach of contract** before the Trial Court, rather than the alleged *interference* with Appellee Cumberland? There was an email exchange between Appellant and Cumberland's Karen Ashworth. It is included in Appellant's Brief Appendix (Item 16). This document shows that Appellant Steven Tipps agreed to move out of Hood Street or lease the property, under pressure from Cumberland and the February 3, 2014 forcible detainer litigation filed by Appellee Thomas Tipps. (Appellant Brief –

Appendix, Exhibit 15 & 16). Appellant was obliged to agree with the email representations under duress: five (5) days to get out in the midst of a severe winter that conjures up in the mind a brutal event that is in clearly punitive and that would interrupt the care giving process for Doris L. Tipps. Under the email "understanding", all of the substantial array of standard terms and conditions of a lease contract were missing. In the State of Texas, the *Statute of Frauds* requires that all real estate contracts be reduced to writing. Contractual terms include the lease term, a fixed deposit amount, and monthly rent provisions, maintenance provisions, and notices of all kinds, were never discussed between any of the parties, nor incorporated into any written documentation. Appellant realized that Appellee Thomas Tipps, the Co-Trustee *in departure*, misrepresented Appellee's legal authority to bring suit, Appellee Thomas Tipps misrepresented the *statutory basis* of the legal life estate in the name of Appellant Doris L. Tipps, and the Trust's purported equitable ownership of Hood Street. **(App Brief Appendix, Exhibit 15).** Appellant decided to resist Appellees Thomas Tipps and Cumberland in their *commercial fraud?* [Each of Exhibits 15 and 16 are before the Fifth Court under Cumberland's Motion to Strike together with APPELLANT STEVEN TIPPS' OBJECTION TO APPELLEE CUMBERLAND TRUST AND INVESTMENT COMPANY'S MOTION TO STRIKE DOCUMENTS IN APPELLANT'S APPENDIX].

**1.30** Appellee Cumberland's allegation of interference by Appellant, established the main argument before the Trial Court. The January 23, 2014 Mediation Settlement Agreement and the September 13, 2013 Rule 11 Agreement were disregarded. The self-appointment of Appellee Thomas Tipps as Trustee was acknowledged by the Trial Court. In Appellant Brief Appendix, Exhibits 15-16 show that Appellee Cumberland and Appellee Thomas Tipps coordinated and their activities against Appellant. The lease of the Hood Street property was more important as a remainder-men and corporate trustee objective—though tortious-- than the care giving activities of Appellant in his Guardianship of Doris L. Tipps when she was gravely ill in the fall of 2013 and the winter of 2014.

**1.31** Cumberland could have resigned at any time after giving statutory notice. Instead, Cumberland sought relief from the Trial Court, in avoidance of accounting to the main beneficiary Doris L. Tipps. Cumberland also achieved in the outcome, some degree of protection that the Tipps Family Trust(s) would not file suit against Appellee Cumberland with the self-appointed Appellee Thomas Tipps established as Trustee of the Tipps Family Trusts.

**1.32** If the Trial Court had observed the right of Appellant to cross-examine each of Karen Ashworth and Appellee Thomas Tipps, the Trial Record would have been expanded for the benefit of Appellant. In Issue One and Issue Two of Appellant's Brief, the Trial Record shows that the Trial Court engaged in *manifest abuse of*

*discretion*? The Trial Court had no discretion in failing to follow Tex. R. CP. 7: a codified Texas Statute that clearly establishes the rights of parties and their access to procedural due process that was denied to Appellant by the Trial Court? While trial courts in general, have substantial powers to hear and decide cases, they lack authority to deny the rights delineated above in (*Goldberg v. Kelly)* and in Appellant's Brief: (*Davidson v. Great Nat'l Life Ins. Co.)*. These rights are procedural due process, including the rights delineated in the Sixth Amendment confrontation and cross-examination clauses, the rights established in the fifth and fourteenth amendment due process clause(s), the right to substantive due process, the protections of *due course of law Clause* in the Texas Constitution, and common law cases.

**1.33** In ignoring these basic rights, the Trial Court abandoned its constitutional mandates: both State and federal, concerning Appellant and his *procedural due process rights*. At the moment of the signed orders, the Trial Court abandoned its sworn duties in the protection of its Ward, Doris L. Tipps and left her secured retirement in a state of uncertainty.

### APPELLANT'S REPLY TO APPELLEE THOMAS TIPPS STATEMENT REGARDING JURISDICTION
### (Appellee Reply Bf. Para 2.1, p9 – Para 2.4 p10)

**1.34** Two important authorities for jurisdictional issues in appeals from probate courts in Texas govern a technically complex and unsettled area of jurisdictional and appellate law.

These authorities are:

(a) The legislative Act of March 30, 1917, 35th Leg., R.S., ch. 168, § 1, 1917 Tex. Gen. Laws 379, 379, now codified as TEX. CIV. PRAC. & REM. CODE § 51.014(a)(2). and

(b) De Ayala v. Mackie, 193 S.W.3d 575 (Sup. Ct. Tex.) (2006)

Under 51.014(a)(2) ("Appeal from Interlocutory Order") of the Texas Civil Practice and Remedies Code provides, in relevant part, as follows: "(a) A person may appeal from an interlocutory order of ...probate court...that (1) appoints a receiver or trustee...."

**Appellee Thomas Tipps Replies that:**

**1.35   Starting with 2.1 through 2.3, pages 9 – 11.  In 2.1,** Appellee states in Reply: "Because the trial court has not entered a final judgment in this case, this court lacks jurisdiction to address Appellant's challenge to the trial court's Order Granting Motion to Accept Resignation, Discharge Trustee, and Reinstate Trustee and its Order to Revoke Authority of Agent".  We disagree.

**1.36**   The Texas Supreme Court states:  "The Legislature enacted the statute, [(a) above] permitting interlocutory appeal of orders overruling motions to vacate orders appointing receivers or trustees in 1917, and the provision remains substantially unchanged today. At no time during the statute's almost ninety-year history have we held that it applies to a motion to remove an estate's executor."

**1.37**   "It did not equate an executor to a trustee for all purposes, and there is no evidence that the Legislature intended to permit immediate appeals of orders refusing to remove estate executors."

Since Doris L. Tipps is still alive and doing very well, there is no executor for the estate, and since there is a will, there is no administrator.

**1.38**   In Ayala v. Mackie, the Supreme Court of Texas distinguishes between an Executor and a Trustee, and since Appellee Thomas Tipps is not an executor, or administrator, but is a trustee, in that context, the statute [51.014(a)(2)] supports an appeal of an Order appointing Appellee Thomas Tipps as Trustee of the Tipps Family Trust(s).

**1.39** Further in Ayala v. Mackie, the Supreme Court of Texas has stated: "If there is an express statute, such as the one for the complete heirship judgment, declaring the phase of the probate proceedings to be final and appealable, that statute controls. Otherwise, if there is a proceeding of which the order in question may logically be considered a part, but one or more pleadings also part of that proceeding raise issues or parties not disposed of, then the probate order is interlocutory." Therefore 51.014(a)(2) applies and permits interlocutory orders to be appealed.

**1.40** For these reasons, this Court has appellate jurisdiction over this appeal.

**Appellee Thomas Tipps Replies that:**

**Starting with 2.4, pages 9 – 10**

**1.41** In regard to First Nat'l Bank v. First State Bank, 456 S.W.2d 173 (Tex Civ. App.—Texarkana 1970, writ dism'd), Ayala v. Mackie is mandatory authority as it describes the history of, and furnished guidance for, the rules of interlocutory appeals from orders in probate courts in a difficult area of law. First Nat'l v. First State is secondary authority. It is a case that purports to support the contentions of Appellee, but fails on point as (1) it has nothing to do with estates or the estates code in Texas, (2) in the context of the subject appeal, a trustee is replacing a trustee, as opposed to a permanent receiver being replaced by a permanent receiver in a commercial banking case, (3) in the subject Appeal, a trustee is appointing himself as replacement trustee that could have resigned without becoming a party to a court Order in which the successor trustee is re-appointed Trustee, and (4) a receiver fails on point in the subject appeal, because there is no danger to trust assets from creditors, third parties, or any other known source.

Page **30** of **103**

**1.42**  In regard to American Nat'l Ins. Co. v. Valley Reservoir & Canal Co., 209 S.W. 438, 440 (Tex. Civ. App. 1919, writ ref'd), Ayala v. Mackie is mandatory authority?  In the context of this Appeal, American Nat'l is secondary authority. The case presented fails on point as (1) it is a commercial case that purports to support the contentions of Appellee, (2) it is unrelated to estates and the Texas Estates Code, and (2) a receiver is not on point as Appellant Doris L. Tipps is not a lost person and there is no danger to trust assets from creditors, from third parties, or from any known source.

**1.42(a) Appellee in Reply, From (Appellee Reply Br. Para 2.5, p 10)** Appellee Thomas Tipps alleges a flaw in Appellant's answer to Citation of the Senior Source Petition.  (C.R. 217). The Prayer section of pleadings is a special section where a litigant states what relief is sought.  Within the Prayer section, Appellant listed that relief:  It included:  (a) the retention of the Medical Power of Attorney for Doris L. Tipps by Steven Tipps, for serious reasons as cited, (b) an Order by the Trial Court to amend the "Do Not Resuscitate" order, (c) a new bed, (d) new furniture for Doris L. Tipps' room at Prestonwood Nursing, and (e) reimbursement of expenses accrued in late 2013 and early 2014 for substantial care giving activities, (e) approval of passes that would allow Appellant Doris L. Tipps to take local drives occasionally accompanied by family members, (f) expense reimbursement on an ongoing basis, and (g) additional expense reimbursement for

the Fall of 2013 and Winter of 2014. Appellee alleges that the expense reimbursement question in para(s) (f) and (g) are unique as compared to the other five requests a - e. that were not addressed by the Trial Court. All of the requests in the Prayer Section, were ignored by the Trial Court. Appellee alleges that the request for monies caused the Final Order to be Interlocutory, therefore denying appellate jurisdiction to the Fifth Court of Appeals and undermining one part of Appellant's burden. Appellant disagrees. (*Please See* Appellee Reply Br., p 10, Para 2.5).

**Appellee Thomas Tipps Replies:**

**Starting with 2.5, page 10 of Appellee Reply Br.** Further to jurisdiction. "Appellant filed an answer to Senior Source's motion in which he plead for reimbursement of ongoing expenses" related to his "substantial visits" to Prestonwood Nursing Home and the repair of Doris Tipps' Lincoln Continental." **Appellant Replies.** The reimbursement request related to 500 hours of care giving and 1,600 miles driven for Doris L. Tipps, between and including October 29, 2014 through April 24, 2014. Six months. Constant care giving. It was a brutal winter. According to the U.S. Centers for Disease Control, "Morbidity and Mortality Weekly", it was the most deadly season for respiratory illness in the United States in decades. Two hospitals. Three rehabilitation organizations. A long

and difficult recovery. (*Please See*, Appt. Br. Appendix. P24, Crises & Survival, Item 10).

**1.43** Further, Appellant Steven Tipps replies: The Trial Court Orders are final as to each of the following: Cumberland's *Motion to Accept Resignation, Discharge Trustee, and Reinstate Trustee* and the Senior *Source Petition to Revoke Authority of Agent* in accordance with the decision in Ayala v. Mackie and Tex. Civ. Prac. and Remedies Code 51.014(a)(2). With respect to the Order removing the Medical Power of Attorney, that order is Final and appealable, and this court has jurisdiction? In both cases, whether final or interlocutory, an order may be interlocutory but remains appealable under 51.014(a)(2).?

**Appellee Thomas Tipps Replies:**
**Starting with 2.6, page 10 – 11 of Appellee. Reply Br. "When the trial court entered its Orders granting Cumberland's and Senior Source's motions, it neither granted nor denied Appellant's claims for reimbursement.**

1.44 Appellant Steven Tipps's replies: Appellant filed his answers to the Cumberland Citation and the Senior Source Citation on Monday September 15, 2014. The request for expense reimbursement was included in the Prayer section of Appellant's answer to the Senior Source citation. This filing with the clerk arrived at the Trial Court thirty-six days before the Trial Court hearing on October

21, 2014. The Trial Court had notice. Counselors for the opposition were served. The issue of reimbursement was in the Trial Record. It was before the trial court, but could not be addressed under the constraints imposed over cross-examination and restrictions over general participation. Further, the Court could have acted on its own Motion to deal with the requests in the Prayer Section of Appellant's Answer to Citation of the Senior Source Petition. The Court was silent in response to each of the seven (7) Prayer requests in the answer to the Senior Source Citation and in the Prayer request set forth in Appellant's answer to the Cumberland Citation filed with the Trial Court. Appellant was an excluded party?

**1.45** In *Ayala v. Mackie,* the Supreme Court stated: "If there is an express statute, such as the one for the complete heirship judgment, declaring the phase of the probate proceedings to be final and appealable, that statute controls. Otherwise, if there is a proceeding of which the order in question may logically be considered a part, but one or more pleadings also part of that proceeding raise issues or parties not disposed of, then the probate order is interlocutory."

**Appellee Thomas Tipps Replies:**

Starting with 3.1, page 11, (Appellee Reply Br.) Appellee Thomas Tipps believes that (i) this Court does not have jurisdiction over this appeal; (ii) Appellant did not preserve error with respect to his 1st, 2nd and 4th issues; and (iii) the record is clear enough for the Court to resolve this appeal….without oral argument.

**Appellant disagrees:**

In order to open procedural due process, Appellant must show the Appellate Court that he has real standing. Removal of the expense reimbursement as an Issue in Appellant's Brief is an attack upon the legal standing of Appellant to bring this appeal and of ultimate recovery.

The Trial Court engaged in manifest abuse of discretion when it denied Appellant cross examination of witnesses and closed the Hearing to further participation of Appellant, including preservation of error, and raising the issue of the expense reimbursement and all other Prayer requests at the Hearing. There was insufficient time allotted during the hearing to cover every issue of every party and this was the responsibility of the trial court in controlling his Docket: enough time to consider all parties and all process. (Appt. Reply Br. Para 1.8, pp.12-13). (Appt. Reply Br. Para 2.5-2.6, pp 61-62.).

In *Goldberg v. Kelly*, "The hearing must be at a meaningful time and in a meaningful manner". (*Armstrong v. Manzo*). "The opportunity to be heard must be tailored to the [*269] capacities and circumstances of those who are to be heard." "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses."(E. g., ICC v. Louisville & N.R. Co.). (Willner v. Committee on Character & Fitness).

The test for abuse of discretion is whether the trial court acted without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.* 701 S.W.2d 238, 241-42 (Tex. 1985).

When we determine whether the trial court abused its discretion, we may not substitute our judgment for that of the trial court unless its decision was so arbitrary that it exceeded the bounds of reasonableness. *Clarendon Nat'l Ins. Co. v. Thompson*, 199 S.W.3d 482, 494 (Tex. App. – Houston [1st Dist. 2006, no pet].

**1.46** Appellant objects to Appellee's Statement on Oral Argument. Appellant's

argument is based in constitutional protections and the Trial Court's *manifest*

*abuse of discretion* that led to a *manifest injustice*. Certain aspects of the Trial

Court Hearing were breaches of the Texas Code of Judicial Conduct, Canon (3)(B)(8), and each of federal and State constitutional protections.

**Appellee Thomas Tipps Replies:**

**Starting with 4.1, page 11 Appellee Reply Br.**

**1.47** Appellee expresses his dissatisfaction with Appellant's Statement of Issues.

**Appellant objects.** The editing of Appellant's Statement of Issues serves to drive up the cost of litigation and confuses the issues.

**Appellee Thomas Tipps Replies:**

Para 5.1, p 12, Appellee Reply Br.). Appellee offers a summary of the Structure of the Tipps Living Trust(s). **Appellant** replies that the main notion to be considered in comparing the Tipps Living Trust documents, the Mediation Settlement Agreement, and the Rule 11 Agreement is the fact that the Mediation Settlement Agreement was an overlay of the Tipps Living Trust. **There were two significant differences between them.** First, within the *unopposed* mediated settlement agreement, the provisions for transitions between trustees supersede the language and powers controlling the replacement of trustees. Further, the *unopposed* Mediated Settlement Agreement required that a Corporate Trustee that resigns, must be replaced with another Corporate Trustee. This was contractual, and all parties agreed under the supervision of the Trial Court. Second, if the Mediated

Settlement Agreement had been enforced by the Trial Court, the replacement corporate trustee would stand alone as the controlling means for managing the assets of the Trusts and with it, independent oversight and accountability. All parties and beneficiaries would be passive. This was the independent oversight that was agreed upon by all parties. The mediation settlement agreement did not change any other significant provision of the Tipps Living Trust. (Appt. Reply Br., Appendix, Doris Tipps Opposition, III).

**Appellee Thomas Tipps Replies:**

**Para 5.2 p 12, Appellee Reply Br. *Id.***

**Appellee Thomas Tipps Replies:**

**Starting with 5.3, page 13 & 8.1, page 31**

**1.48** Appellant Steven Tipps objects to the statement in 5.3 that "Appellant Doris L. Tipps suffered from total incapacity." In August 2012, Appellee Thomas Tipps sought a referral from Dr. David Isaradisaikul, M.D., in order to have Appellant Doris L. Tipps tested by a psychiatrist for dementia. The test report from the Holiner Psychiatric reflecting the examination of Doris L. Tipps was positive (or good). Dr. David Isaradisaikul, M.D. indicated constant improvement, as a result. In both instances these scientists concluded that Appellant has mild cognitive disability (variations in short term memory. On October 29, 2013, within the month that Dr. J. Douglas Crowder declared Appellant Doris L. Tipps totally

disabled, she made the highest score on a test administered by Dr. Isaradisaikul while under his direct care.

Appellant asks: on what science was Appellant Thomas Tipps basing his allegation to the Trial Court that Appellant Doris L. Tipps was totally disabled? The only information that Appellee Thomas Tipps had for alleging a determination of total disability was in support of the opposite conclusion. Based on two independent scientific evaluations, though one year earlier, concluded that Appellant Doris L. Tipps had mild cognitive disability on September 4, 2014, the date that Appellee Thomas Tipps alleged to the Trial Court that Doris Lee Tipps was totally disabled. (Appt. Br. "Statement of Facts" p 12.). (Appt. Reply Br. Para 1.86, Dr. Crowder and Dr. Saine, pp.57-59).

**1.49** <u>**Medical Power of Attorney & Guardianship.**</u> Appellant Steven Tipps held the medical power of attorney for Doris L. Tipps at different intervals over many years. In the summer of 2012, Appellant transferred the medical power of attorney to Appellee Thomas Tipps. This decision was, in part, due to an event in which Appellee Doris L. Tipps became lost on the highways in north Texas. Appellant assisted the Carrollton police and an Amber Alert was issued. Doris was located by Denton, Texas Police Department and returned home after 2:00A.M. by Appellant. This event occurred in the general time frame of June 5, 2012. Since Appellant lives in Carrollton, Texas, with or without the medical power of attorney

or the guardianship of the person or estate of Doris Lee Tipps, Appellant has fulfilled the roles related to the official papers described in this Reply Brief, in an advisory capacity since 2005.

**Trust and Estate Advisory Role – 2008 Financial Crises.** By example, in the third weekend of February 2008, when Behr Stearns & Company disappeared, Appellant agreed to advise Doris on preparations to deal with the Trust(s) exposure to the financial crises. This was an unpaid activity. In the capacity of a person trained in finance, Appellant advised his mother for three months. In mid-May 2008, Appellant Doris L. Tipps made the decision to liquidate the portfolio assets, including the tax free municipal bonds held by the Tipps Family Trust(s). These monies totaled approximately $800,000 and were placed directly into Trust controlled certificates of deposit with matching F.D.I.C. insurance. At the time of the liquidation, the Dow Jones Industrial Average was approximately 11,500. This disinvestment procedure was objected to by Appellee Thomas Tipps. Six months later on September 15, 2008, the Dow Jones Industrial Average dropped to approximately 6.500. Appellant Steven Tipps has never requested to hold family powers: the medical powers of attorney, guardianship powers of Appellants person, the Durable Power of Attorney, the guardianship of Appellant's estate, or to be Trustee of the Tipps Family Trust(s). In review, the decision to remove the powers, especially the medical power of attorney was fortuitous and made prior to

the date that Appellant Doris L. Tipps being declared. The transfer of that power from Appellee Thomas Tipps occurred seven weeks before the two critical illnesses that occurred between October 29, 2013 and April 24, 2014. The medical power of attorney should always be in the hands of a person that knows Doris Lee Tipps and supports life in all circumstances; it should not be in the hands of a third party guardian that has demonstrated callous disregard for the safety and well-being of Appellant Doris L. Tipps and has invoked punitive measures against Appellants Doris L. Tipps and Steven Tipps for reporting negligent endangerment and other deficiencies.  (C.R. s 7). (C.R. s 15). (C.R. s 42)

**Appellee Thomas Tipps Replies:**

**1.50   Starting with 5.4 , pp 14.**  Appellant objects.  The powers that were removed from Appellee Thomas Tipps by Appellant Doris L. Tipps were removed for cause and were removed before Appellant Doris L. Tipps was declared incompetent. Please See Findings of Kathleen C. Saine, Ph.D. (neuro-psychologist (Appt. Br. – Appendix II, Item 11, p 25).

**Appellee Thomas Tipps Replies:**

**1.51   Starting with Para 5.5, p 14.**  Appellant objects.  The date of the psychiatric evaluation of Appellant Doris L. Tipps was Friday, October 4, 2013 at 2:00P.M.   Appellant Steven Tipps brought Doris Lee Tipps to Dr. Crowder's

office. There were three scientific reports or opinions that ultimately disagreed with Dr. J. Douglas Crowder's report of total disability: (1) that of Dr. David Isaradisaikul, M.D. of Dallas Neuro-Stroke, OP, (2) Dr. Joel Holiner. M.D., of the Holiner Psychiatric Group at Medical City Dallas, and (3) of Dr. Kathleen C. Saine, Ph.D (Clinical Neuropsychology) with Ron Paulman, Ph.D. All three of these scientific reports or opinions disagree with the findings of Dr. J. Douglas Crowder. (Appt. Reply Br. Appendix, Findings of Psychiatrist J. Douglas Crowder, M.D., IX). (App. Reply Br. Appendix, Findings of Neuropsychologist Kathleen C. Saine, Ph.D. X).

**1.52   Para 5.6, p 15. Appellee Reply Brief.** Appellant objects to the finding that Appellant Doris L. Tipps is totally incapacitated. (Para 1.51 above). (Please See Para 5.6 of Appellee Reply Brief, pp 15-16).

**1.53   Para 5.7, P 16. Appellee Reply Brief.** Appellant objects. The unanticipated difficulties alleged by Cumberland were actually the unanticipated difficulties of Appellant Steven Tipps when Appellee Cumberland and Appellee Thomas Tipps engaged Steven Tipps in a *squeeze play*. (C.R. 217). In both public and private communications with Appellant, neither party dealt in good faith in their efforts to eject Appellant from Hood Street in February 2014. (Please See Appt. Reply Br. Para 1.55, pp. 41-42).

Page **41** of **103**

**1.54   Para 5.8, P 16 - 17 Appellee Reply Brief.** (C.R. at 7) In Agents Answer to Petitioner's Petition to Revoke Authority of Agent, Appellant Steven Tipps addresses the issues of the Senior Source – Prestonwood responsibility under State and federal rules to (1) furnish a safe environment and (2) to provide prudent care for their patients.  The conflict that emerged between Senior Source and Appellant was due to abuses and neglect that were brought to the attention of Senior Source and Prestonwood by Appellant.  As holder of the medical power of attorney for Appellant Doris L. Tipps, Appellant Steven Tipps was extremely concerned and did not trust Senior Source or Prestonwood to meet their obligations in (1) and (2) above. (C.R. at 7).  Of greater concern was the emerging influence of Appellee Thomas Tipps with Senior Source and the close coordination of Appellee Thomas Tipps and Senior Source in suing for removal of the medical power of attorney of Doris L. Tipps.  Earlier, Appellant's transfer of the medical power to Appellee Thomas Tipps in 2012 was a serious mistake.

**1.55**   Para 5.9, P17.  Appellee Reply Brief.  "When the trial court considered Cumberland's motion, Cumberland elaborated on the difficulties that it had experienced when it tried to assume control of the Trust's real property... (RR. 16-18)."- **In Reply, Appellant states:**  The property at Hood Street is not owned by the Trust(s) and therefore, the Trust has no equitable interest in the property.  While Doris L. Tipps' and Thomas Tipps' names are on the Deed, Appellee

Thomas Tipps is one of several remainder-men whose equitable ownership will only be realized at the death of the second to die. Until then, the Trust is not the equitable owner of 1844 Hood Street. That equitable ownership resides with the person of Appellee Doris L. Tipps, the *life tenant*, As is described at (C.R. 217) or (Appt. Reply Br. Appendix, III). Cumberland and Appellee Thomas Tipps tortuously interfered with the Guardianship held by Steven Tipps, placing the urgent situation of Appellant Doris L. Tipps' emergencies in a subordinate position in order to pursue a real-estate play based on misrepresentation of authority, misrepresentation of ownership, intimidation, duress, and tortuous interference with the Guardian of Appellant Doris L. Tipps. Appellee Cumberland and Appellee Thomas Tipps were working together to force Appellant Steven Tipps into a circumstance where his care giving responsibilities for Appellant Doris L. Tipps would be interrupted, when Doris Lee Tipps was most vulnerable. This was egregious tortious interference by Cumberland and by Appellee Thomas Tipps.

I.      **1.55 (a) Para 5.10, P 18-19**. Appellee Reply Brief. Appellant Steven Tipps objects. The following is quoted from: Appt. Br., "VII. Real cross-examination of Karen Ashworth and Appellee Thomas Tipps (Appt. Br. "Standard of Review" pp 17-18).

"What could have come from cross examination of the first key fact witness, Karen Ashworth? Was Appellee Cumberland responsible for mistakes made by

their Special Assets Group, in failing to identify legal encumbrances attached to the real estate portfolio? Was Cumberland's allegation that Appellant Steven Tipps was the cause of their resignation fair and reasonable in light of the existence of readily available documents (a Deed of Trust with attached reservation legal *life* The Trial Courts' denial of cross-examination of Karen Ashworth is central to these issues. The unrestrained cross-examination of Karen Ashworth and Appellee Thomas Tipps by Appellant Steven Tipps could have established whether Appellee Thomas Tipps, with his legal duty to disclose, fraudulently concealed the existence of the *life estate* from Karen Ashworth. (I. C.R. at 217) or (Appt Reply Br. Appendix, III). In the alternative, were Appellee Thomas Tipps or Karen Ashworth, working together to disassemble a reserved legal *life estate*, circumventing the legal protections of Appellant Doris L. Tipps by the establishment of *facts on the ground.*" (Appt. Br, Para VII, pp 17 – 18.).

**1.56 Para 5.11, P19. Appellee Reply Brief.** Appellant Steven Tipps alleges that there were two alternatives available to the Trial Court on October 21, 2014: First, to enforce the Rule 11 Agreement and the Mediation Settlement Agreement. The first option was a rote exercise: a simple ministerial act of issuing an Order enforcing two legally binding contracts that originated under the supervision of the Trial Court. The second option was to engage in bypassing of two enforceable contracts, in favor of a solution that is a source of this appeal. Further, Appellant

Steven Tipps was ordered by the Trial Court to address his questions to Appellee Thomas Tipps. The only question directed to Appellee Thomas Tipps was intercepted by the Trial Court. (RR. 28) (Appellant Reply Brf. Para 1.1-1.5, pp. 9-11).

**1.57** Para 5.12, P20. Appellee Reply Brief. Appellant objects to the first paragraph..."Cumberland is unable to perform its duties as Trustee since a condition of its acceptance was that Appellant Steven Vinson Tipps move out of the Hood real property..." This part of the Order originated by specific intervention by the Trial Court, when the Trained Court stated: "I am going to deny your right to cross-examine." The protection by the Trial Court of adverse witnesses barred the exploration of Cumberland's interference with Appellant Steven Tipps, denied him of his procedural due process rights, and fixed an important part of the Trial Record to the detriment of Appellant. *(Please See, Appt. Reply Br.—Cumberland—Para 2.5-2.6, pp. 65-67).*

Appellant objects to the second paragraph that states in part..."Based on the circumstances of this case, the Court finds that it will not be possible to find a Corporate Trustee willing to serve as Trustee of the Trusts." Appellant asks, how many trust companies are in this U.S. national marketplace? What does it take to encourage cooperation? Appellant believes a contract among the parties would

ease the transition to a new corporate trustee, possibly backed by sanctions for breach of the lower court Order.

**1.58 Para 5.13, P19. Appellee Reply Brief.** Appellant Replies. The Notice of Appeal included the *Order Granting Motion to Accept Resignation, Discharge Trustee and Reinstate Trustee.* That order is final and appealable? The Trial Court order to Revoke Authority of Agent is also final and appealable. Appellant has legal standing in both orders. At a later date, the Fifth Court Ordered that the following counsel and parties be added to the case management system.

(1) Doris Lee Tipps, Appellant, represented by W. Thomas Finley, 5500 Preston Rd., Suite 390, Dallas, Texas 75205

(2) Senior Citizens of Greater Dallas D/B/A Senior Source, Appellee, represented by attorney John H. Phillips, 4313 W. Lovers Lane, Dallas, Texas 75209.

**1.59** The Fifth Court of Appeals Ordered that the record of the Motion to Show Authority be included in the Appellate Record, including (1) Doris Lee Tipps' Opposition to Cumberland Trust & Investment Company's Motion to Accept Resignation, Discharge Trustee, and Reinstate Trustee; (2) Demand for Accounting; and (3) Motion to Enforce Rule 11 Agreement and Mediated Settlement Agreement (W. Thomas Finley, Counsel for Doris Lee Tipps (C.R. s 15) and Doris Lee Tipps' Opposition to the Senior Source's Petition to Revoke Authority of Agent (W. Thomas Finley, Counsel for Doris L. Tipps (C.R. s 42).

**1.60   Para 6.0(a), P21.  Appellee Reply Brief.**  Appellant has not preserved error with respect to his first, second and fourth issues. **Appellant objects.** (*Please See* Appt. Reply Br. 1.8, p 12).

**1.60(a) Para 6.1, P21. Appellee Reply Brief.  "Appellant did not tell the trial judge his particular complaints."**  Appellant Steven Tipps did not have an opportunity to confront the trial judge for preservation.  (Appt. Reply Br. Para 1.1 thru 1.8 pp. 9-13) (Fed. R. C.P. 51).  Having a conversation with the Trained Court had proven futile in each of the cross examinations. (RR. 22, 28)

**1.61   Para 6.1(b)P 22. Appellee Reply Brief.  "The trial court properly terminated Appellant's Medical Power of Attorney."** Appellant objects.  (C.R. s 7, Part I - VII).  Appellant asserts (1) that reckless endangerment of Appellant Doris L. Tipps by Senior Source and Prestonwood Nursing, (2) that punitive steps by Senior Source and Prestonwood Nursing violated State regulations prohibiting retaliation against an elderly person, or her Agent, for communicating a complaint about safety issues (reckless endangerment) and prudent care.  Further, the retaliation by Senior Source and Prestonwood was intended to suppress and intimidate each of Doris L. Tipps and her son Appellant Steven Tipps, while at the same time denying each of them of their civil and constitutional rights. The great weight and preponderance of the evidence is in favor of Appellant Doris L. Tipps

and Appellant Steven Tipps on the issue of the unreasonable cancellation of the medical power of attorney then held by Appellant Steven Tipps. (C.R. s 7).

**1.62** From (C.R. s 7 at VIII), "While withdrawn by the Petitioner, these punitive actions by the Petitioner violated the Constitutional and Civil rights of the Mother as well as of the Agent that directly and specifically violated, without limitation, The Texas HUMAN RESOURCES CODE, TITLE 6, CHAPTER 102 SECTION 102.003 (f)." **(Appt. Br. Appendix. III).**

**1.63** From the Prayer..."Therefore we further PRAY that the Court will balance the Mother's rights and interests against the Petitioners petition for more power: powers that the Petitioner and the Petitioner's Agent have shown they are willing to abuse." (C.R. s 7). ). **(Appt. Br. Appdx. III).**

**1.64 Para 6.2(c) P 22. Appellee Reply Brief.** "Appellant has not properly briefed his fourth issue and has not requested a ruling on his request for reimbursement." **Appellant asserts** that the reimbursement demand was based upon an ancient doctrine in contract law which infers a promise to pay a reasonable amount for labor and materials, even if the absence of a specific legally enforceable agreement between the parties. The request for funding was raised in the PRAYER, Para (f) and (g). The legal doctrine is: *QUANTUM MERUIT,* and it was declared in Appellant's Brief. (Appt. Br. under "Appellant's Burden", p 21.)

During the trial court Hearing, there was no opportunity to raise this issue. The trial court closed the Hearing to all other issues.

**Para 6.3 P22. Appellee Reply Brief.** *Id.*

**1.66 Para 6.4 P22. Appellee Reply Brief.** Appellant Replies. Given the Trial Court's agenda, there was no opportunity to present the Trial Court with a detailed information. This was a Hearing; it was not a Trial. The association of the cost accruals with the answer to the Senior Source Petition was to alert the Trial Court of this need. The detailed invoice information completed but the opportunity to make requests was constrained by the Trial Court's management of his Docket.

**1.67 7(a) Standard of Review. Appellee Reply Brief. Appellant's Issues.**

**1.68 Para. 7.1 P23. Appellee Reply Brief.** "The standard of review applicable to complaints about exclusion of evidence is abuse of discretion. (*City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex. 1995). In order to obtain reversal, the appellant must show the trial court committed error and that the error was reasonable calculated to cause and probably did cause the rendition of an improper judgment..." *McCraw v. Marris,* 828 S.W.2d 756, 757 (Tex. 1992).

**Appellant Replies**: **Appellant Steven Tipps argues** *plain,* manifest, clear, and *gross abuse of discretion.* Appellant was barred from cross-examination of adverse witnesses, effectively preventing any challenge of readily controvertible

witness testimony of two key fact witnesses. (Appt. Reply Br., Para 1.8, p. 12). (Appt. Reply Br. –Cumberland—Para 2.5 – 2.6, pp. 65-67.) The Trial Court's error was failure to enforce the Rule 11 Agreement and the Mediation Settlement Agreement, which caused an improper judgment that resulted in the loss of independent oversight of the Tipps Family Trusts and all of the legal costs associated with the Rule 11 Agreement and the Mediation Settlement Agreement. As a signatory of the Mediation Settlement Agreement, Appellant Steven Tipps, was the only adverse signatory that signed a release of liability for the benefit of Appellee Thomas Tipps, releasing Appellee of liability for all decisions and actions taken during his term as Co-Trustee. This was a significant protection for Appellee Thomas Tipps, that he retained, and retains, whereas Appellant Steven Tipps released the right to pursue litigation against Appellee Thomas Tipps for wrongful interference and other wrongs committed personally against Appellant Steven Tipps by Appellee Thomas Tipps as Co-Trustee. (Appt. Reply Br., Para 1.8, p. 13). (Appt. Reply Br.--Cumberland—Para 2.5 – 2.6, pp. 65-67).

**Standard of Review: Appellant's Issue 3 (Appellee's second issue).**

**1.69 Para. 7.2 P23. Appellee Reply Brief.** "In his third issue, Appellant complains that the trial court erred in withdrawing the Medical Power of Attorney held by Appellant for Doris L. Tipps. This issue incorporates a complaint about the trial court's findings that (i) a conflict exists between the powers granted the

Page **50** of **103**

Guardian of the Person and the powers claimed by Appellant under a medical power of attorney; (ii) the conflict is not in the best interest of the Appellant Doris L. Tipps and may be detrimental to the health and proper care of Appellant Doris L. Tipps; and (iii) the authority of Appellant under the medical power of attorney from the Ward should be revoked.

Appellant Steven Tipps replies: *Id.* Para 6.1(b). Appellant Steven Tipps incorporates by reference, in its entirety, Appellants Agent's Answer to Petitioner's Petition to Revoke Authority of Agent. (Appt. Reply Br. Appendix IV), or (C.R. s 7), and (C.R. s 41).

**1.70   Para 7.3 P 24.  Appellee's Reply Brief.** "A trial court's findings of fact are reviewed for factual sufficiency of the evidence using the same legal standards as are applied to review jury verdicts for factual sufficiency." **Appellant Steven Tipps replies** that a factual sufficiency review should be included in a de Novo review in the appellate Court.  When a party is substantively excluded from significant aspects of a Hearing, the factual sufficiency review is an analysis of what is there as well as what is not there and why it is not there." The Trial Record was affected by the Trial Court's manifest abuse of discretion in declining Appellant's right to cross examine witnesses. "A trial court abuses its discretion if3it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. " *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex.2003).

(Appt. Reply Br. Para 1.8, p 13).  (Appt. Reply Br. Para 2.5-2.9, pp **65-69**). Appt. Reply Br. Para 1.44, pp. 33-34).

### Standard of Review:  Appellant's Issue 4 (Appellee's third issue).

**1.71   Para. 7.4 P24. Appellee replies**:  "In his fourth issue, Appellant complains that the trial court erred by failing to address Appellant's request for reimbursement of various expenses and costs (even though Appellant did not request a ruling).  The trial court's decision in this respect is reviewed for abuse of discretion…"   **Appellant Replies.**  When the Hearing commenced at 3:30 p.m. on Tuesday October 21, 2014, the Docket was already full with big issues.  Appellant Steven Tipps could not have known that the trial court would object to his presence as a pro se party, would ignore his standing under TRCP Rule No. 7, would ignore his substantial right to due process and to procedural due process, would decline his right to cross-examination of key fact witnesses, and would close the hearing to further participation:  including raising the issues of reimbursement and preservation.  Appellee's *abuse of discretion* standard is related to Appellant's complaint of *manifest abuse of discretion,* and each of these can be considered in *de Novo* review. (Appt. Reply Br. Para 1.8, Page 17).

**1.72   Para 8(a) P25 Appellee's Reply Brief.  Appellant did not preserve error with respect to issues 1 and 2.  Appellant replies:** "With respect to Issue One and Issue Two of Appellant's Brief, the preservation of error issue was discussed

in the context of a Hearing that excluded the cross-examination of the first key fact witness, giving the effect of protections to adverse witnesses that may be cross-examined under the confrontation and cross-examination clause(s) of the Sixth Amendment of the U. S. Constitution.  This act, without consideration of how the Trial Court conducted itself in other matters, resulted in undue prejudice against Appellant and was manifest abuse of discretion?  (*Please See*, Appt. Reply Br. Para 1.3 – 1.7, pp. 10-12) & (Para 1.8 – 1.17, pp 13 – 19). (Appt, Reply Br. Para 2.5 – 2.9, pp. 65-69).

**1.73   Para 8.2 P 26 Appellee's Reply Brief.  Appellee replies:** "Tex. Rule. App. P. 33.1  encompasses the concept of "party responsibility," which requires the complaining party to tell the trial judge his particular complaint, including the precise and proper application of the law as well as the underlying rationale…"(Pena v. State, 285 S.W.3d 459, 463 (Tex. Crim. App. 2009).

 **Appellant Replies:**   Certiorari lies to correct proceedings erroneous upon the face of the record when there is no other adequate remedy.  It is available in the exercise of super intending control over a tribunal which is proceeding illegally where no other mode of review has been provided.  Certiorari lies where there is a want of jurisdiction or an act in excess in excess of jurisdiction which is apparent on the face of the record. *(State v. Nelson,* 246 Ark, 210, 438 S.W.2d (1969).

**1.74  Para 8.3.P 27 Appellee Reply Brief.**  Appellant did not object when the trial court stated:  I am going to deny your right to cross-examination. Appellant reply: *Please See:*  (Appt. Reply. Br. Para 1.8, p 12). (Appt. Reply Br. Para 2.5 – 2.6, pp. 65-67). *(Goldberg v. Kelly)*, 397 US 254, 268, 90 S. Ct 1011, 25 L. Ed. 2d 287 1970. (Appt. Reply Bf. Para 1.13 – 1.16, pp. 17-18). (Appt. Reply Bf. Para 1.17, p. 18).

**1.74(a)  Para 8(b) P 27 Appellee's Reply Brief.**  The trial court properly controlled its docket with respect to Appellant's cross examination of witnesses.

**Appellee Replies:** (Appt. Reply Br. Para 1.8 – 1.12, pp 13 – 17).

**1.75 Para 8.4 P 27.  Appellee Reply Brief.**  "Even if Appellant preserved error with respect to his first two issues, the trial court did not err by exercising control over the examination of witnesses.  **Appellant Replies**: *Please See:* (Appt. Reply Br., Para 1.8 – Para 1.17, pp. 12-18).

**1.76  Para 8.5 P28. Appellee Reply Brief.**  "An appellate court will not reverse a judgment due to the exclusion of evidence unless the appellant establishes that:  (1) the trial court's ruling was in error; and (2) the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment." *(Please See)* (Appt. Reply Br. Para 1.67, pp 46-47.).  (Appt. Reply Br. – Cumberland – Para 2.5-2.9, pp. 65 – 69)

**1.77  Para 8.6. P 28. Appellee Reply Brief.** "As applied to the facts of the present case, Appellant has not informed the trial court or this Court why he needed to cross-examine Cumberland or what he hoped to establish by questioning Cumberland…" Appellant directed a request to the Trial Court to cross-examination of Cumberland's first key fact witness. The Trial Court asked a few questions of Appellant, then stated: "I am going to deny your right to cross-examine." **Appellant replies, as persuasive authority,** that Francis L. Wellman's "The Art of Cross Examination clearly establishes that cross examination is an art that involves a plan, secrecy, randomness, and the element of surprise. (Appellant Reply Brief. Para 1.1 thru 1.8, pp 10– 12).

**1.78  Para 8.7. P29 Appellee Reply Brief.** Appellee states: "Similarly, with respect to Appellant's complaint that the Trial Court did not allow him to cross-examine Thomas Tipps…he directed his questions to the trial court instead of conducting a proper cross-examination… (Appt. Reply Br. Para 1.4-1.8, pp 9-12).

**1.79  Para 8.8. P 29. Appellee's Reply Brief.** "Because the trial court properly exercised control over Appellee's cross-examination of witnesses, it did not abuse its discretion and there is no error on this record." **(Appellant Reply Brief. Para 1.1 thru 1.8, pp 10– 12).1.80   Para 8.8(c) P 29. Appellee Reply Brief.** "There is nothing to suggest that the trial court's restriction of Appellant's cross-examination probably caused the rendition of an improper judgment." **(Please See**

Page 55 of 103

**Appt. Reply Br., Para 1.18 thru 1.19, pp 19-20). (Appt. Reply Br. (Cumberland) Para 2.5 – 2.6, pp. 65 – 67).**

**1.81    Para 8.9 P29 Appellee Reply Brief.** "Alternatively, even if the trial court erred by restricting Appellant's cross-examination of Karen Ashworth and Thomas Tipps, the record does not establish that such error was reasonably calculated to cause and probably did cause the rendition of an improper judgment."… **Appellant Replies**: (Please See Appt. Reply Br. Para 1.18 thru 1.19, pp 19-20). (Appt. Reply Br. Para 1.67, pp 49-50).

**1.82    Para 8.10. p 30.   Appellee Reply Brief.** "Appellant's allegation that the trial court improperly restricted his examination of Thomas Tipps…directed legal questions to the court…" (*Please See* Appt. Reply Br. Para 1.1 thru 1.16, pp. 10-17).

**1.83    Para 8.a p 30. Appellee Reply Brief.** Issue No. 2 responds to Appellant's third issue:) The trial court properly terminated Appellant's Medical Power of Attorney because it was executed very near the time when Doris Tipps was found incompetent and because it conflicted with the powers held by Doris Tipps' duly-appointed guardian…" (Appellant Reply Brief, Para 1.22, & Para 1.24 thru Para 1.28. pp 18 thru 21).  (Appt. Reply Br. Appendix IV ). (Appellant Brief, Index II, Item 11, p 25).

**1.84 Para. 8.11 p 31. Appellee Reply Brief.** "Appellant next argues that the trial court erred in terminating his Medical Power of Attorney for Doris Tipps because the Texas Health and Safety Code requires the Court to consider the principal's preferences as expressed in the medical power of attorney when determining whether to terminate agent's medical power of attorney..." **Appellant Replies:**

*Please See:* **(Appt Reply Bf. Appendix III & IV). Or (C.R. s 7). Or (C.R. s 42).**

**1.85 Para. 8.12 p 31.** Appellee Reply Brief. Appellee alleges that Appellant Doris L. Tipps...unequivocally disqualified Appellant Steven Tipps as the guardian of her person or her estate on July 19, 2012..." **Appellant Replies:** Doris L. Tipps reached a decision in July 2013 that she could no longer afford to trust her eldest son with her money and her medical power of attorney. (C.R. s 7). (C.R. s 42). (Appt. Reply Br. Para 1.86, p 57, Appellant Reply re: Dr. Crowder and Dr. Saine).

**1.86 Para. 8.13 p 32. Appellee Reply Brief.** "Given the evidence that Doris Tipps did not want Appellant acting as her guardian in 2012, and only allegedly changed her mind in close proximity to the date on which she was deemed to be incompetent, the record establishes that the Court properly took Ms. Tipps wishes in consideration when it terminated Appellant's Medical Power of Attorney. ..."

**Appellant responds:** On Friday October 4, 2013, at 2:00 P.M., Dr. J. Douglas Crowder, M.D. conducted a test of Doris L. Tipps and concluded that Appellant Doris L. Tipps was totally disabled due to severe dementia. On December 2, 2013 and December 16, 2013 Dr. Kathleen C. Saine, Ph.D, a neuro-psychologist performed a broad array of tests, two weeks apart, and concluded that Doris L. Tipps has mild dementia. Dr. Saine's report was presented in Appellant's Brief in the Appendix II, Item 11, p 25). The results that were found by Dr. Crowder were unfound in Dr. Saine's evaluation as a neuropsychologist whom has been retained by Dr. Crowder for confirmatory testing of Dr. Crowder's patients. Doris L. Tipps remains "declared" but does not suffer from severe dementia. There are two other scientists that disagree with Dr. Crowder's findings. None of the two opposing reports or opinions were ever presented by Appellee Thomas Tipps to the trial court. When Doris L. Tipps made the decision to transfer the medical power of attorney to Appellant Steven Tipps, it was within 30 days of Dr. Crowder's report that was used to declare Doris Tipps and 112 days of being *undeclared* by Dr. Kathleen C. Saine. The other two scientific tests were performed in August to November 2012. Appellee Thomas Tipps had a duty to inform the Trial Court of the strength of the scientific evaluations that existed at the time that he, Appellee Thomas Tipps, presented his Application for Temporary Guardianship to the Trial Court. (Appt. Reply Br. Appendix, Findings of Dr. Crowder Item 9). (ApptReply

Br. Appendix, Findings of Dr. Kathleen C. Saine). (Appt. Br. P 21 under "Appellant's Burden")

**1.87  Para. Issue No. 3 P 32. (responds to Appellant's fourth issue):** "The trial court was not required to address Appellant's request for reimbursement given that Appellant failed to request a ruling and failed to present any evidence of his costs or expenses to the court. In any event, Appellant has failed to preserve and waived his point of error...." **Appellant Replies:** *Please See,* (Appt. Reply Br. Para 1.64, pp. 48-49). (Appt. Repl. Br. Para 1.71, P 48), & (Para. 1.42(a), p. 30).

**1.88  Para. 8.15 P 33. Appellee Repl. Brief.** "Appellant sets forth his position that the trial court erred by failing to address his "valid expense and cost claims" in four sentences none of which contain any citations to statute or case law..."

**Appellant replies.** The Prayer section of the Senior Source answer to citation lists seven (7) requests as well as the general requests: "The Agent seeks reimbursement from the petitioner of all costs associated with this Petition, and all other relief, both general and special, legal and equitable, to which the Agent may be entitled."

None of the seven specific requests included in the Prayer section of the Answer to Citation from Senior Source were acted on by the Trial Court.

(Please See, Appt. Br. at 19). (Appt. Reply Br. Para 1.42(a), pp 29-30).

**1.89 Para. 8.16 P 34 Appellee Reply Brief.** "As applied to the facts of the present case, the record reveals that Appellant did not request hearing on his application for reimbursement, did not argue his request before the court at the hearing on October 21, 2014, and did not request a ruling or object to the lack of a ruling...." *Id.* (Para 1.88 above).

**1.90 Para 8(c) P 35. Appellee Reply Brief.** "Appellant did not provide evidence of the costs and expenses for which he sought reimbursement...." *Id.* (Para(s) 1.88 & 1.89 above).

**1.91 Para 8.17 P 35 Appellee Reply Brief.** Even if this Court finds that Appellant did not waive his fourth point of error by failing to properly brief the issue and failing to request or obtain a ruling on his request for reimbursement, Appellant presented no evidence to the court to support his request for reimbursement...." Id. (Para(s) 1.88 – 1.90).

"Appellant asserts that the reimbursement demand was briefed with two words: *quantum meruit*, which is based upon an ancient doctrine in contract law that infers a promise to pay a reasonable amount for labor and materials, even if the absence of a specific legally enforceable agreement between the parties. The request for funding was raised in the PRAYER, Para (f) and (g). This legal doctrine was declared in Appellant's Brief. (Appt. Br. under "Appellant's

Burden", p 21.) During the trial court Hearing, there was no opportunity to raise

this issue. The trial court closed the Hearing to all other issues. (Appt. Reply Br.,

Para 1.64, pp. 48-49).



Appellant Reply Brief

To Reply Brief of Thomas Tipps

Ends Here

# In the
# COURT OF APPEALS
# FIFTH DISTRICT OF TEXAS
# DALLAS, TEXAS

IN THE MATTER OF THE GUARDIANSHIP OF DORIS L. TIPPS

Appealed from Cause No. PR-13-03072-3
In the Probate Court No. 3 of Dallas County, Texas
Honorable Judge Michael E. Miller, Presiding

APPELLANT'S COMBINED REPLY BRIEF TO
SECOND APPELLEE REPLY BRIEF
CUMBERLAND TRUST AND INVESTMENT COMPANY

TO THE HONORABLE JUSTICES OF THE FIFTH COURT OF APPEALS:

Appellant, Steven Tipps, submits this Appellant Reply Brief, in accordance

with Rule 9.4, 9.4 (i) (2) (c), and Rule 38 of the Texas Rules of Appellate

Procedure and all local rules of this Court. In support of this Appeal from Final

Judgement, Appellant respectfully asserts the following

# APPELLANT'S REPLY BRIEF

## 2.0 ARGUMENT AND AUTHORITIES IN REPLY

## TO APPELLEE CUMBERLAND TRUST'S REPLY BRIEF

A. Pro se litigants are held to the same standard as attorneys.

**2.1** Appellant incorporates by reference from Appellant's Reply Brief – Reply to Appellee Thomas Tipps, Argument and Authorities in Reply, Section 1.0, Paras 1.1, and 1.2, (p 9), Para(s) 1.3, and 1.4 (p 10), Para(s) 1.5 and 1.6 (p 11), Para(s) 1.7 (p 13), and Para 1.8 (pp 13-14).

**2.1(a)** Appellant further incorporates by reference, Appellant Doris Lee Tipps' Opposition to Cumberland Trust & Investment Company's Motion to Accept Resignation, Discharge Trustee, and Reinstate Trustee; Demand for Accounting; and Motion to Enforce Rule 11 Agreement and Mediated Settlement Agreement. (Appt. Repl. Br. Appendix, III).

**2.1(b)** The statutes that govern procedures in civil cases in Texas courts are the Texas Rules of Civil Procedure ("TRCP") and Texas Rules of Civil Evidence. ("TRCE"). Among those rules, Rule No. 7 of the TRCP states: "Any party to a suit may appear and prosecute or defend his rights therein, either in person or by an attorney of the court." The cases cited in Cumberland's Reply Brief Section 1A, pp 8-9 are noted, but they do not address the significant issue in this Appeal that is: *a plain, manifest, and*

***gross abuse of discretion* that led to a *manifest injustice.*** The Trial Court stated: "I am going to deny your right to cross-examine." (*Goldberg v. Kelly*). (*Davidson v. Great Nat'l Life Ins. Co.*).

***2.1(c)*** **Appellee Cumberland Replies**. In *Mansfield*, "It is well established that the "right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with the relevant rules of procedure and substantive law." Mansfield State Bank v. Cohn, 573 S.W.2d 181, 184 (Tex. 1978) (quoting Feretta v. California, 422 U.S. 806, 835 n. 46 95 S.Ct. 2525, 45 L.E.2d 562 (1975)).

***2.2*** In contrast with *Mansfield*, judicial officials are not permitted to make their own rules or laws for *pro se* litigants to abuse or to be abused by, nor to foster circumstances in the court room that are contrary to the Texas Canons of Judicial Conduct, specifically Canon (3)(b)(8). "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles." *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex.2003). Considering just the basics, the *guiding principles* that the Trial Court failed to consider were the due course of law clause of the Texas Constitution, the *Due Process clause(s)* of the U. S. Constitution, the Sixth Amendment of the U. S. Constitution and its confrontation and cross-examination clause(s), and the Fourteenth

Amendment that makes the Fifth and Sixth Amendments applicable to the states. Over time, the *due course of law clause* in the Texas Constitution has become congruent with the federal *due process clause(*s) in the U. S. Constitution (Para 1.13 through 1.16, pp. 18-19) case summaries of Appellant's Reply Brief to Appellee Thomas Tipps, are incorporated herein by reference); procedural due process of the federal system is congruent with the State of Texas procedural due process. (Para 1.17 pp. 18-19) case summaries of Appellant's Reply Brief, are incorporated herein by reference).

*2.3*    A trial court has no discretion in determining what the law is or in applying the law to the facts. *Cayton v. Moore*, 224 S.W.3d 440 Tex. App. - Dallas 2007, no pet. An abuse of discretion occurs if the trial court clearly failed to analyze and determine the law correctly or applied the law incorrectly to the facts. *Id.*

*2.4*    When we determine whether the trial court abused its discretion, we may not substitute our judgment for that of the trial court unless its decision was so arbitrary that it exceeded the bounds of reasonableness. *Clarendon Nat'l Ins. Co. v. Thompson*, 199 S.W.3d 482, 494 (Tex. App).– Houston [1st Dist. 2006, no pet].

*2.5*    In the subject Appeal, the Trial Court chose between two alternatives: (1) to enforce the *uncontested* Mediated Settlement Agreement that required an

independent corporate trustee, by agreement among the parties, along with the uncontested Rule 11 Agreement that was read into the record on September 13, 2013, or (2) to abandon the main purpose of the Mediation, the Mediation Settlement Agreement, and forego the independent oversight of a corporate trustee and related accountability altogether. (C.R. s 15). (Appt. Reply Br. Appendix p III).

2.6    In the October 21, 2014 Hearing, (1) those parties that supported enforcement of the mediation settlement agreement and the Rule 11 Agreement, Appellants, were excluded from their right to due process, their procedural due process right of cross examination of adverse witnesses, and their right to be Heard?; and (2) those that supported abandonment of the Mediation Settlement Agreement and the Rule 11 Agreement were Heard by the Trial Court, given full access to procedural due process, and their witnesses were protected from cross-examination? (R.R. 22, 28, & 1-31) (C.R.s 15). These parties were also represented by legal counsel. Within the Texas Code of Judicial Conduct, under Adjunctive Responsibilities, Canon (3) (B) (8) states, in relevant part: "A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, a right to be heard according to law." This Canon (3) (b) (8) is nearly identical to the basic meaning of *due process* as cited in Goldberg v. Kelly: "The

fundamental requisite of due process of law is the opportunity to be heard."
(*Grannis v. Ordean*, 234 U. S. 385, 394 (1914). A trial court has broad discretion and we may not disturb its ruling absent manifest abuse of discretion. *Champion Int'l Corp. v. Twelfth Court of Appeals*, 762 W.W.2d 898,899 (Tex. 1988; TEX.R. CIV. P. 320.) The "due course" clause in our state constitution requires the same level of "due process" as the federal constitution. (*City of Fort Worth v. Park*), 2011, Tex. APP LEXIS 5725 (2011) (14)

B. Steven Tipps did not make an offer of proof

2.7 Within the Cumberland Reply Brief, Part I A, Page 8, Appellee Cumberland states: "Steven Tipps complains on appeal of the probate court's refusal to allow cross-examination of Karen Ashworth and Thomas Tipps. (Appt. Br. At 5). The probate court gave Steven Tipps the opportunity to cross Thomas Tipps; Steven simply did not ask any questions of the witness."

2.8 **Appellant denies this allegation.** In each of the requests to interact with the two adversarial witnesses, the Trained Court engaged Appellant Steven Tipps in a conversation that was substantively a cross-examination of Appellant, while Appellant was requesting permission to cross examine Appellee Cumberland's key fact witness, Karen Ashworth and Appellee Thomas Tipps. (Appellant Brief, Para. IV, p 16). It was confusing. This

occurred twice, a clear indication that it was not a mistake by the Trained Court? None of the other parties were put to this test. In *Goldberg v. Kelly*, "The hearing must be at a meaningful time and in a meaningful manner". (*Armstrong v. Manzo*). "The opportunity to be heard must be tailored to the [*269] capacities and circumstances of those who are to be heard." "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses."(E. g., ICC v. Louisville & N.R. Co.). (Willner v. Committee on Character & Fitness). "Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed. While this is important in documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. They have ancient roots. They find expression in the Sixth Amendment. This Court has been zealous to protect these rights from erosion. It is spoken out not only in criminal cases … but

also in all types of cases where administrative…actions were under scrutiny." (Greene v. McElroy).

*2.9* Appellant was subpoenaed to court, fully compliant with the requirement of answers in each of two separate citations, having arrived to court on time and available to sue or defend. He was in a fundamental way barred from participation. As is stated above in Section A, Para 2.5 and 2.6 above, there were two choices before the trial court on October 21, 2014. Appellant was on the side that challenged the Motion(s) in which he had legal standing and was denied his procedural due process rights?

*2.10* - **1.4** "After cross-examination of Appellant by the Trained Court, Appellant was allowed to address one question to the second fact witness, and, as ordered by the Trial Court, the question was directed to Appellee Thomas Tipps. Appellant stated: "How does the court handle a life estate that is attached to 1844 Hood Street? It is not in the trust(s), it is not transferable under Texas law into the trust(s)?" (Appt. Reply Br. Appendix. I). In any other courtroom in this country, by hypothesis, a Trained Court would have asked: are you addressing this question to the witness, or are you addressing the question to this court? The Trial Court then stated: "I'm not going to give you legal advice." Further questions were denied. (Appellant. Br. Appendix. Pp. 28-29, No. 7 (RR. 28-29). *In Murray,* "the purpose of cross-

Page **69** of **103**

examination is to sift and to modify and to have the witness explain what has been said on his direct examination, and if the witness by this process can be discredited and the weight of his testimony weakened, the right should not be denied." (*Murray v. Morris*, 17 S.W.2d 110, 111 (Tex. Civ. App.) – Amarillo 1928, writ dism'd).

*2.11* - **1.5** That question of the second key fact witness, Appellant Thomas Tipps was the only question allowed by the Trial Court's *undue constraint* of cross-examination?

It was a significant question under those circumstances.

*2.12* - **1.6** The question was central to the controversy over Hood Street where on February 3, 2014, Appellee Thomas Tipps sued Appellant Steven Tipps for forcible detainer. Appellee Cumberland (Karen Ashworth) and Appellee Thomas Tipps were engaged together in a *squeeze play* against Appellant in January and February 2014. (C.R. 217). The litigation brought by Appellee Thomas Tipps together with Cumberland's interference had a pernicious timing. The interference against Appellant Steven Tipps extended, in its effects, to interference with a substantial care giving process for Appellant Doris L. Tipps, for its duration but also on the weekend of a life threatening emergency that required full-time attention of Appellant Steven Tipps. (Appellant Brief, page 11). (C.R. 217) (Appellant Brief – Appendix Item 15

& 16). On February 3, 2014, Appellee Thomas Tipps', role under the Rule 11 Agreement that stipulated his resignation as co-trustee, changed from ministerial duties of paying bills and receiving receipts for the Trust, to the formation of a joint effort with Appellee Cumberland in litigation and harassment of Appellant Steven Tipps. Cumberland was Trustee "in Waiting" during the interval of Thursday January 23, 2014, the date of the Mediation Settlement Agreement, to Monday February 17, 2014, the date of the Trial Court Order that adopted the Mediation Settlement Agreement and installed Cumberland as Trustee of the Tipps Family Trust(s).

*2.13* - **1.7** Impeachment through cross-examination of Appellee Cumberland's Karen Ashworth and Appellee Thomas Tipps' testimony would have developed the extent of the respective roles of each individual in the attempted circumvention of the legal life estate (*life tenancy*) attached to Hood Street. The impingement by the Trial Court, of Appellant's right to cross-examination of adverse witnesses is inconsistent with the procedural due process commands as expressed in *Goldberg v. Kelly* and in *University of Texas Med. Sch. v. Than*? (Federal and State of Texas procedural due process).

*2.14* - **1.8** The Sixth Amendment and its confrontation and cross examination clause(s) are mandatory authority in U. S. courts. It is a rare circumstance

where these rights are quashed by a trial court in the United States. Through the 14th Amendment, the Fifth and Sixth Amendments of the U. S. Constitution apply to the States. (*Cran v. Hale*, 745 S.W.2d 129 (1988) (Ark. Sup. Ct.) (563). On the face of the Record, the Trained Court excluded Appellant from procedural due process: the right to be heard. As Appellant was denied cross-examination, the first Cumberland witness was immediately dismissed. There was no opportunity declare an exception for preservation of error or discuss reimbursement issues because the Trained Court interrupted Appellant in a restrictive manner and prematurely ended all attempts to participate in the process. (RR. 22). (RR. 28). Each of the two attempts to cross-examine adverse witnesses were either denied or unduly restricted. Given this experience, the Trial Court was closed that day to additional presentation of issues including the Reimbursement Issue, the Fourth Issue in Appellant's Brief and preservation. **"If a party does not have an opportunity to object to a ruling or order, the absence of an objection does not later prejudice that party [on appeal]".** (*Fed. R. CP. 51*). A trial court has no discretion in determining what the law is or in applying the law to the facts. (*Cayton v. Moore*, 224 S.W.3d 440 (Tex.App. – Dallas 2007), no pet. An abuse of discretion occurs if the trial court

clearly failed to analyze and determine the law correctly or applied the law incorrectly to the facts. *Id.* " (Appellant incorporates by reference from Appellant's Reply Brief – Reply to Appellee Thomas Tipps, Argument and Authorities in Reply, Section 1.0, Para(s) 1.1, and 1.2, (p9), Para(s)1.3, and 1.4 (p 10), Para(s) 1.5 and 1.6 (p. 11), Para(s) 1.7 (p 12), and 1.8 (pp 13-14)).

*2.15* Appellant Steven Tipps' requests to proceed with cross-examination -- directed to the Trial Court-- were **substantive exceptions?** In each, it is clear that Appellant Steven Tipps requested to confront his accusers, but was forced to endure nearly identical, cross examinations by the judge in each of the attempts to gain access to cross examination and procedural due process. (RR. 22 & 28). Appellee Cumberland states: "Here it is well within the probate court's discretion to recognize that cross examining Ms. Ashworth had no bearing on the resolution of Cumberland's motion." (Appellant incorporates herein by quotation, Para 1.19, (p 17) through Para 1.23 (p 20).

*2.16 -1.19* A review of the facts suggests that the Trained Court was moving toward acceptance of the Cumberland Motion including approval of Appellee Cumberland's unconditional resignation, consideration of the resignation of Appellee Thomas Tipps as co-trustee, and recognition of Appellee Thomas Tipps's self-appointment to the position of Trustee of the

Tipps Family Trusts. The replacement of a Trustee was, nominally, effected by the transition language in the Trust documentation that stated that a Trustee could appoint a replacement trustee for the Tipps Living Trust(s). The Trial Court agreed to accept this language even though these Tipps Family Trust procedures had been overlaid with real independent oversight that was understood and accepted by the signatories, including Appellee Thomas Tipps, of the Mediation Settlement Agreement. Cross-examination of the Appellee Cumberland's fact witness Karen Ashworth and of Appellee Thomas Tipps was clearly unwelcome in the Trial Court on that date, at that time, and in that place. There were two courses of action that were before the Trial Court: (1) to enforce the Rule 11 Agreement and the Mediation Settlement Agreement or (2) to bypass the ministerial act of enforcing the two contracts and allow Appellee Thomas Tipps to replace Appellee Cumberland as corporate trustee of the Tipps Family Trust(s).

*2.17* At the Hearing that occurred on October 21, 2014, there were three closely linked, overlapping, interlocutory phases: each phase involving a discrete issue under the authority of the Trained Court.

*2.18 - 1.21* **In Phase I,** Appellee Thomas Tipps initiated a motion to show authority that resulted in the isolation of Appellant Doris L. Tipps from her legal counsel and the striking of Appellant Doris L. Tipps objections in W.

Thomas Finley's pleadings in opposition. (Appt. Reply Br. Appendix. III).

From January 23, 2014 through October 21, 2014, Mr. Finley's most important and regular role was to urge, with leverage, that Senior Source, as Guardian to engage Prestonwood Nursing, as agent of the Guardian, to meet their federal and State mandates of (a) the requirement to provide a safe environment for Appellant Doris L. Tipps and (b) generally, the obligation to provide prudent care, and moreover, specifically to provide timely and decisive responses to Appellant Doris L. Tipps continuing emergencies while in the care of Select Specialty Hospital in Plano, Texas, Axel Rehabilitation on Communication Parkway in Plano, Texas, and at Prestonwood Rehabilitation and Nursing Center in Hebron, Texas.

2.19 **Phase II** was initiated by Appellee Thomas Tipps in which Appellee requested Appellee Senior Source to file a Petition against Appellant Steven Tipps for removal of the medical power of attorney from Appellant Steven Tipps, thus separating Appellant Doris L. Tipps from a known and trusted source of medical decisions and protection(s) in and for her life. A by-product of the Phase II termination of Appellant Steven Tipps medical power of attorney, whether intended or not, was in effect, to legally terminate Appellants immediate and decisive interventions in Doris L. Tipps health emergencies that were year after year for past five years, clearly in

favor of her survival. In several of these emergencies her survival was uncertain, in the last series of emergencies in late 2013 and early 2014, she nearly died.

*2.20 -1.22* **In Phase III** Appellant Thomas Tipps moved with Cumberland to initiate litigation alleging that Appellant Steven Tipps was responsible for the resignation of Cumberland, that Cumberland—with its absolute right to resign without the Trial Court's permission, chose to seek official court approval of its resignation together with its recommendation that Appellee Thomas Tipps be approved by the Trial Court as the replacement Trustee of the Tipps Family Trust(s). In the need that developed with Cumberland's resignation, the party that was more likely than not to benefit from the struggle between Cumberland and Appellant Steven Tipps, was the party that organized the struggle in the first place. Consider the outcome of the Trial Court Hearing: (1) Cumberland resigned, Appellee Thomas Tipps replaced Cumberland as Trustee, and (2) both Appellees Cumberland and Thomas Tipps then assigned blame to Appellant Steven Tipps. In the ensuing litigation Cumberland argued that Steven Tipps interfered with Cumberland and was the prime cause of Cumberland's resignation: a suit over a single asset that was legally beyond the reach of Cumberland's portfolio management. (C.R. 217) or (Appt. Reply Br. Appendix I).

2.21 Appellee Cumberland Replies from Page 8.

Argument & Authorities. For Cumberland: "It is well established that the "right of self representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with the relevant rules of procedure and substantive law. " **Appellant Replies**. In the cited cases, in *Mansfield State Bank v. Cohn, in Drum v. Calhoun, and in Culver v. Culver*, claims of manifest abuse of discretion and violation by the courts of substantial rights were not at issue. In the subject appeal, the claim of manifest abuse of discretion is more an issue of needed protections of a party then an issue of needed protections of the dignity of the court. "In the area of procedural due process, the protections afforded under the State Constitution are congruent with those provided by the Federal Constitution. (*Price v. City of Junction,* 711 F.2d 582, 590). "The hearing must be at a meaningful time and in a meaningful manner" *(Armstrong v. Manzo).* "The opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard." *(Goldberg v. Kelly).* The "due course" clause in our state constitution requires the same level of "due process" as the federal constitution. (City of Fort Worth v. Park, 2011, Tex. APP LEXIS 5725 (2011) (14). Procedural due process involves basic notions of justice and fair play. The sufficiency of procedures must be judged in light of the

parties, the subject matter and the circumstances involved. *(Gene Harmon Ford, v. David McDavid Nissan, Inc.,* 997 W.W.2d 298, 312 (Tex. App.-Austin 1999, writ denied). The Due Process Clause does not mandate the parties be heard at the arbitration hearing; rather, the Due Process Clause requires that the parties be given a meaningful opportunity to be heard at the arbitration hearing. (Ewing v. Act Catastrophe – Texas LC, 375, S.W.2d 545 (2012) (17).

## Appellant Reply Brief

## To Reply Brief of Cumberland Trust

## Ends Here

**In the**
**COURT OF APPEALS**
**FIFTH DISTRICT OF TEXAS**
**DALLAS, TEXAS**

IN THE MATTER OF THE GUARDIANSHIP OF DORIS L. TIPPS

Appealed from Cause No. PR-13-03072-3
In the Probate Court No. 3 of Dallas County, Texas
Honorable Judge Michael E. Miller, Presiding

APPELLANT'S COMBINED REPLY BRIEF TO
THIRD APPELLEE REPLY BRIEF
SENIOR CITIZENS OF GREATER DALLAS d/b/a/
SENIOR SOURCE

TO THE HONORABLE JUSTICES OF THE FIFTH COURT OF APPEALS:

Appellant, Steven Tipps, submits this Appellant Reply Brief, in accordance

with Rule 9.4, 9.4(i)(2)(c), and Rule 38 of the Texas Rules of Appellate Procedure

and all local rules of this Court. In support of this Appeal from Final Judgement,

Appellant respectfully asserts the following.

## APPELLANT'S REPLY BRIEF

## 3.0  ARGUMENT AND AUTHORITIES IN REPLY

## TO SENIOR CITIZENS OF GREATER DALLAS D/B/A "SENIOR SOURCE"

**3.1**     Senior Citizens of Greater Dallas, D/B/A Senior Source has incorporated into the Senior Source Reply Brief, much of the Appellee Reply Brief for Appellee Thomas Tipps.  Appellant's Reply to the Reply Brief for Thomas Tipps is set forth in Section 1.01, page 9 – 55, Para(s) 1.1- 1.91 of this Combined Appellant Reply Brief.

**3.1(a)** Appellant incorporates by reference, Appellant Doris Lee Tipps' Opposition to The Senior Source's Petition to Revoke Authority of Agent. (Appt. Repl. Br. Appendix, IV).

**3.2**     In Appellee Senior Source's Reply Brief (Sr. Reply Br.), Senior Source sets forth its authority as Texas Estates Code §1151.051 and the alleged conflict between the Medical Power of Attorney held by Appellant and the duties and responsibilities set forth in §1151.051.  Those authorities and those responsibilities do not exist in a vacuum.  From the beginning, Senior Source and its Agent, Prestonwood Nursing, demonstrated, starting in February 2014, proved to Appellant that they together were willing to abuse those authorities and

responsibilities to the detriment of Appellant Doris L. Tipps and Appellant Steven Tipps.

**3.3** Agents Answer to Citation of Senior Source's Petition follows in its entirety. In Para VII of Agent's Answer, Appellant Steven Tipps relates his direct support for the Cumberland and Senior Source appointments. Appellant Steven Tipps was the only person to take that stand, and through the mediated settlement conference to make certain that both Cumberland and Senior Source were positioned and supported for court approval in each of their forthcoming appointments. Appellant made these efforts in behalf of Senior Source in good faith; Appellant made these efforts in behalf of Cumberland in good faith. Without Steven Tipps' intervention with Doris L.Tipps on January 23, 2014—the date of the Settlement Conference-- at Select Specialty Hospital, Senior Source's appointment would not have occurred on February 17, 2014 under the Trial Court's Order. (Appt. Br. Appendix – Crises & Survival p 4, line 90). Without Doris' assent, and the confirming telephone call to her hospital bedroom from her attorney Tom Finley and her ad litem attorney Scott Weber, neither Senior Source, nor Cumberland could have been appointed under the Settlement mediation settlement agreement on Thursday January 23, 2014. Appellant regrets his support of either of these organizations.

**3.4** It is reasonable to ask: why did Senior Source commence an investigation of Appellant Steven Tipps at Select Specialty Hospital on February 14, 2014? (Appt.

Br. Appendix – Crises & Survival, p2, line 199). Appellant and Appellee Senior Source were complete unknowns to each other. Cumberland and Appellant, were complete unknowns to each other, yet Cumberland engaged Appellant in an adversarial struggle in the same relative time as Senior Source commenced its investigation, and later filed suit against Appellant. There is no reason why these two substantial corporate and charitable interests are adverse to Appellant?

**3.5 - _Step I._** In Re Appellee Reply Brief –Thomas Tipps. In July – August 2012, Appellant transferred the Medical Power of Attorney to Appellee Thomas Tipps. Also, in August 2012, one month after Doris L. Tipps signed the July 19, 2012 Declaration of Guardian in the Event of Later Incapacity or Need of Guardian: a document that is purported to have disqualified Appellant from serving as guardian of her person and estate. In late August 2012, Appellee Thomas Tipps emailed the Texas Department of Adult Protective Services, with and copied the email to Appellant Steven Tipps. This was the first of the known allegations of abuse alleged by Appellee Thomas Tipps. Appellant cooperated with TDAPS' investigators. In October 2012, Appellant suggested that a TDAPS investigator could interview Doris L. Tipps at her apartment at Lakeview in Carrollton, Texas. Later, TDAPS stated that the indicated interview had occurred. On the afternoon of the interview of Doris, TDAPS dropped its investigation. In the follow-up conversation, the investigator gave Appellant information on what TDAPS

Page **82** of **103**

recommends for families with these issues. They suggest independent corporate trustees. (October 2013). (Appt. Br. Appendix – Crises & Survival).

**3.6 *Step II.*** A second investigation was initiated in the relative time frame of January 2, 2014, by the investigation staff of Probate Court No. 3. Patricia McArdle was the investigating officer for the probate court. (Appt. Br. Appendix – Crises & Survival – Email to Tom Finley p2, line 199). In August 2013, Probate Court No. 3, Appellee Thomas Tipps alleged in his Application for Appointment of Temporary Guardian of the Person and Estate of Appellant Doris L. Tipps the following:

(1) "There is imminent danger that the physical health or safety of the Proposed Ward will be seriously impaired unless the Court takes immediate action to appoint Applicant as Proposed Ward's Temporary Guardian, and

(2) …(T)he Proposed Ward is making poor financial decisions and said decisions are contrary to the Proposed Ward's long-standing expressed wishes. The Proposed Ward is unable to care for herself and her finances."

(Note): This bid to become guardian of her person and estate failed.

**3.7 *Step III.*** On September 30, 2013, the Trial Court issued its Order On Motion For Independent Mental Examination in which the Trained Court stated: " IT IS FURHTER ORDERED that no one communicate with the physician or psychiatrist prior to the issuance of his report except as may be necessary to schedule the

examination." On Friday October 4, 1013 at 2:00 P.M., J. Douglas Crowder, M.D. tested Doris L. Tipps and found that Doris was totally disabled and specifically unable to handle her finances. Appellant had absolutely no conversation with Dr. Crowder, other than in introducing Doris to the examining physician. Appellant then left Dr. Crowder's office until the testing was complete. When Dr. Crowder tried to have a conversation with Appellant, Appellant informed the doctor that he was barred by court Order not to have any discussions with the physician examiner.

**3.8 _Step IV._** In the week of February 14, 2014, Senior Source commenced its investigation of Appellant. This occurred by visiting Doris at Select Specialty Hospital in Plano (Hwy 544) Plano, Texas. (Appellant Br. Appendix – Crises & Survival - Emails to Tom Finley, p2, line 209). After that event, the interactions between Appellant and Senior Source became adversarial. as indicated in Agents Answer to Petitioner's Petition to Revoke Authority of Agent. The interaction between Appellant and Cumberland had also become adversarial by January 2014. Appellant then became the target of three investigations and the beneficiary of five lawsuits initiated by Appellee Thomas Tipps. (C.R. s 7). (C. R. s 15). (C.R. s 42).

| GUARDIAN SHIP OF | & | IN THE PROBATE COURT |
| DORIS LEE TIPPS, | & | NO. 3 OF |
| INCAPACTATED | & | DALLAS COUNTY, TEXAS |

## AGENTS ANSWER TO PETITIONER'S
## PETITION TO REVOKE AUTHORITY OF AGENT

## (Also located at: (Appt. Reply Br. Appendix. IV) &

## At (C.R. s 42) & C.R. s 7)

TO THE HONORABLE JUDGE OF SAID COURT:

I

**3.9** Now Comes Steven V. Tipps, Agent, and brings this Answer under Rule No. 7 of the Texas Rules of Civil Procedure, that Agent comes without counsel, *pro se defensio*, that Doris Lee Tipps is represented by her legal counsel, W. Thomas Finley ("Mr. Finley"), that Thomas R. Tipps, Glenda D. Jordan, and Sally J. Tipps (each) are represented by legal counsel (Sullivan & Cook), and that Agent has no position adverse to Doris Lee Tipps, the Mother, whose rights, protections, health, and safety are paramount. The Petition names the Agent, and now Agent comes to confront and defend against all accusations of Petitioner.

II

**3.10** Steven V. Tipps, Agent of Doris Lee Tipps represents that he is holder of a Medical Power of Attorney for Doris Lee Tipps, ("the Mother") and complains of Petitioner for violation of Texas HUMAN RESOURCES CODE, Title 6, Chapter 102 RIGHTS OF THE ELDERLY ; SEC 102.002 (a), (b) PROHIBITION(S), SEC 102.003 (a) RIGHTS OF THE ELDERLY and SEC 1002.003 (b) DIGNITY, and SEC102.003 (f) RIGHTS OF THE ELDERLY. "An elderly individual may complain about the individual's care or treatment. The complaint may be anonymously or communicated by a person designated by the elderly individual. The person providing service shall promptly respond to resolve the complaint. The person providing service may not discriminate or take other punitive action against an elderly individual who makes a complaint."

Page **85** of **103**

## III

**3.11** The Agent denies the claim of Petitioner that Agent attempted to direct the care of the Mother. The Agent denies the claim of Petitioner that Agent tried to elicit medical information about the Ward claiming authority by a medical power of attorney. On one occasion, Agent stated to Prestonwood Staff that Agent held a Medical Power of Attorney and that statement of fact was made while reporting an emergency condition directly caused by the Agent of the Guardian while the Guardian case managers were out of state in a conference.

## IV

**3.12** Agent complains of Petitioner, as Principal, and Prestonwood Nursing (Agent of Petitioner) that Agent of Petitioner recklessly endangered the Mother at 8:00 p.m. local time on April 23, 2014 by "tossing the Mother into the air, as in a "sack of potatoes" and that the Mother became airborne and crashed into a hard bed in Room 406 at Prestonwood Nursing. Agent witnessed, in stunned disbelief, the take-off, the flight, and the crash landing of the Mother, as Agent opened the door to Room 406 at that time, on that date, and in the location.

## V

**3.13** Agent, in behalf of the Mother, gently complained to Prestonwood Staff, to Senior Source's management, and to the Office of the Ombudsman. Agent was peaceful, respectful, and civil in all communications with Petitioner, Agent of Petitioner, the staff of Agent of Petitioner, and the Ombudsman.

## VI

**3.14** In a letter dated April 29, 2014, the Petitioner informed the Agent that, effective immediately, (1) Agent's rights to visit the Mother on the evening shift at Prestonwood Nursing were terminated, that (2) Agent's visitation rights were restricted to 11:00 a.m. and 3:00 p.m. , (3) that continued interference by the Agent would result in complete denial of the Agent's rights to visit the Mother, (4) that Agent may be exposed to judicial recourse,(5) that Agent would be denied access to any medical information of Petitioner's Agent, and (6) that Agent would be subjected to police intervention. This, notwithstanding that the Agent is in possession of a substantial fund of knowledge concerning the Mother's historical medical information, that the Agent has substantial knowledge of the Mother's medical history, medications, illnesses, predispositions, emergencies, and

Page **86** of **103**

recoveries. Petitioner, and the Agent of Petitioner desires to remove the threat of this knowledge in order to increase my mother's health and safety.

**3.15** Between October 29, 2014 and April 24, 2014, the Agent committed 500 hours in daily visits (7 days per week) in support of the Mother and over 1,600 miles driven between 1844 Hood Street and Baylor Medical Center Carrollton (first bronchial pneumonia), Axel Rehab on Mash Lane in Plano, Baylor Medical Center Carrollton (second bronchial-pneumonia), Select Specialty Hospital Plano, and Axel Nursing and Rehabilitation Center. All of the major decisions made between those dates were made by the Agent, without consultation with anyone other than physicians, specialists and nursing staff under the Guardianship or the Medical Power of Attorney held by the Agent.

**3.16** Petitioner's wholly unreasonable power to restrict medical information is unrealistic. Agent of the Petitioner occasionally asks the Agent to assist in persuading the Mother to take the medicines that she has refused. The Agent cannot perform this assistance without knowledge of the medicines the Mother is refusing. Petitioner's request to restrict medical assistance, under certain circumstances, could be construed as unlawful under the Texas Samaritan statutes. The Mother's refusal to accept medications has been, in one known instance, due to her medicines being swapped with another resident at Prestonwood Nursing. As a result, the Mother became very ill with vomiting and pain and other discomforts resulting from errors by the Agent of the Petitioner. This list of other concerns about the Agent of the Petitioner is prolific and includes: (1) refusal or inability to respond to the Mother's calls for assistance on the night shift, (2) poor management of the Mother's oxygen requirements, (3) refusal of staff on the night shift with bathroom assistance, (4) refusal to recognize the symptoms of a heart attack, to report such symptoms the physicians, and failure to record the incident or communicate it to the Agent of the Petitioner (5) failing to fill the Mother's water jug at night, and (6) failing to secure the call button to the Mother's bed to prevent the communication unit from falling to the floor on the night shift.

## VII

**3.17** On Friday September 13, 2013, the trained Court was assembled to consider the guardianship petition presented by Sullivan & Cook, attorneys for Thomas R. Tipps, Glenda D. Jordan, and Sally J. Fink. The Agent had recently received the transfer of the Durable Power of Attorney, the Medical Power of Attorney, and the Guardianship of the Mother. Prior to the trained Court session, the Agent met with the Mother's *at litem* attorney, Scott Weber and Mr. Finley. Attorney's Weber and

Page **87** of **103**

Finley each advanced the notion of a corporate trustee and Mr. Finely suggested an independent guardian. As the Mother's temporary guardian, the Agent advanced and supported both objectives.

**3.18** During the Settlement Conference on Thursday January 24, 2014, the Mother's attorneys requested the approval of an independent guardian: the Mother refused. To avoid further dismemberment of the Trusts, the Agent traveled to Select Specialty Hospital to meet with the Mother. In that meeting, the Mother changed her mind and agreed to have an independent guardian. The Agent has supported the Petitioner.

VIII

**3.19** While withdrawn by the Petitioner, these punitive actions by the Petitioner violated the Constitutional and Civil rights of the Mother as well as of the Agent that directly and specifically violated, without limitation, The Texas HUMAN RESOURCES CODE, TITLE 6. CHAPTER 102 SECTION 102.003 (f).

PRAYER

**3.20** WHEREFORE, PREMISES CONSIDERED, Defendant prays that citation issue as required by law to all persons interested in this matter, and that upon hearing the trained Court find that a no conflict exists between the powers granted the Petitioner and the Medical Power of Attorney held by the Agent. Petitioner together with the Agent of Petitioner have abused their discretion, they have together or separately recklessly endangered the Mother's health and safety, they have engaged in an act of suppression that violated State law, and they have consistently withheld services and assistance from the Mother on the night shift at Prestonwood Nursing. Therefore we further PRAY that the Court will balance the Mother's rights and interests against the Petitioners petition for more powers: powers that the Petitioner and the Petitions Agent have shown they are willing to abuse.

**3.21** In Accordance with these general requests, the Agent requests the following specific relief:

    a) The Agent desires to retain the Medical Power of Attorney for the Mother as a counterbalance to the reckless acts of the Petitioner's Agent and the unlawful acts and abuse of power by the Petitioner and the Agent of the Petitioner.

b) The Agent petitions the Court to order the Petitioner to amend the "Do Not Resuscitate" order established and approved by the Petitioner to include language that instructs medical personnel attending an emergency in connection with the care of the Mother, to be permitted to use non-invasive electrical and chemical means to revive the Mother.

c) The Agent seeks to have the Court approve a new and more comfortable bed for the Mother at Prestonwood Nursing and Rehabilitation expense,

d) The Agent seeks to have additional furniture, such as a recliner, furnished by Prestonwood Nursing to Room 406,

e) The Agent seeks to have the Court approve, by order to the Petitioner, occasional passes that will permit the Agent to take the Mother on local drives to visit her home at 1844 Hood Street and for lunch or dinners out, with small oxygen bottles furnished by Prestonwood Nursing. Agent's requests for this additional degree of freedom have been denied by Petitioner during in recent months,

f) The Agent seeks to have the Court issue an order for reimbursement of ongoing expenses related to the very substantial visits to Prestonwood Nursing and to order the repair of the Mother's Lincoln Continental for such transportation (costs totaling $2,100),

g) The Agent seeks reimbursement, from the Tipps Living Trust(s), of costs incurred during the Guardianship for between October 29, 2014 and February 24, 2014 and for the additional interval between February 24, 2014 and April 30, 2014.

**3.22** The Agent seeks reimbursement from the Petitioner of all costs associated with this Petition, and all other relief, both general and special, legal and equitable, to which the Agent may be entitled.

Respectfully submitted,

Steven V. Tipps
Pro Se Litigant
5015 Addison Circle

Addison, Texas 75001
214-223-6358
Fax 254-731-2522
Email: casing@prodigy.net
Email: casingscientific@gmail.com

**3.23** Appellee Reply Br. Page 5, Para 1. Appellee states that "there is inherently a conflict created between the charge put upon a guardian of the person under Texas Health & Safety Code §1151.051 and the authority granted Appellant under the Medical Power of Attorney". Appellant replies that there is a disconnection between the actual world and the imaginary world. Appellant's concerns about the Senior Source – Prestonwood arrangement have been based on disturbing facts that were addressed in Agents Answer to Petitioner's Petition to Revoke Authority of Agent.

**3.24** The medical power of attorney that was transferred in August 2012 to Appellee Thomas Tipps, then back to Appellant Steven Tipps, and then by court Order to Senior Source is now in the hands of an organization that has shown itself capable of abuse of power that should never been exercised against an elderly resident for making a complaint while resident at Prestonwood.

**3.25** Appellant continues to have a serious concern about the possession of the medical power of attorney. After the transfer of the MPA to Appellee Thomas Tipps in August 2012, Appellant observed Doris L. Tipps in a life threatening emergency that was caused by the holder of the medical power of attorney and his

influence with a physician to remove Doris from her blood thinner, coumadin. Steven took Doris to the emergency room at 2:30 A. M. at Baylor Medical Center – Carrollton with a blood clot in her left calf. She was in agony with chronic pain, and that event could have ended in amputation or death. Ten days at Baylor. This is the reason why the issue of the holder of the medical power of attorney is contested. Appellant believes Senior Source has shown itself to be vulnerable to undue influence. A medical power of attorney carries with it the right to terminate health care services, and in cases where a rally is possible, as it was for Doris Lee Tipps in the winter of 2013 – 2014, Life should be the overwhelming and absolute consideration in the decision.

Appellant Reply Brief

To Reply Brief of Thomas Tipps

Ends Here

# CERTIFICATE OF SERVICE

       I hereby certify that a true and correct copy of the above and foregoing instrument was served on the following counsel on this the 24th day of July 2015 by email:

| *Appellant* | *Counsel:* |
|---|---|
| Steven Tipps | Steven Tipps, Pro Se Party<br>5015 Addison Circle<br>Addison, Texas 75001 |

| *Appellant:* | *Counsel:* |
|---|---|
| Doris L. Tipps | W. Thomas Finley<br>Finley Law Group,<br>5500 Preston Road, Suite 390<br>Dallas, Texas 75290 |

| Cumberland Trust & Investment Co. | *Counsel:* |
|---|---|
| *Appellee:* | Alvin J. Golden<br>Laurellen Ratliff<br>Ickard Golden Jones, P.C.<br>400 West 15th Street, Suite 975<br>Austin, Texas 78701-1646 |

| Senior Citizens of Greater Dallas, | *Counsel:* |
|---|---|
| *d/b/a Senior Source*<br><br>*Appellee:* | John H. Phillips<br>Boone, Boone, & Phillips<br>4313 Lovers Lane<br>Dallas, Texas 75209 |

*Counsel:*

Thomas Tipps

Jeffrey Cook
Adam Barela
Sullivan & Cook, L.L.C.
*Appellee:* 
600 E. Las Colinas Blvd
Suite 1300
Irving, Texas  75039


/s/Steven Tipps

Steven Tipps

Pro Se Appellant

# CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that this brief complies with the type-volume limitations because it is within the 50 page limit for briefs on the merits.

The undersigned further certifies that this brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) because this brief was prepared in proportionally spaced typeface using "Microsoft Word 2013" in fourteen (14) point "Times New Roman" style font.

/s/Steven Tipps
Steven Tipps

# CONCLUSION

Appellant's efforts to conduct cross-examination were either completely denied or unduly restricted, indicating the direction of the decisions that were being taken.

# PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Appellant respectfully prays that this Court, upon consideration of these matters, reverse and remand to the Trial Court in favor of Appellant Doris Tipps and Appellant Steven Tipps. Appellant further prays for general costs and general relief, and such other relief to which he may show himself entitled.

Respectfully submitted:

**/s/Steven Tipps**

Steven Tipps, Pro Se Appellant
5015 Addison Circle
Addison, Texas 75001
214.223.6358
Fax 254.731.2522
Email: casingscientific@gmail.com
casing@prodigy.net

# COMBINED APPELLANT REPLY BRIEF
## INDEX OF APPENDIX
## AS RELATED TO
## THREE APPELLEE REPLY BRIEFS

**I.** Appellant Steven Tipps Answer to Citation - Cumberland..........................97

**II.** Appellant Steven Tipps Answer to Citation – Senior Source................... 103

**III.** W. Thomas Finley – For Doris L. Tipps, Objection to Appointment....112

**IV.** W. Thomas Finley – For Doris L. Tipps Objection to Senior Source....140

**V.** Case excepts – De Ayala v. Mackie........................................155

**VI.** Case Summaries...............................................................158

    a. Texas procedural due process congruent with
        Federal *procedural due process*......................................159

    b. Texas due course clause of the Texas Constitution congruent with
        U. S. Constitution's *due process* clause.........................161

    c. Davidson v. Great Nat'l Life Ins. Co. – Case Reference Summaries.165

    d. Texas abuse of discretion cases.......................................166

**VII.** Application for Appointment of Temporary Guardian
       Of the Person and Estate of Doris L. Tipps

**VIII.** Order on Motion For Independent Medical Examination..................179

**IX.** Mental Examination Report – J. Douglas Crowder, M.D...............181

**X.** Mental Examination Report – Kathleen C. Saine, Ph.D................187

**XI.** Reporters Record – October 21, 2014 Hearing................................198

**XII.** Crises and Survival – 10-29-2013 to 04-24-14, Two Pneumonias......230

# I.

# APPELLANT STEVEN TIPPS ANSWER TO CITATION

# CUMBERLAND TRUST & INVESTMENT COMPANY

 ORIGINAL

NO. PR13-3072-3

| | | |
|---|---|---|
| GUARDIAN SHIP OF | & | IN THE PROBATE COURT |
| DORIS LEE TIPPS, | & | NO. 3 OF |
| INCAPACTATED | & | DALLAS COUNTY, TEXAS |

## AGENTS ANSWER TO MOTION TO ACCEPT RESIGNATION, DISCHARGE TRUSTEE AND REINSTATE TRUSTEE

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, STEVEN VINSON TIPPS ("the Agent"), individually, and brings this Answer to the Petition under Rule No. 7 of the Texas Rules of Civil Procedure. Agent comes without counsel, *pro se defensio*. Doris Lee Tipps ("the Mother") is represented by her legal counsel, W. Thomas Finley ("Mr. Finley"), that Thomas R. Tipps, Glenda D. Jordan, and Sally J. Fink (each) are represented by legal counsel (Sullivan & Cook). The Agent has no interest adverse to the Mother. The Petition names the Agent, and now Agent comes to confront and defend against all accusations of Petitioner.

I

In order for there to be compliance with Judge Miller's order which was signed by the Judge on Monday February 14, 2014, there were two steps that had to be fulfilled: Step I: Cumberland would accept responsibility as the replacement trustee, upon the simultaneous resignation of Thomas R. Tipps and Doris L. Tipps, the Co-Trustees. Step II: All of the transferrable assets had to be moved to Cumberland, at which time compliance with the February 17, 2014 order would have been complete.

The financial assets and other transferable assets, the great majority of the bounty, were held generically in the Tipps Living Trust and its Sub-Trusts, and these assets were to be moved to Cumberland Trust as the successor trustee. The financial assets should have been in the form of investments in stock and bond mutual funds, ordinarily, of the highest quality, any tax free municipal bonds that were held in the name of the Trusts, bank accounts, and insurance annuities and policies. Other assets were the three rent houses, a tree farm, and the Mother's residence at

1844 Hood Street Carrollton, Texas 75006, in which the Mother maintains a Life Estate. Hood is held in the Mother's name and is non-transferrable in the Trusts during her lifetime.

Cumberland was fully aware of the agreed treatment for the Tipping-T real estate . In fact, the real estate portfolio, as a whole, was a known quantity as it was evaluated by Cumberland by the time Cumberland informed the Court that it was ready to serve. There were, therefore, no known surprises in any of the real estate portfolio: four houses and one tree farm. In Section 4.5, Petitioner states that "Cumberland discovered that administration of the Trust would be fraught with unanticipated difficulties". The only "unanticipated difficulty" was the Life Estate that the Mother retained in Hood Street that barred transfer of Hood Street to the Trusts before the death of the second to die.

Assuming that Hood Street was equivalent to ten percent of the overall valuation of the Trusts, one might ask: why did Cumberland fail to insist that the Co-Trustee, Thomas R. Tipps, proceed with the transfer of the financial assets to the Trust. If the "unanticipated difficulties" in Section 4.5 of the Petition only related to a relatively small portion of the overall bounty, why did Cumberland fail to ask for an increase in fees, for the unanticipated loss in fee income associated with Hood Street? This recovery would have been reasonable and would have resolved that issue, if the issue was related to lost income at Cumberland, rather than an apparent "Tug of War" connected with 1844 Hood Street. If there were not a struggle connected with Hood Street, why was the Co-Trustee filing a lawsuit for eviction of the Agent from Hood Street and why was Cumberland participating with the Co-Trustee in what amounted to a "squeeze play" against the Agent.

II

The Settlement Agreement did establish for the replacement of the Corporate Trustee, in event that a corporate Trustee were to resign. Frost Bank was the other interested party at the time of Cumberland's appointment. Thomas R. Tipps is the same individual that engaged in self dealing $125,000 in Trust assets, a violation of Texas Trust law. Thomas R. Tipps is the same individual that off-loaded $75,000 of unauthorized distributions to Sally J. Fink and Glenda D. Jordan ("the Sisters") and caused the disappearance of approximately $200,000 in legal fees from the Mother's retirement assets.

Counsel for Cumberland has stated in Section 4.8 of the Petition that the former Co-Trustee "continues to deal with the funds in the Trust" and in Section 4.9 he states "it would be in the best interest of the Ward to accept the resignation of Cumberland and to approve the appointment of Thomas Tipps as Trustee".

## III

The Court Order signed by Judge Miller on Monday February 17, 2014 required that the Co-Trustee resign as Co-Trustee. The Settlement Agreement attached to the Judge's Order was not furnished with a reincarnation clause reserved for the Co-Trustees' return. Resignation meant resignation. Transfer of the Assets meant Transfer of the Assets.

Sanctions should be applied.

## IV

1844 Hood Street has become central to the discussions and arguments in the Petition and Petitioners infer wrong doing in its occupancy arrangement. Petitioner refers to the Mother as the Ward, as the Totally Disabled Person. In these daily visits, it never occurs to me that she has dementia. I make visits four to five times per week for at least two hours over what seems an endless track. From October 29, 2013, during my Guardianship, through April 30, 2014, the Agent spent 500 hours in daily trips to the hospitals, rehabilitation centers, and skilled nursing facilities for one purpose during the worst season for respiratory illness in decades. Not one day was missed, and the support that was provided to Mom during these visits included daily briefings from the nurses and physicians assistants, review with her physicians, sometimes flower or newspaper deliveries, back scratching, and calling in the nurses for pain medications or bathroom assistance. This was a struggle for survival. The most important information I conveyed to her each day were her vital signs, prognosis, and likely departure date for rehabilitation and return Home. I was a full time care giver.

During that six months she had two fully involved bronchial pneumonias. The first infection commenced on October 29, 2014 with admission to Baylor Medical Center Carrollton on the morning of November 30, 2014. Dr. Richard Sohmer was the emergency room physician and Baylor Carrollton. The key to getting her through these emergencies was to get her to the

emergency room before the infection became a health emergency. Mom was transferred to Accel Rehab Center, and she arrived Home at Lakeview on November 11, 2013.

The Mother's residence at Lakeview was staffed with full time 24 hour nursing and monitoring personnel. On Sunday January 5, 2014, I called Lakeview at 11:15 a.m. Mom had another cough that is the principal warning signal for bronchial pneumonia. I took her to Baylor Medical Center at 2:30 p.m., after lunch and lung treatment, we drove to Baylor Carrollton Emergency to have her checked. Dr. Harris, the Emergency Room physician admitted Mom at 7:00 p.m. that evening with bronchial pneumonia. This infection was different. I visited Mom that Monday morning and this extremely fast moving infection was at an early state of sepsis. She was moved to the Baylor ICU. This illness was chronic compared to the first bronchial pneumonia. She stayed in Baylor for nearly two weeks and then was transferred to Select Specialty Hospital in Plano, where she became critically ill. This was new. She stopped eating. Dr. Hardeep Rai, Mom's primary care physician was worried that she had stopped eating and was giving up. Agent started to assist during her meals and enlisted the support of the outside agency to assist with meals, keeping her comfortable, pulling her up in her bed, calling for bed pan assistance, calling for nursing assistance, and scratching her back.

The illness progressed to a stage that Dr. Rai approached me to ask whether we should save her or let her die. Dr. Rai was told that she deserved the last full measure. I ordered Dr. Rai to get all of the specialists on deck. Dr. Boorla, the cardiologist. Dr. Wilson, the nephrologist. Dr. Torton the infectious infectious disease specialist. Dr. Sam Eljamell, the lung specialist. Dr. Tomkins, a cardiologist.

Dr. Sohn, observed that Mom's condition continued to deteriorate. She was taken to Baylor Carrollton Radiology for draining her pleural sacs. Her chest expansion was approaching zero. She was breathing with her neck muscles to the extent that her neck was about eight inches in diameter. Six hundred milliliters of fluid were removed, and on return from the procedure, her neck has returned to a four inch diameter. She returned to Select Specialty Hospital where she gradually recovered. She was transferred to Accel Skilled Nursing and Rehabilitation Center on Communication Parkway in Plano, Texas. This second pneumonia and recovery started on Sunday January 5, 2014 and continued to early July 2014 when she finally recovered and stabilized.

1844 Hood Street was, and is, the base for all of the support activities related to Mom's emergencies while living at Lakeview and during her hospitalizations and rehabilitation. Being cost free has made it possible for Agent to give the Mother an extraordinary level of personal care and protection. This direct involvement and continuing presence has been ongoing. Hood Street has been at the centre of those activities for the last decade. If strictly measuring the avoided cost to the Trusts resulting from the Agents 500 hours of service from Hood Street, those amounts would be substantial. The proximity of 1844 Hood Street to Lakeview is half a mile. The proximity of 1844 Hood Street to Accel Rehabilitation located on Communication Parkway is 12 minutes, to Select Specialty Hospital 12 minutes, and Fifteen to twenty minutes one way to Baylor Hospital Carrollton. There have been days when the Agent made three or four round trips per day. Petitioner engaged in malicious prosecution, intimidation, and tortuously interfered with the Guardian, in the exercise of his duties. Agent was further damaged by Petitioner's refusal to fund expenses and other costs that were intended to inflict economic losses on the Agent.

PRAYER

WHEREFORE, PRESMISES CONSIDERED, Steven V. Tipps, the Agent prays that the Court will Order that Frost Bank be named successor Trustee, and that Co-Trustee is ordered to turn over the transferable assets of the Trust to Frost Bank ("Frost") and to complete the transfer of assets to Frost within thirty days of the acceptance of the Cumberland's resignation. Cumberland's release from Liability must be conditional upon an accounting for all Trust income for the period between the date of Cumberland's acceptance of its Trust duties and the date that all transferable assets are moved to the replacement corporate trustee. The Agent prays for such other and further relief to which he may show himself entitled.

Respectfully submitted,

Steven V. Tipps, Pro Se Party
5015 Addison Circle
Addison, Texas 75001
214-223-6358
Fax 254-731-2522
Email: casingscientific.gmail.com
Email: casing@prodigy.net

**II.**

**APPELLANT STEVEN TIPPS ANSWER TO CITATION**

**SENIOR CITIZENS OF GREATER DALLAS, D/B/A**

**SENIOR SOURCE**

GUARDIAN SHIP OF          &       IN THE PROBATE COURT

DORIS LEE TIPPS,           &       NO. 3 OF

INCAPACTATED           &       DALLAS COUNTY, TEXAS

## AGENTS ANSWER TO PETITIONER'S PETITION TO REVOKE AUTHORITY OF AGENT

TO THE HONORABLE JUDGE OF SAID COURT:

I

Now Comes Steven V. Tipps, Agent, and brings this Answer under Rule No. 7 of the Texas Rules of Civil Procedure, that Agent comes without counsel, *pro se defensio*, that Doris Lee Tipps is represented by her legal counsel, W. Thomas Finley ("Mr. Finley"), that Thomas R. Tipps, Glenda D. Jordan, and Sally J. Tipps (each) are represented by legal counsel (Sullivan & Cook),and that Agent has no position adverse to Doris Lee Tipps, the Mother, whose rights, protections, health, and safety are paramount. The Petition names the Agent, and now Agent comes to confront and defend against all accusations of Petitioner.

II

Steven V. Tipps, Agent of Doris Lee Tipps represents that he is holder of a Medical Power of Attorney for Doris Lee Tipps, ("the Mother") and complains of Petitioner for violation of Texas HUMAN RESOURCES CODE, Title 6, Chapter 102 RIGHTS OF THE ELDERLY ; SEC 102.002 (a), (b) PROHIBITION(S), SEC 102.003 (a) RIGHTS OF THE ELDERLY and SEC 1002.003 (b) DIGNITY, and SEC102.003 (f) RIGHTS OF THE ELDERLY. "An elderly individual may complain about the individual's care or treatment. The complaint may be anonymously or communicated by a person designated by the elderly individual. The person providing service shall promptly respond to resolve the complaint. The person providing service may not discriminate or take other punitive action against an elderly individual who makes a complaint."

III

The Agent denies the claim of Petitioner that Agent attempted to direct the care of the Mother. The Agent denies the claim of Petitioner that Agent tried to elicit medical information about the Ward claiming authority by a medical power of attorney. On one occasion, Agent stated to Prestonwood Staff that Agent held a Medical Power of Attorney and that statement of fact was made while reporting an

emergency condition directly caused by the Agent of the Guardian while the Guardian case managers were out of state in a conference.

## IV

Agent complains of Petitioner, as Principal, and Prestonwood Nursing (Agent of Petitioner) that Agent of Petitioner recklessly endangered the Mother at 8:00 p.m. local time on April 23, 2014 by "tossing the Mother into the air, as in a "sack of potatoes" and that the Mother became airborne and crashed into a hard bed in Room 406 at Prestonwood Nursing. Agent witnessed, in stunned disbelief, the take-off, the flight, and the crash landing of the Mother, as Agent opened the door to Room 406 at that time, on that date, and in the location.

## V

Agent, in behalf of the Mother, gently complained to Prestonwood Staff, to Senior Source' management, and to the Office of the Ombudsman. Agent was peaceful, respectful, and civil in all communications with Petitioner, Agent of Petitioner, the staff of Agent of Petitioner, and the Ombudsman.

## VI

In a letter dated April 29, 2014, the Petitioner informed the Agent that, effective immediately, (1) Agent's rights to visit the Mother on the evening shift at Prestonwood Nursing were terminated, that (2) Agent's visitation rights were restricted to 11:00 a.m. and 3:00 p.m. , (3) that continued interference by the Agent would result in complete denial of the Agent's rights to visit the Mother, (4) that Agent may be exposed to judicial recourse,(5) that Agent would be denied access to any medical information of Petitioner's Agent, and (6) that Agent would be subjected to police intervention. This, notwithstanding that the Agent is in possession of a substantial fund of knowledge concerning the Mother's historical medical information, that the Agent has substantial knowledge of the Mother's medical history, medications, illnesses, predispositions, emergencies, and recoveries. Petitioner, and the Agent of Petitioner desires to remove the threat of this knowledge in order to increase my mother's health and safety.

Between October 29, 2014 and April 24, 2014, the Agent committed 500 hours in daily visits (7 days per week) in support of the Mother and over 1,600 miles driven between 1844 Hood Street and Baylor Medical Center Carrollton (first bronchial pneumonia), Axel Rehab on Mash Lane in Plano, Baylor Medical Center Carrollton (second bronchial-pneumonia), Select Specialty Hospital Plano, and Axel Nursing and Rehabilitation Center. All of the major decisions made between those dates were made

by the Agent, without consultation with anyone other than physicians, specialists and nursing staff under the Guardianship or the Medical Power of Attorney held by the Agent.

Petitioner's wholly unreasonable power to restrict medical information is unrealistic. Agent of the Petitioner occasionally asks the Agent to assist in persuading the Mother to take the medicines that she has refused. The Agent cannot perform this assistance without knowledge of the medicines the Mother is refusing. Petitioner's request to restrict medical assistance, under certain circumstances, could be construed as unlawful under the Texas Samaritan statutes. The Mother's refusal to accept medications has been, in one known instance, due to her medicines being swapped with another resident at Prestonwood Nursing. As a result, the Mother became very ill with vomiting and pain and other discomforts resulting from errors by the Agent of the Petitioner. This list of other concerns about the Agent of the Petitioner is prolific and includes: (1) refusal or inability to respond to the Mother's calls for assistance on the night shift, (2) poor management of the Mother's oxygen requirements, (3) refusal of staff on the night shift with bathroom assistance, (4) refusal to recognize the symptoms of a heart attack, to report such symptoms the physicians, and failure to record the incident or communicate it to the Agent of the Petitioner (5) failing to fill the Mother's water jug at night, and (6) failing to secure the call button to the Mother's bed to prevent the communication unit from falling to the floor on the night shift.

## VII

On Friday September 13, 2013, the trained Court was assembled to consider the guardianship petition presented by Sullivan & Cook, attorneys for Thomas R. Tipps, Glenda D. Jordan, and Sally J. Fink. The Agent had recently received the transfer of the Durable Power of Attorney, the Medical Power of Attorney, and the Guardianship of the Mother. Prior to the trained Court session, the Agent met with the Mother's *at litem* attorney, Scott Weber and Mr. Finley. Attorney's Weber and Finley each advanced the notion of a corporate trustee and Mr. Finely suggested an independent guardian. As the Mother's temporary guardian, the Agent advanced and supported both objectives.

During the Settlement Conference on Thursday January 24, 2014, the Mother's attorneys requested the approval of an independent guardian: the Mother refused. To avoid further dismemberment of the Trusts, the Agent traveled to Select Specialty Hospital to meet with the Mother. In that meeting, the Mother changed her mind and agreed to have an independent guardian. The Agent has supported the Petitioner.

## VIII

While withdrawn by the Petitioner, these punitive actions by the Petitioner violated the Constitutional and Civil rights of the Mother as well as of the Agent that directly and specifically violated, without limitation, The Texas HUMAN RESOURCES CODE, TITLE 6. CHAPTER 102 SECTION 102.003 (f).

### PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant prays that citation issue as required by law to all persons interested in this matter, and that upon hearing the trained Court find that a no conflict exists between the powers granted the Petitioner and the Medical Power of Attorney held by the Agent. Petitioner together with the Agent of Petitioner have abused their discretion, they have together or separately recklessly endangered the Mother's health and safety, they have engaged in an act of suppression that violated State law, and they have consistently withheld services and assistance from the Mother on the night shift at Prestonwood Nursing. Therefore we further PRAY that the Court will balance the Mother's rights and interests against the Petitioners petition for more powers: powers that the Petitioner and the Petitions Agent have shown they are willing to abuse.

In Accordance with these general requests, the Agent requests the following specific relief:

a) The Agent desires to retain the Medical Power of Attorney for the Mother as a counterbalance to the reckless acts of the Petitioner's Agent and the unlawful acts and abuse of power by the Petitioner and the Agent of the Petitioner.

b) The Agent petitions the Court to order the Petitioner to amend the "Do Not Resuscitate" order established and approved by the Petitioner to include language that instructs medical personnel attending an emergency in connection with the care of the Mother, to be permitted to use non-invasive electrical and chemical means to revive the Mother.

c) The Agent seeks to have the Court approve a new and more comfortable bed for the Mother at Prestonwood Nursing and Rehabilitation expense,

d) The Agent seeks to have additional furniture, such as a recliner, furnished by Prestonwood Nursing to Room 406,

e) The Agent seeks to have the Court approve, by order to the Petitioner, occasional passes that will permit the Agent to take the Mother on local drives to visit her home at 1844 Hood Street and for lunch or dinners out, with small oxygen bottles furnished by Prestonwood Nursing. Agent's requests for this additional degree of freedom have been denied by Petitioner during in recent months,

f) The Agent seeks to have the Court issue an order for reimbursement of ongoing expenses related to the very substantial visits to Prestonwood Nursing and to order the repair of the Mother's Lincoln Continental for such transportation (costs totaling $2,100),

g) The Agent seeks reimbursement, from the Tipps Living Trust(s), of costs incurred during the Guardianship for between October 29, 2014 and February 24, 2014 and for the additional interval between February 24, 2014 and April 30, 2014.

The Agent seeks reimbursement from the Petitioner of all costs associated with this Petition, and all other relief, both general and special, legal and equitable, to which the Agent may be entitled.

Respectfully submitted,

Steven V. Tipps
Pro Se Litigant
5015 Addison Circle
Addison, Texas 75001
214-223-6358
Fax 254-731-2522
Email: casing@prodigy.net
Email: casingscientific@gmail.com

# BOONE, BOONE & PHILLIPS, L.L.P.

LAWYERS
4313 W. LOVERS LANE
DALLAS, TEXAS 75209-2803

JOHN H. PHILLIPS
BOARD CERTIFIED, ESTATE PLANNING AND PROBATE LAW
TEXAS BOARD OF LEGAL SPECIALIZATION

DIRECT DIAL (214) 902-8036
DIRECT FAX (214) 206-9975
E-MAIL "jhphillips@swbell.net"

April 29, 2014

Mr. Steven Tipps
1844 Hood St
Carrollton, TX 75006
*via email to casing@prodigy.net and by certified mail/return receipt requested and regular mail*

RE:  Guardianship of Doris Lee Tipps, Incapacitated
     Cause No. Pr-13-3072-3
     in the Probate Court No. 3 of Dallas County, Texas

Dear Mr. Tipps:

I am counsel of record for SENIOR CITIZENS OF GREATER DALLAS d/b/a The Senior Source, Guardian of the Person of DORIS LEE TIPPS, an Incapacitated Person, in the above matter.

The Guardian of the Person has the right to physical possession of Mrs. Tipps and has the duty to provide care, supervision and protection for her.

Effective immediately you may only visit Mrs. Tipps from 11:00 o'clock a.m., until 3:00 o'clock p.m. (local time).

Your continued interference with the Guardian and with the staff at Prestonwood Nursing and Rehabilitation are an unnecessary burden to both and are detrimental to the well-being of Mrs. Tipps. If you continue to interfere, the Guardian will exercise its right to deny you any visits to Mrs. Tipps, and may seek judicial recourse against you as well.

If you have questions or concerns about Mrs. Tipps' health or care, you may contact Alex Scheibner who is her case manager at The Senior Source. His phone number is 214-823-5700 ext 6186.

Prestonwood Nursing and Rehabilitation is instructed not to give you any information about Mrs. Tipps, and is encouraged to exercise its right to require you to leave its premises if you become troublesome and to call for police assistance immediately if needed.

Sincerely,

John H. Phillips

cc:  client

From: Tom Finley [mailto:tom@finleylawgroup.com]
Sent: Thursday, May 01, 2014 8:43 PM
To: John H. Phillips (jhphillips@swbell.net)
Cc: Jean Jones
Subject: In the Matter of the Guardianship of Doris L. Tipps, Proceeding No. PR-13-3072-3, Dallas County Probate Court No. Three

Mr. Phillips,

I act as counsel for Doris Lee Tipps. I *attach* for your ease of reference the Order Appointing Guardian of the Person and Approving Mediation Settlement Agreement that has been entered in the case file of the guardianship proceeding identified *above.* This is the order appointing your client Senior Citizens of Greater Dallas as the guardian of the person (only) of Doris Lee Tipps.

Your letter to our client's son Steven V. Tipps dated April 29, 2013 (which I *attach*), has been given to me for response. Your letter is quite extraordinary.

As you know probably better than I, our client has rights. Section 1151.001 (*Rights and Powers Retained by Ward*) of the Texas Estates Code provides that "[a]n incapacitated person for whom a guardian is appointed retains all legal and civil rights and powers except those designated by court order as legal disabilities by virtue of having been *specifically granted* to the guardian." (Emphasis supplied.)

What are the legal and civil rights that our 91-years-old client retained? Subsection 102.003(a) (*Rights of the Elderly*) of the Texas Human Resources Code provides that "[a]n elderly individual has all the rights, benefits, responsibilities, and privileges granted by the constitution and the laws of this state and the United states, except where lawfully restricted. The elderly individual has the right to be free of interference, coercion, discrimination, and reprisal in exercising these rights." Our client is entitled to meet with her family members whenever she desires. I see nowhere in the court's order where your client is *specifically granted* the power to restrict our client from meeting with her family at any hour or at all hours, if she so desires, as section 1151.001 of the Texas Estates Code would require. Our client is not incarcerated in a penal institution, and your client is not the warden.

Further, insofar as Prestonwood Nursing and Rehabilitation is concerned, subsection 102.003(f) (*Rights of the Elderly*) of the Texas Human Resources Code provides that "[a]n elderly individual may complain about the individual's care or treatment. The complaint may be made anonymously *or communicated by a person designated by the elderly individual.* The person providing services may not

discriminate *or take other punitive action* against an elderly individual who makes a complaint." (Emphasis supplied.) Your client should understand that Steven V. Tipps is our client's only living relative who resides within thousands of miles of Dallas, Texas, and he has been her constant and daily caregiver for at least the past five to ten years. He is her closest and favorite child. As such, he is—and always has been—her designated personal representative. Your attempt to restrict our client from meeting with her son in the evening after his work, and your unvarnished threats to (i) deny our client *any* visits with her son, (ii) initiate police action against her son, and (iii) sue her son constitutes what any competent judge would characterize as "punitive action".

Prestonwood Nursing and Rehabilitation was engaged by your client and is acting at your client's direction. It is, therefore, your client's agent, and your client is the principal. As the principal, your client is legally responsible for any and all violations of the legal and civil rights of our client by Prestonwood Nursing and Rehabilitation.

With respect, I urge your client to immediately rescind the restriction contained in your *attached* April 29, 2014 letter. If your client refuses, then we will commence the necessary actions in Judge Miller's court, at the Texas Department of Aging and Disability Services, and at the Texas Health and Human Services Commission to protect our elderly client's legal and civil rights.

Thank you for your assistance and cooperation.

Sincerely,

Tom

**III.**

**W. THOMAS FINLEY COUNSEL FOR**

**APPELLANT DORIS L. TIPPS**

**OPPOSITION TO CUMBERLAND TRUST & INVESTMENT**

**COMPANY'S MOTION TO ACCEPT RESIGNATION, DISCHARGE**

**TRUSTEE AND REINSTATE TRUSTEE; DEMAND FOR ACCOUNTING;**

**AND MOTION TO ENFORCE RULE 11 AGREEMENT AND MEDIATED**

**SETTLEMENT AGREEMENT (C.R. s 15)**

No. PR-13-3072-3

| | | |
|---|---|---|
| In the Matter of the | § | In the Probate Court |
| | § | |
| Guardianship of | § | No. Three |
| | § | |
| Doris L. Tipps | § | Dallas County, Texas |

### Doris Lee Tipps' Opposition to Cumberland Trust & Investment Company's Motion to Accept Resignation, Discharge Trustee, and Reinstate Trustee; Demand for Accounting; and Motion to Enforce Rule 11 Agreement and Mediated Settlement Agreement

This began as a contested guardianship proceeding. Thomas Tipps applied to become the guardian of the person and estate of his mother, Doris Lee Tipps. Doris Lee Tipps did not want Thomas Tipps to be the guardian of either her person and certainly not of her estate, and she does not want him to be trustee of her trust. She filed a contest to Thomas Tipps' application. On September 13, 2013, Thomas Tipps and Doris Lee Tipps, acting through her personal counsel as well as through the attorney ad litem, entered into a Rule 11 agreement, the essential terms of which were that (i) Doris Lee Tipps and Thomas Tipps would resign as co-trustees of the Tipps Living Trust dated March 6, 1992, as amended and restated (the "Tipps Living Trust"), and (ii) that "a corporate trustee [will] take over the role of the trustee". Later, both Doris Lee Tipps, again acting through counsel, and Thomas Tipps entered into that certain Mediation Settlement Agreement dated January 23, 2014, that requires

Doris Lee Tipps' Opposition to Cumberland Trust & Investment Company's Motion to Accept Resignation, Discharge Trustee, and Reinstate Trustee; Demand for Accounting; and Motion to Enforce Rule 11 Agreement and Mediated Settlement Agreement – Page 1

15
Document Page 113 of 240

the appointment of a corporate trustee of the Tipps Living Trust. The Court should enforce both those agreements. On February 17, 2014, the Court appointed Cumberland Trust & Investment Company ("Cumberland") as sole trustee of the Tipps Living Trust. Seventy-four days after its appointment by the Court, Cumberland resigned as trustee on May 2, 2014, citing "unanticipated difficulties which made their continued service as Trustee impractical" and declaring "that it has not received Trust property from the prior Trustee, Thomas Richard Tipps, and, therefore, has no accounting to provide to any beneficiary". A trustee, especially an institutional fiduciary in the business of serving as a corporate trustee, is under a duty to take such steps as are reasonable to secure and keep control of trust property. Doris Lee Tipps, the sole primary and income beneficiary of the trust, is entitled to receive an accounting from Thomas Tipps and Cumberland as to the disposition of the trust's receipts, disbursements, assets, and liabilities.

## Chronology

1. On September 4, 2013, Thomas Tipps filed his Application for Appointment of Temporary Guardian of the Person and Estate of Doris Lee Tipps.

2. On September 12, 2013, Doris Lee Tipps filed her Contest of Appointment of Thomas Tipps as Temporary Guardian.

Doris Lee Tipps' Opposition to Cumberland Trust & Investment Company's Motion to Accept Resignation, Discharge Trustee, and Reinstate Trustee; Demand for Accounting; and Motion to Enforce Rule 11 Agreement and Mediated Settlement Agreement – Page 2

2

3. On September 13, 2013, Thomas Tipps filed his Application for Appointment of Permanent Guardian of the Person and Estate of Doris Lee Tipps.

4. At a hearing held on September 13, 2013, counsel for Thomas Tipps and Doris Lee Tipps in open court dictated into the Court's record a Rule 11 agreement requiring them both to resign as co-trustees of the Tipps Living Trust and to appoint a corporate trustee. Mona Richard, the court reporter, is a certified shorthand reporter; both Thomas Tipps and Doris Lee Tipps, together with their respective counsel, were present in court; and they both orally acknowledged the terms of the agreement before the Court, who pronounced it "a fair deal" and "I definitely approve it". A transcript of the hearing is appended as "Exhibit A".

5. On December 20, 2013, the Court signed a Memorandum of Informal Docket Control Pre-Trial Order, ordering Thomas Tipps and Doris Lee Tipps to mediate their dispute on or before March 1, 2014.

6. On January 23, 2014, Nathan K. Griffin conducted a mediation that culminated in a Mediation Settlement Agreement, in accordance with which Thomas Tipps agreed to resign as trustee of the Tipps Living Trust in favor of Cumberland as the sole trustee. The agreement provides, in pertinent part, that

Doris Lee Tipps' Opposition to Cumberland Trust & Investment Company's Motion to Accept Resignation, Discharge Trustee, and Reinstate Trustee; Demand for Accounting; and Motion to Enforce Rule 11 Agreement and Mediated Settlement Agreement – Page 3

3

If one or more disputes arise with regard to the interpretation and/or performance of this Agreement . . ., the Parties agree to attempt to resolve same with Nathan K. Griffin . . . . If litigation is brought to construe or enforce this Agreement, the party who substantially prevails shall be entitled to recover attorney's fees, as well as court cost and expenses, including the cost of mediation.

A copy of the agreement is appended as "Exhibit "B".

7. On February 17, 2014, the Court signed an Order Appointing Guardian of the Person and Approving Mediation Settlement Agreement. In the order, Cumberland was appointed the sole corporate trustee of the Tipps Living Trust, and Thomas Tipps was ordered to resign as trustee. Senior Citizens of Greater Dallas doing business as "The Senior Source" was appointed the guardian of the person of Doris Lee Tipps with limited authority in accordance with the provisions of section 1101.152 of the Texas Estates Code.

8. On May 2, 2014, Cumberland executed and distributed its Notice of Resignation as Successor Corporate Trustee, declaring "that it has not received Trust property from the prior trustee, Thomas Richard Tipps, and therefore, has no accounting to provide to any beneficiary" of the Tipps Living Trust. A copy of the resignation document is appended as "Exhibit C".

Doris Lee Tipps' Opposition to Cumberland Trust & Investment Company's Motion to Accept Resignation, Discharge Trustee, and Reinstate Trustee; Demand for Accounting; and Motion to Enforce Rule 11 Agreement and Mediated Settlement Agreement – Page 4

4

18
Document Page 116 of 240

## Opposition to Acceptance of Resignation, Discharge
## of Cumberland, and Reinstatement of Thomas Tipps as Trustee

9. A trustee is under a duty to keep clear and accurate accounts, showing exactly what the trustee has received and spent and all investment gains and losses. Any expenses and costs that arise as a result of the trustee's failure to keep proper accounts are chargeable against the trustee personally, rather than against the trust estate.

10. Not only must the trustee keep accounts, the trustee must render an accounting upon a beneficiary's reasonable request. *Faulker v. Bost*, 137 S.W.3d 254 (Tex. App. 2004).

11. Cumberland should not be permitted to resign and be discharged unless and until it has accounted to the Tipps Living Trust sole primary and income beneficiary, Doris Lee Tipps.

12. Thomas Tipps should not be reinstated as trustee of the Tipps Living Trust because (i) he is unqualified and ill-suited to serve as a trustee, and (ii) in both an enforceable Rule 11 agreement and in the Mediation Settlement Agreement he agreed that only a corporate trustee may serve as sole trustee of the trust. He is ill-suited and unqualified because he declared himself bankrupt as recently as May 28, 2009, and was ordered to successfully complete a course

Doris Lee Tipps' Opposition to Cumberland Trust & Investment Company's Motion to Accept Resignation, Discharge Trustee, and Reinstate Trustee; Demand for Accounting; and Motion to Enforce Rule 11 Agreement and Mediated Settlement Agreement – Page 5

in personal financial management by a federal bankruptcy judge as recently as September 27, 2009.

## Demand for Accounting

13.     Doris Lee Tipps demands that Thomas Tipps and Cumberland deliver to her as the sole primary and income beneficiary of the Tipps Living Trust a written statement of accounts covering all transactions since the creation of the trust on or before January 19, 2015, in accordance with the provisions of section 113.151 of the Texas Trust Code and containing the information set forth in section 113.152 of the Texas Trust Code.

## Motion to Enforce Rule 11 Agreement and Mediation Settlement Agreement

14.     The Court should enforce the Rule 11 agreement entered of record on September 13, 2013, that requires that only a corporate trustee may serve as the successor sole trustee to Doris Lee Tipps and Thomas Tipps as co-trustees of the Tipps Living Trust. The Court has a ministerial duty to enforce a valid Rule 11 agreement. *In re Guardianship of White*, 329 S.W.3d 591, 592 (Tex. App. 2010, no pet.); *Scott-Richter v. Taffarello*, 186 S.W.3d 182, 189 (Tex. App. 2006, pet. denied); *ExxonMobil Corp v. Valence Operating Co.*, 174 S.W.3d 303, 309 (Tex. App. 2005, pet. denied).

15.     Of equal force, the Court should enforce the Mediation Settlement Agreement approved by the Court on February 17, 2014, that also requires that

Doris Lee Tipps' Opposition to Cumberland Trust & Investment  Company's Motion to Accept Resignation, Discharge Trustee, and Reinstate Trustee; Demand for Accounting; and Motion to Enforce Rule 11 Agreement and Mediated Settlement Agreement – Page 6

only a corporate trustee may succeed Thomas Tipps as trustee of the Tipps Living Trust. The agreement states that it "is a written settlement as contemplated by Section 154.071 of the Texas Civil Practice and Remedies Code." That statute provides that, "If the parties reach a settlement and execute a written agreement disposing of the dispute, the agreement is enforceable in the same manner as any other written contract."

Doris Lee Tipps asks the Court to:

- Decline to accept Cumberland's resignation as court-appointed corporate trustee of the Tipps Living Trust;

- Order Thomas Tipps and Cumberland to deliver a written statement of accounts to Doris Lee Tipps on or before January 19, 2015, covering all transactions since the creation of the trust in accordance with the provisions of sections 113.151 and 113.152 of the Texas Trust Code;

- Refuse to discharge Cumberland from any liability unless and until Thomas Tipps and Cumberland have delivered their accounting to Doris Lee Tipps;

- Reject the application of Thomas Tipps to be appointed as the successor to Cumberland as trustee of the Tipps Living Trust;

- Order that a corporate trustee to be selected by Doris Lee Tipps, the sole primary and income beneficiary of the Tipps Living Trust, be appointed

Doris Lee Tipps' Opposition to Cumberland Trust & Investment Company's Motion to Accept Resignation, Discharge Trustee, and Reinstate Trustee; Demand for Accounting; and Motion to Enforce Rule 11 Agreement and Mediated Settlement Agreement – Page 7

to succeed Cumberland in accordance with the provisions of the Rule 11 Agreement and the Mediation Settlement Agreement; and

- Order Thomas Tipps and Cumberland to pay Doris Lee Tipps's attorney's fees and costs as required by the Mediation Settlement Agreement.

Respectfully submitted,

Finley Law Group PLLC

By: _____
W. Thomas Finley
State Bar of Texas Member
    Number 07025500

Finley Law Group PLLC
5500 Preston Road, Suite 390
Dallas, Texas 75205-2676
Telephone: 972.581.2880
Fax: 972.581.2881

Doris Lee Tipps' Opposition to Cumberland Trust & Investment Company's Motion to Accept Resignation, Discharge Trustee, and Reinstate Trustee; Demand for Accounting; and Motion to Enforce Rule 11 Agreement and Mediated Settlement Agreement – Page 8

8

## Certificate of Service

I certify that on October 17, 2014, a true and correct copy of the foregoing Doris Lee Tipps' Opposition to Cumberland Trust & Investment Company's Motion to Accept Resignation, Discharge Trustee, and Reinstate Trustee; Demand for Accounting; and Motion to Enforce Rule 11 Agreement and Mediated Settlement Agreement was served by electronic mail, by certified mail, return-receipt requested, and by facsimile transmission to the following counsel and pro se party of record:

Jeffrey Cook
Lisa Leffingwell
Sullivan & Cook, L.L.C.
2301 Cedar Springs Road, Suite 200
Dallas, Texas 75201-7837

Scott D. Weber
Calloway, Norris, Burdette & Weber, PLLC
3811 Turtle Creek Boulevard, Suite 400
Dallas, Texas 75219-4531

Steven V. Tipps, Pro Se Party
5015 Addison Circle
Addison, Texas 75001-3008

Alvin J. Golden
Katherin C. Akinc
Ikard Golden Jones, P.C.
400 West 15th Street, Suite 975
Austin, Texas 78701-1646


_____
W. Thomas Finley

939986_1

Doris Lee Tipps' Opposition to Cumberland Trust & Investment Company's Motion to Accept Resignation, Discharge Trustee, and Reinstate Trustee; Demand for Accounting; and Motion to Enforce Rule 11 Agreement and Mediated Settlement Agreement – Page 9

9

CAUSE NO. PR-13-3072-3

In re The Guardianship of )( IN THE PROBATE COURT

Doris Tipps, )( NUMBER THREE OF

Alleged Incapacitated Person )( DALLAS COUNTY, TEXAS

_____

REPORTERS RECORD

_____

APPEARANCES:

Mr. Jeffrey E. Cook
Ms. Lisa Leffingwell
2301 Cedar Springs Rd, Ste. 200
Dallas, Texas 75201
SB: 04734495
SB: 12158575
          Attorneys for Thomas Tipps, son of ward

Mr. Scott Weber
ATTORNEY AT LAW
3811 Turtle Creek Blvd, Ste. 400
Dallas, Texas 75219
SB: 21044875
(214)521-1520
          Attorney ad litem for Doris Tipps, the ward

Mr. W. Thomas Finley
ATTORNEY AT LAW
5500 Preston Rd, Ste. 390
Dallas, Texas 75205
SB: 07025500
(972)580-2880
          Attorney for Doris Tipps, the ward

BE IT REMEMBERED THAT on the 13th day of September, 2013, A.D. the above-entitled cause came on for hearing before the HONORABLE COURT, MICHAEL E. MILLER, Judge Presiding, and the following proceedings were taken down by MACHINE SHORTHAND:

P-R-O-C-E-E-D-I-N-G-S

THE COURT: This is Cause Number PR-13-3072-3, regarding Doris Tipps.

Go right ahead, sir.

MR. COOK: Thank you, Your Honor.

Your Honor, I'm Jeff Cook with Lisa Leffingwell, and I filed an Application for Appointment of Temporary Guardian of the Person and Estate of Doris Lee Tipps. That application is set this morning, it was filed in time last week.

The court appointed Scott Weber as the attorney ad litem for Ms. Tipps upon our filing, and Mr. Weber has worked with us since his appointment to understand the facts and visit with Ms. Tipps, and we have worked out an agreement that we're going to dictate into the record that will eliminate the need for a temporary guardianship.

What I'd like -- We have present Tom Tipps, the potential guardian of the person who filed the application, is here in court. Ms. Tipps is here --

Looking very lovely this morning.

MS. TIPPS: Thank you.

MR. COOK: -- and Mr. Weber is here. And then Mr. Finley is here, who yesterday filed a contest on behalf of Ms. Tipps, to the Application for Temporary Guardianship, and then there are some other family members. Also, who's here is

an attorney who drafted all the underlying documents going back 20 years, nothing to do with what we're going to do today, but is here. And then Glenda who is one of the children, and Steve, another one of the adult children.

Might I proceed?

THE COURT: Go right ahead.

MR. COOK: Your Honor, I believe the agreement is as follows: Ms. Tipps currently is a resident at a location called Lakeview at Josey Ranch, where she has resided for more than a year. And the agreement is, until either further written agreement of the parties or order of the court, she will continue to stay at that place; that will be her residence.

Number two, there are some trusts which are generically called the Tipps Family Trust. I think there are technically two names, there is the Tipps Living Trust, it's the Tipps Family Trust, so the Living Trust gives way to the survivors trust; and the Family Trust. Whatever they are technically called, currently, the co-trustees of those trusts are Doris Tipps and Thomas Tipps, and we have agreed that they have resigned as trustees. And we will agree to appoint a corporate trustee to take over the role of the trustee of all of those trusts, whatever the technical names are.

In the meantime, until the corporate trustee is located, Thomas Tipps has been the one writing the checks,

paying the bills, he's been handling the money for a long time, he will continue to do that until those duties are turned over to the corporate trustee, subject to this specific agreement.

No distributions will be made to any of the adult children of Ms. Tipps at all, and the bills that are paid will be the customary living expenses and normal expenses that he has been paying for Ms. Tipps. That will be in place until the corporate trustee is put in place.

Ms. Tipps will agree to submit to a mental status examination. We have agreed that Dr. Crowder will do that and we will not proceed then with this Application for Temporary Guardianship. And we have filed an Application for Permanent Guardianship that will be on hold until the mental examination is complete and we see what the results of that are. I believe that is the agreement.

MR. WEBER: That is the agreement.

THE COURT: Very good. Sounds like a fair deal. Thank you all for agreeing.

MR. COOK: May I get some testimony?

THE COURT: Go ahead.

MR. COOK: Mr. Tipps, you have been present --

THE COURT: Let me swear him in.

(NO OMISSIONS)

THOMAS TIPPS

After being sworn, testified on his oath as follows:

DIRECT EXAMINATION

BY MR. COOK:

Q. State your name, please.

A. Thomas Tipps.

Q. Mr. Tipps, you've been present in court this morning when I read -- and Mr. Weber has agreed on behalf of your mother -- the arrangement that has been dictated into the record of the court; is that correct?

A. Yes.

Q. And are you okay and agree with the agreement and the terms as I have dictated them?

A. Yes, I agree.

Q. Do you request that the court approve that agreement?

A. Yes, please.

Q. Do you think that agreement is a reasonable way to accomplish the things that you hoped to accomplish by filing this application?

A. Yes, I do.

MR. COOK: Pass the witness.

MR. WEBER: I have no questions, Your Honor.

THE COURT: All right.

MR. COOK: I have nothing further.

THE COURT: Who is going to submit the order?

MR. COOK: I don't think there needs to be an order since we have dictated it as a Rule 11 agreement -- assuming you approve it? I don't think we need a written -- We'll just have this transcribed.

THE COURT: Well, I definitely approve it.

MR. COOK: We will need an order for Dr. Crowder.

MR. WEBER: Right.

MR. COOK: Do you want to draft that, Scott?

MR. WEBER: I can.

MR. COOK: You can?

MR. WEBER: That's fine, Jeff.

MR. COOK: We'll work that out, Your Honor, and we'll get an order down to you.

THE COURT: Anything else?

MR. WEBER: I can't think of anything.

THE COURT: Thank you all very much.

MR. COOK: Thank you, Judge.

(END OF PROCEEDINGS)

REPORTER'S CERTIFICATE

THE STATE OF TEXAS    )
COUNTY OF DALLAS      )

I, MONA L. RICHARD, Official Court Reporter in and for the Probate Court Number Three of Dallas County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $42 and was paid by W. Thomas Finley.

WITNESS MY OFFICIAL HAND this the 7th day of July, 2014.

S/MONA L. RICHARD
_____
Mona L. Richard, Texas CSR 2384
Expiration Date: December 2015
Official Court Reporter
Probate Court Number Three
Dallas County, Texas
Dallas, Texas

## CAUSE NO. PR-13-3072-3

| | | |
|---|---|---|
| IN RE: THE GUARDIANSHIP OF | § § | IN THE PROBATE COURT |
| DORIS LEE TIPPS, | § § | NUMBER THREE OF |
| ALLEGED INCAPACITATED PERSON | § | DALLAS COUNTY, TEXAS |

## MEDIATION SETTLEMENT AGREEMENT

The Parties hereto, Doris L. Tipps ("Doris"), Thomas Richard Tipps ("Tom"), Glenda Jordan ("Glenda"), Sally Fink ("Sally"), and Steven Tipps ("Steve")(each a "Party" and collectively referred to herein as the "Parties"), agree that this lawsuit and all related claims and controversies between them are hereby settled in accordance with the following terms of this Settlement Agreement.

1. The Parties acknowledge that bona fide disputes and controversies exist between them, and by reason of such disputes and controversies they desire to compromise and settle all claims and causes of action of any kind whatsoever which the Parties have or may have arising out of the transaction or occurrence which is the subject of this litigation. It is further understood and agreed that this is a compromise of a disputed matter, and nothing contained herein shall be construed as an admission of liability by any Party, all such liability being expressly denied.

2. Each signatory hereto hereby warrants and represents that they have full authority to enter into this Settlement Agreement; that each has had an opportunity to discuss the Settlement Agreement with the lawyer of their own choosing, and that they are entering into same freely and voluntarily, and it is contemplated that this Settlement Agreement is a complete and full Settlement Agreement among the Parties as it relates to the above styled and numbered action:

3. The Parties agree on the following settlement terms subject to Court approval:

a. Senior Source shall be the Guardian of the Person of Mrs. Tipps. In the event that Senior Source shall resign, then the Parties agree to mediate, with Nathan K. Griffin as the mediator, in order to select a suitable successor. In the event that the Parties cannot agree upon a successor Guardian of the Person, then Glenda or Sally may apply, but in no event shall Tom or Steve seek to be appointed Successor Guardian of the Person of Doris. Tom and Steve reserve any and all rights to contest the appointment of a Successor Guardian of the Person;

b. Tom, as Trustee, immediately upon Court approval shall appoint Cumberland Trust & Investment Company as his Successor Trustee of the Tipps Family Trusts ("Trusts"), pursuant to the terms of the Trusts, Tom shall resign as the Trustee, and Cumberland shall serve as the sole Trustee in accordance with the terms of the trust documents prepared by Terry Lustig, which are attached hereto as Exhibit A-1 through A-169;

MEDIATION SETTLEMENT AGREEMENT – Page 1

c.  Tom represents and warrants that he, as the Trustee of the Trusts, did not sign any notes or guarantees with regard to the Trusts' acquisition of an interest in the Fitzhugh Property or Tipping T, LLC (collectively "Tipping T");

d.  Tom, Glenda, and Sally shall receive from the Trusts, as an advance on their inheritance and valued at the aggregate sum of $125,000, the Trusts' interest in the Tipping T, so that they will each have an undivided 1/6th interest in the Tipping T;

e.  Tom, Glenda, and Sally shall defend and indemnify the Trusts from any all claims arising out of or related to the Trusts' ownership interest in Tipping T prior to the transfer of the Trusts' interest in Tipping T, as described above;

f.  The fees and expenses of Scott D. Weber, the attorney ad litem for Doris, shall be paid out of the Trusts, and the fees and expenses of Tom Finley, counsel for Doris, in the amount of $20,000 shall be paid out of the Trusts within three business days of the Court's approval of this Agreement; and

g.  Not subject to Court approval, the fee for mediation shall be paid out of the Trusts.

4.  Tom shall be released from all liability as Trustee of the Trusts through the date of his resignation, as set out in paragraph 3(b).

5.  Except for the agreements set forth herein, the Parties hereby agree to release, discharge and forever hold the other harmless from any and all claims, demands, or suits, known or unknown, fixed or contingent, liquidated or unliquidated, whether or not asserted in the above case, as of this date, arising from or related to the events and transactions which are the subject matter of this cause from the beginning of time to the effective date of this Agreement. This mutual release runs to the benefit of all attorneys, agents, employees, officers, directors, shareholders, partners, heirs, assigns, and legal representatives of the Parties hereto.

6.  · The Parties and their counsel agree to cooperate with each other in the drafting and execution of such additional documents as are reasonably requested or required to implement the provisions and spirit of this Settlement Agreement, but notwithstanding such additional documents the Parties confirm that this is a written settlement agreement as contemplated by Section 154.071 of the Texas Civil Practice and Remedies Code.

7.  This Settlement Agreement is made and performable in Dallas County, Texas, and shall be construed in accordance with the laws of the State of Texas.

8.  If one or more disputes arise with regard to the interpretation and/or performance of this Agreement or any of its provisions, the Parties agree to attempt to resolve same with Nathan K.

MEDIATION SETTLEMENT AGREEMENT – Page 2

Griffin, the Mediator who facilitated this settlement. If litigation is brought to construe or enforce this Agreement, the Party who substantially prevails shall be entitled to recover attorney's fees, as well as court costs and expenses, including the cost of the mediation.

9.    Although the Mediator has provided a basic outline of this Settlement Agreement to the Parties and/or their counsel as a courtesy to facilitate the final resolution of this dispute, the Parties and/or their counsel have thoroughly reviewed such outline (and, in the case of any Parties who are not represented by counsel, have had an opportunity to consult with counsel of their own choosing regarding such outline, have declined to do so, and are not relying on any other counsel for any other Party) and have, where necessary, modified it to conform to the requirements of their agreement. All signatories to this Settlement Agreement hereby release the Mediator from any and all responsibility arising from the drafting of this Settlement Agreement, and by signing this Settlement agreement, acknowledge that they, or their attorneys, have been advised by the Mediator in writing that this Settlement Agreement should be independently reviewed by counsel before executing the Agreement.

AGREED, this 23rd day of January, 2014.

_____
Thomas Tipps

_____
Sally Fink

**APPROVED AS TO FORM:**

_____
Jeff Cook/Lisa Leffingwell
Attorney for Thomas Tipps

_____
Tom Finley
Attorney for Doris L. Tipps

_____
Glenda Jordan

_____
Steven Tipps

_____
Scott D. Weber
Attorney Ad Litem for Doris L. Tipps

MEDIATION SETTLEMENT AGREEMENT – Page 3

19

## Exhibit C

### NOTICE OF RESIGNATION AS SUCCESSOR CORPORATE TRUSTEE

CUMBERLAND TRUST AND INVESTMENT COMPANY hereby resigns as the successor corporate Trustee of The Tipps Family Trust and Tipps Survivors Trust u/a Thomas Vinson Tipps and Doris Lee Tipps dated March 6, 1992, as amended and restated January 23, 2003, pursuant to Article III Section 3 of said Trust, to be effective immediately.

CUMBERLAND TRUST AND INVESTMENT COMPANY affirms that it has not received Trust property from the prior trustee, Thomas Richard Tipps, and, therefore, has no accounting to provide to any beneficiary thereof.

CUMBERLAND TRUST AND INVESTMENT COMPANY

By: _Michelle R Diamond SVP_

Title: _Senior Vice President & Trust Officer_

Date: _5/2/14_

## NO. PR-13-3072-3

| | | |
|---|---|---|
| IN RE: GUARDIANSHIP OF | § | IN THE PROBATE COURT |
| | § | |
| DORIS LEE TIPPS | § | NUMBER THREE OF |
| | § | |
| AN ALLEGED INCAPACITATED | § | |
| ADULT | § | DALLAS COUNTY, TEXAS |

## MOTION TO SHOW AUTHORITY

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES THOMAS RICHARD TIPPS, ("Movant") herein, and files this Motion to Show Authority complaining of W. THOMAS FINLEY, alleged attorney for DORIS LEE TIPPS, and shows the Honorable Court the following:

I.

W. THOMAS FINLEY does not have authority to act as counsel for DORIS LEE TIPPS in this matter. DORIS LEE TIPPS does not have sufficient capacity to retain counsel as she was adjudicated to be totally incapacitated on February 17, 2014. W. THOMAS FINLEY is in fact representing STEVEN VINSON TIPPS.

II.

Based upon these facts, Movant believes that W. THOMAS FINLEY is prosecuting this suit without proper authority of DORIS LEE TIPPS. Pursuant to Rule 12 of the Texas Rules of Civil Procedure, Movant requests that W. THOMAS FINLEY should be cited to appear before this court and show his authority to act on behalf of DORIS LEE TIPPS. Should W. THOMAS FINLEY fail to show sufficient authority to prosecute this suit on behalf of DORIS LEE TIPPS, then W. THOMAS FINLEY should be banned from further appearing in this case and the pleadings of W. THOMAS FINLEY's alleged to be filed on behalf of DORIS LEE TIPPS should be stricken.

MOTION TO SHOW AUTHORITY – Page 1
Cause No. PR-13-3072-3 (Tipps)

**WHEREFORE, PREMISES CONSIDERED, THOMAS RICHARD TIPPS**, Movant herein, respectfully prays that:

1. **W. THOMAS FINLEY** will be cited to appear and to answer herein and to present to this court sufficient proof of authority to prosecute the suit on behalf of **DORIS LEE TIPPS**;

2. Upon the failure of **W. THOMAS FINLEY** to present such proof to the court, the Court order that **W. THOMAS FINLEY** is no longer allowed to appear in this cause and to further order pleadings filed by **W. THOMAS FINLEY** to be stricken from the record;

3. The Court should enter an order denying any and all attorney's fees requested by **W. THOMAS FINLEY**; and

4. For such other and further relief, in law or in equity, to which **THOMAS RICHARD TIPPS**, Movant herein, may be justly entitled.

Respectfully submitted,

/s/ Jeffrey Cook

Jeffrey Cook
State Bar No. 04734495
Lisa Leffingwell
State Bar No. 12158575
2301 Cedar Springs
Suite 200
Dallas, Texas 75201
Tel. (214)520-7494
Fax. (214)528-6925

**ATTORNEYS FOR THOMAS RICHARD TIPPS**

<u>**MOTION TO SHOW AUTHORITY**</u> – Page 2
Cause No. PR-13-3072-3 (Tipps)

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document was sent via facsimile to all counsel of record on this 20th day of October, 2014.

/s/ Jeffrey Cook

_____
Jeffrey Cook
Lisa Leffingwell

**MOTION TO SHOW AUTHORITY – Page 3**
Cause No. PR-13-3072-3 (Tipps)

## VERIFICATION

STATE OF TEXAS              §
                           §
COUNTY OF DALLAS           §

BEFORE ME, the undersigned authority, personally appeared **THOMAS RICHARD TIPPS,** who, on oath, stated that the statements made in the foregoing Motion to Show Authority to Act are true and correct to the best of his knowledge and belief.

**THOMAS RICHARD TIPPS**

SUBSCRIBED AND SWORN TO BEFORE ME on this the 20 day of October 2014, to certify which witness my hand and seal of office.

LISA R LEFFINGWELL
My Commission Expires
June 26, 2016

Notary Public, State of Texas

**MOTION TO SHOW AUTHORITY – Page 4**
Cause No. PR-13-3072-3 (Tipps)



## NO. PR-13-3072-3

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE PROBATE COURT |
| | § | |
| DORIS LEE TIPPS, | § | NUMBER THREE OF |
| | § | |
| AN INCAPACITATED PERSON | § | DALLAS COUNTY, TEXAS |

## ORDER GRANTING MOTION TO ACCEPT RESIGNATION, DISCHARGE TRUSTEE AND REINSTATE TRUSTEE

On this 21st day of October, 2014, came on to be heard the joint Motion to Accept Resignation, Discharge Trustee and Reinstate Trustee filed by CUMBERLAND TRUST AND INVESTMENT COMPANY (hereinafter "CUMBERLAND") and THOMAS TIPPS. After hearing and considering the pleadings filed herein and evidence submitted, the Court finds as follows:

1. Pursuant to the Mediation Settlement Agreement filed herein and approved by the Court on February 17, 2014, THOMAS TIPPS resigned as Trustee of the Tipps Family Trusts ("the Trusts") on March 10, 2014, pursuant to the Court's order;

2. CUMBERLAND was appointed as Successor Trustee and executed its acceptance on March 17, 2014;

3. CUMBERLAND is unable to perform its duties as Trustee since a condition of its acceptance was that STEVEN VINSON TIPPS move out of the Hood real property owned by the Trusts, STEVEN VINSON TIPPS has failed to move as he agreed, and CUMBERLAND has executed its resignation dated May 2, 2014 subject to the Court's acceptance;

4. Based on the circumstances of this case, the Court finds that it will not be possible to find a Corporate Trustee willing to serve as Trustee of the Trusts;

5. CUMBERLAND notified all beneficiaries of the Trust of said resignation pursuant to Section 3 of Article 3 of the Trusts on May 2, 2014;

PR-13-03072-3
CODR
ORDER
076308

6. Although CUMBERLAND accepted the appointment of Trustee of the Trusts, CUMBERLAND never took possession or control of any of the assets of the Trust, no account is required by CUMBERLAND and it should be discharged from liability, if any;

7. THOMAS TIPPS has continued to pay the expenses of the Ward so her care has been assured and collect all receipts due the Trusts pending the transfer to CUMBERLAND;

8. THOMAS TIPPS was previously appointed as Trustee by Ward when she had capacity to make such appointment; and

9. It is in the best interest of Ward that THOMAS TIPPS be reinstated and confirmed as Successor Trustee of the Tipps Trusts.

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED by the Court as follows:

1. The resignation of CUMBERLAND TRUST AND INVESTMENT COMPANY is accepted by the Court;

2. No accounting is required from CUMBERLAND TRUST AND INVESTMENT COMPANY and it is hereby discharged as Trustee of the Tipps Family Trusts; and

3. THOMAS TIPPS is reinstated and confirmed as Trustee of the Tipps Family Trusts.

SIGNED this 21 day of October , 2014.

_____
JUDGE PRESIDING

 

## NO. PR-13-3072-3

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE PROBATE COURT |
| | § | |
| DORIS LEE TIPPS, | § | NUMBER THREE OF |
| | § | |
| AN INCAPACITATED PERSON | § | DALLAS COUNTY, TEXAS |

### ORDER GRANTING MOTION TO SHOW AUTHORITY

On this 21st day of October, 2014, came on to be heard the Motion to Show Authority filed by THOMAS TIPPS. After hearing and considering the pleadings filed herein and evidence submitted, the Court finds that the Motion should be granted.

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED by the Court as follows:

1. The Motion to Show Authority is granted;

2. **W. THOMAS FINLEY** is banned from further appearing in this case and the pleadings of **W. THOMAS FINLEY** alleged to be filed on behalf of **DORIS LEE TIPPS** should be stricken;

2. Any attorney's fees requested by **W. THOMAS FINLEY** should be denied.

SIGNED this 24 day of October, 2014.

JUDGE PRESIDING

PR – 13 – 03072 – 3
CODR
ORDER
676711

Document Page  139 of 240

# IV.

## W. THOMAS FINLEY, COUNSEL FOR DORIS L. TIPPS

## APPELLANT DORIS LEE TIPPS' OPPOSITION TO  SENIOR SOURCE'S

## PETITION TO REVOKE AUTHORITY OF AGENT

## (C.R. s 42)

No. PR-13-3072-3

| | | |
|---|---|---|
| In the Matter of the | § | In the Probate Court |
| | § | |
| Guardianship of | § | No. Three |
| | § | |
| Doris L. Tipps | § | Dallas County, Texas |

### Dorris Lee Tipp's Opposition to The Senior Source's
### Petition to Revoke Authority of Agent

1.    On September 10, 2013, Doris Lee Tipps, as principal, executed a Medical Power of Attorney naming her son Steven Vinson Tipps as her agent for making health care decisions for her in accordance with the provisions of title 2, subtitle H, chapter 166, subchapter D, of the Texas Health and Safety Code. A copy of the Medical Power of Attorney is appended as "Exhibit A".

2.    In accordance with the provisions of section 166.152 ("Scope and Duration") of the Texas Health and Safety Code, the medical power of attorney given to Steven Vinson Tipps is effective indefinitely.

3.    Subsection 166.156 ("Appointment of Guardian") of the Texas Health and Safety Code mandates that, as between a guardian and the agent to whom the principal has delegated the authority to make health care decisions for her, the Court must "consider the preferences of the principal as expressed in the medical power of attorney."

Doris Lee Tipp's Opposition to The Senior
Source Petition to Revoke Authority of Agent – Page 1

1

4.     Section 1151.001 ("Rights and Powers Retained by Ward") of the Texas Estates Code provides that "[a]n incapacitated person for whom a guardian is appointed retains all legal and civil rights and powers except those designated by court order as legal disabilities by virtue of having been specifically granted to the guardian."

5.     Subsection 102.003(a) ("Rights of the Elderly") of the Texas Human Resources Code provides that "[a]n elderly individual has all the rights, benefits, responsibilities, and privileges granted by the constitution and laws of this state and the United States, except where lawfully restricted. The elderly individual has the right to be free of interference, coercion, discrimination, and reprisal in exercising these civil rights."

6.     Subsection 102.003(f) ("Rights of the Elderly") of the Texas Human Resources Code provides that "[a]n elderly individual may complain about the individual's care or treatment. The complaint may be made anonymously or communicated by a person designated by the elderly individual. The person providing services may not discriminate or take other punitive action against an elderly individual who makes a complaint."

7.     Steven Vinson Tipps is—and has been for the past many years—the constant caregiver for his mother, Doris Lee Tipps.

8.    Doris Lee Tipps prefers that all decisions about her health care be either made or, at least, ratified by her son Steven Vinson Tipps.

9.    The Senior Source's petition to revoke the authority of Steven Vinson Tipps is plainly an attempted act of reprisal and a punitive action taken against Doris Lee Tipps and her designated agent, Steven Vinson Tipps, that violates the legal and civil rights reserved to her by the Texas Estates Code and by the Texas Human Resources Code.

Doris Lee Tipps asks the Court to reject the petition of The Senior Source to revoke the authority of her duly designated health care agent, Steven Vinson Tipps.

Respectfully submitted,

Finley Law Group PLLC

By:_____Tom Finley_____
W. Thomas Finley
State Bar of Texas Member
     Number 07025500

Finley Law Group PLLC
5500 Preston Road, Suite 390
Dallas, Texas 75205-2676
Telephone: 972.581.2880
Fax:  972.581.2881

## Certificate of Service

I certify that on October 21, 2014, a true and correct copy of the foregoing Doris Lee Tipp's Opposition to The Senior Source's Petition to Revoke Authority of Agent was this day sent by electronic mail, by certified mail, return-receipt requested, and by facsimile transmission to the following counsel of record and pro se party:

Scott D. Weber
Calloway, Norris, Burdette & Weber, PLLC
3811 Turtle Creek Boulevard, Suite 400
Dallas, Texas 75219-4531

Steven V. Tipps, Pro Se Party
5015 Addison Circle
Addison, Texas 75001-3008

John H. Phillips
Boone, Boone & Phillips, L.L.P.
4313 West Lovers Lane
Dallas, Texas 75209-2803.

_____
W. Thomas Finley

939987_1

Doris Lee Tipp's Opposition to The Senior
Source Petition to Revoke Authority of Agent – Page 4

Exhibit A

---

# MEDICAL POWER OF ATTORNEY

## OF

## DORIS LEE TIPPS

## Dated: September 10, 2013

---

# DISCLOSURE STATEMENT

## Information Concerning
## The Medical Power of Attorney

### THIS IS AN IMPORTANT LEGAL DOCUMENT. BEFORE SIGNING THIS DOCUMENT, YOU SHOULD KNOW THESE IMPORTANT FACTS:

Except to the extent you state otherwise, this document gives the person you name as your agent the authority to make any and all health care decisions for you in accordance with your wishes, including your religious and moral beliefs, when you are no longer capable of making them yourself. Because "health care" means any treatment, service, or procedure to maintain, diagnose, or treat your physical or mental condition, your agent has the power to make a broad range of health care decisions for you. *Your agent may consent, refuse to consent, or withdraw consent to medical treatment and may make decisions about withdrawing or withholding life-sustaining treatment. Your agent may not consent to voluntary inpatient mental health services, convulsive treatment, psychosurgery, or abortion.* A physician must comply with your agent's instructions or allow you to be transferred to another physician.

Your agent's authority begins when your doctor certifies that you lack the competence to make health care decisions.

Your agent is obligated to follow your instructions when making decisions on your behalf. Unless you state otherwise, your agent has the same authority to make decisions about your health care as you would have had.

It is important that you discuss this document with your physician or other health care provider before you sign it to ensure that you understand the nature and range of decisions that may be made on your behalf. If you do not have a physician, you should talk to someone else who is knowledgeable about these issues and can answer your questions. You do not need a lawyer's assistance to complete this document; but, if there is anything in this document that you do not understand, then you should ask a lawyer to explain it to you.

The person you appoint as agent should be someone you know and trust. The person must be eighteen (18) years of age or older or a person under eighteen (18) years of age who has had the disability of minority removed. If you appoint your health or residential care provider (*e.g.*, your physician or an

Disclosure Statement - Page 1
Initialed for Authenticity

*D.L.T.*

employee of a home health care agency, hospital, nursing home, or residential care home, other than a relative), then that person has to choose between acting as your agent or as your health or residential care provider. The law does not permit a person to do both at the same time.

You should inform the person you appoint that you want the person to be your health care agent. *You should discuss this document with your agent and your physician and give each a signed copy. You should indicate on the document itself the people and institutions who have signed copies.* Your agent is not liable for health care decisions made in good faith on your behalf.

Even after you have signed this document, you have the right to make health care decisions for yourself as long as you are able to do so and treatment cannot be given to you or stopped over your objection. You have the right to revoke the authority granted to your agent by informing your agent or your health or residential care provider orally or in writing, or by your execution of a subsequent medical power of attorney. Unless you state otherwise, your appointment of a spouse dissolves on divorce.

This document may not be changed or modified. If you want to make changes in the document, then you must make an entirely new one.

You may wish to designate an alternate agent in the event that your agent is unwilling, unable, or ineligible to act as your agent. Any alternate agent you designate has the same authority as your primary agent to make health care decisions for you.

THIS POWER OF ATTORNEY IS NOT VALID UNLESS IT IS SIGNED IN THE PRESENCE OF TWO COMPETENT ADULT WITNESSES. THE FOLLOWING PERSONS MAY NOT ACT AS ONE OF THE WITNESSES:

(a) The person you have designated as your agent;

(b) A person related to you by blood or marriage;

(c) A person entitled to any part of your estate after your death under a Will or Codicil executed by you or by operation of law;

(d) Your attending physician;

(e) An employee of your attending physician;

Disclosure Statement - Page 2
Initialed for Authenticity

D.L.T.

**(f)** An employee of a health care facility in which you are a patient if the employee is providing direct patient care to you or is an officer, director, partner, or business office employee of the health care facility or of any parent organization of the health care facility; or

**(g)** A person who, at the time this power of attorney is executed, has a claim against any part of your estate after your death.

**SIGN BELOW TO ACKNOWLEDGE YOUR RECEIPT OF THIS DISCLOSURE STATEMENT PRIOR TO YOUR EXECUTION OF THE MEDICAL POWER OF ATTORNEY AND TO AFFIRM THAT YOU HAVE READ AND DO UNDERSTAND THE INFORMATION CONTAINED THEREIN.**

\* \* \* \* \*

I acknowledge receipt of this Disclosure Statement prior to execution of the *Medical Power of Attorney*, and I affirm that I have read and understand the information contained in this Disclosure Statement.

_____
Doris Lee Tipps

Disclosure Statement - Page 3
Initialed for Authenticity

D.L.T.

8

# MEDICAL POWER OF ATTORNEY

1.     Designation of Health Care Agent.

I, Doris Lee Tipps, appoint:

> Steven Vinson Tipps
> 3210 East Beltline Road, #146
> Farmers Branch, Texas  75234-2324

as my agent to make any and all health care decisions for me, except to the extent I state otherwise in this document. This Medical Power of Attorney takes effect if I become unable to make my own health care decisions and this fact is certified in writing by my physician.

2.     Limitations on Decision-Making Authority. Limitations on the decision-making authority of my agent are as follows: My agent must honor any Directive to Physicians and Family or Surrogates that I have made under the Texas Advance Directive Act if, but only if, that Directive would otherwise require (under the circumstances then existing) that life-sustaining procedures be withheld or withdrawn. The fact that I have executed a Directive to Physicians and Family or Surrogates must not limit the power of my agent to act under this Medical Power of Attorney, unless the Directive would otherwise operate to require that life-sustaining procedures be withheld or withdrawn. This document is not intended to revoke any such Directive.

3.     Medical Information. My agent is to be considered a personal representative under privacy regulations related to Protected Health Information ("PHI") and is to be entitled to all health information in the same manner as if I personally were making the request. Accordingly, I confirm that, in connection therewith, my agent will be treated as my personal representative for all purposes as provided by regulation subsection 164.502(g) of title 45 of the *Code of Federal Regulations* and the medical information privacy law and regulations generally referred to as "HIPAA."

4.     Designation of Alternate Agent. (You are not required to designate an alternate agent but you may do so. An alternate agent may make the same health care decisions as the designated agent if the designated agent is unable or unwilling to act as your agent. If the agent designated is your spouse, the designation is automatically revoked by law if your marriage is

Medical Power of Attorney - Page 1
Initialed for Authenticity                                          D.L.T.

dissolved.) If the person designated as my agent is unable or unwilling to make health care decisions for me, then I designate the following person to serve as my agent, to make health care decisions for me as authorized by this document:

**Alternate Agent**: None

The original of this document is kept at:

3210 East Beltline Road, #146
Farmers Branch, Texas 75234-2324.

The following individuals or institutions have signed copies:

W. Thomas Finley, Esq.
Finley Law Group PLLC
5500 Preston Road, Suite 390
Dallas, Texas 75205-2676.

5.      **Duration**. I understand that this power of attorney exists indefinitely from the date I execute this document unless I establish a shorter time or revoke the power of attorney. If I am unable to make health care decisions for myself when this power of attorney expires, then the authority I have granted my agent continues to exist until the time I become able to make health care decisions for myself.

6.      **Prior Designations Revoked**. I revoke any prior medical power of attorney previously signed by me.

7.      **Acknowledgement of Disclosure Statement**. I have been provided with a Disclosure Statement explaining the effect of this document. I have read and understand the information contained in the Disclosure Statement.

I sign my name to this Medical Power of Attorney on this tenth day of September, 2013, at Dallas, Dallas County, Texas.

_____
Doris Lee Tipps

Medical Power of Attorney - Page 2
Initialed for Authenticity

D.L.T.

10

## Statement of First Witness

I am not the person appointed as agent by this document. I am not related to the principal by blood or marriage. I would not be entitled to any portion of the principal's estate on the principal's death. I am not the attending physician of the principal or an employee of the attending physician. I have no claim against any portion of the principal's estate on the principal's death. Furthermore, if I am an employee of a health care facility in which the principal is a patient, I am not involved in providing direct patient care to the principal and am not an officer, director, partner, or business office employee of the health care facility or of any parent organization of the health care facility.

_Tom Finley_
(Witness Signature)
_Tom Finley_
(Print Name)
_September 10, 2013_
(Date)
_3851 North Versailles Avenue_
(Address)
_Dallas, Texas 75209-5925_
(City and State)

## Signature of Second Witness

_B. Jean Jones_
(Witness Signature)
_B. Jean Jones_
(Print Name)
_September 10, 2013_
(Date)
_214 Deer Creek Lane_
(Address)
_Sunnyvale, Texas 75182_
(City and State)

933380_1

**Medical Power of Attorney - Page 3**
**Initialed for Authenticity**

D.L.T.

11



GUARDIANSHIP OF      §   IN THE PROBATE COURT

DORIS LEE TIPPS,       §     NO. 3 OF

INCAPACITATED       §   DALLAS COUNTY, TEXAS

## ORDER TO REVOKE AUTHORITY OF AGENT

On the 21ˢᵗ day of October, 2014, the PETITION TO REVOKE AUTHORITY OF AGENT filed by SENIOR CITIZENS OF GREATER DALLAS d/b/a The Senior Source, Guardian of the Person of DORIS LEE TIPPS, an Incapacitated Person, (the "Ward") on June 2, 2014, was heard and considered by the Court, and after hearing and considering the pleadings filed herein, testimony given and arguments, the Court finds that a conflict exists between the powers granted the Guardian of the Person and the powers claimed by STEVEN V. TIPPS under a medical power of attorney from the Ward, that is not in the best interest of the Ward and may be detrimental to the health and proper care of the Ward, and that the authority of STEVEN V. TIPPS under a medical power of attorney from the Ward should be revoked.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the authority of STEVEN V. TIPPS under any medical power of attorney from the Ward, DORIS LEE TIPPS, is hereby revoked.

SIGNED this _22_ day of October, 2014.

_____
JUDGE PRESIDING

TIPPS GUARDIANSHIP - ORDER TO REVOKE AUTHORITY OF AGENT
CAUSE NO. PR-13-3072-3 - Page Solo

PR-13-03072-3
COOR
ORDER
078386

FILED

15 JAN -7 AM 11: 36

JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

## No. PR-13-3072-3

In the Matter of the

Guardianship of

Doris L. Tipps

In the Probate Court

No. 3

Dallas County, Texas

### Notice of Appeal

Steven V. Tipps, pro se Appellant, gives notice of his intent to appeal the trial court's <u>Order Granting Motion to Accept Resignation, Discharge Trustee and Reinstate Trustee</u> signed on October 21, 2014.

This appeal is taken to the Fifth Court of Appeals in Dallas, Texas

Respectfully submitted,

Steven V. Tipps
5015 Addison Circle
Addison, Texas 75001
214-223-6358
800-358-6866
Fax 254-731-2522
Email: casing@prodigy.net
casingscientific@gmail.com

LISA MATZ, CLERK
2014 NOV 20 PM 3: 08
FILED IN
5TH COURT OF APPEALS

PR-13-03072-3
CNA
NOTICE — APPEAL
731801

1

## Certificate of Service

I certify that on November 19, 2014, a true and correct copy of the foregoing Notice of Appeal was sent by electronic email, by certified mail, return-receipt requested, and by facsimile transmission to the following counsel of record.

Jeffrey Cook
Lisa Leffingwell
Sullivan & Cook, L.L.C.
2301 Cedar Springs Road, Suite 200
Dallas, Texas 75201-7837

Alvin J. Golden
Katherine C. Akinc
Ikard Golden Jones, P.C.
400 West 15th Street, Suite 975
Austin, Texas 78701-1646

_____
Steven V. Tipps

2

# V.

# CASE EXCEPTS – De Ayala v. Mackie

# COMBINED APPELLANT REPLY BRIEF
## TO
## THREE APPELLEE REPLY BRIEFS

## CASE EXCERPT

### In DeAyala v. Mackie, the Texas Supreme Court states:

"Probate proceedings are an exception to the "one final judgment" rule; in such cases, "multiple judgments final for purposes of appeal can be rendered on certain discrete issues." *Id.* at 192. The need to review "controlling, intermediate decisions before an error can harm later phases of the proceeding" has been held to justify this rule. *Logan v. McDaniel*, 21 S.W.3d 683, 688 (Tex.App.-Austin 2000, pet. denied). Not every interlocutory order in a probate case is appealable, however, and determining whether an otherwise interlocutory probate order is final enough to qualify for appeal, has proved difficult."

"In the past, courts relied on the "substantial right" test to decide whether an ostensibly interlocutory probate order had sufficient attributes of finality to confer appellate jurisdiction. *See, e.g., Huston v. F.D.I.C.*, 800 S.W.2d 845, 848 (Tex.1990); *Estate of Wright*, 676 S.W.2d 161, 163 (Tex.App.-Corpus Christi 1984, writ ref'd n.r.e.). Under that standard, once the probate court adjudicated a "substantial right," the order was appealable. That phrase soon became a fruitful source of litigation as appellate courts struggled to delineate its parameters. Eleven years ago, we attempted to clarify appellate jurisdiction in this complex area. *See Crowson v. Wakeham*, 897 S.W.2d 779, 783 (Tex.1995) (acknowledging that "our language heretofore has been somewhat ambiguous")."We noted that, while adjudication of a "substantial right" was one factor to be considered, equally important was our earlier precedent requiring that the order dispose of all issues in the phase of the proceeding for which it was brought. *Id.* at 782-83. To sidestep "potential confusion" about the appropriate test for jurisdiction, we adopted this test:

"If there is an express statute, such as the one for the complete heirship judgment, declaring the phase of the probate proceedings to be final and appealable, that statute controls. Otherwise, if there is a proceeding of which the order in question may logically be considered a part, but one or more pleadings also part of that proceeding raise issues or parties not disposed of, then the probate order is interlocutory."

Page **97** of **103**

*"Id.* at 783. Recognizing the inherent difficulties in applying any test to determine appealability, we urged parties to seek severance orders to eliminate ambiguities about whether the order was intended to be final and appealable. *Id.* at 783 (explaining that "[l]itigants can and should seek a severance order either with the judgment disposing of one party or group or parties, or seek severance as quickly as practicable after the judgment")."

Moreover, under *Crowson,* the trial court's order was interlocutory because it did not dispose of all parties or issues in a particular phase of the proceedings. Because an order denying a plea to the jurisdiction and refusing to remove an executor does not end a phase of the proceedings, but sets the stage for the resolution of all proceedings, the order is interlocutory. *See, e.g., Fischer v. Williams,* 160 Tex. 342, 331 S.W.2d 210, 213-14 (1960)

"The Legislature enacted the statute permitting interlocutory appeal of orders overruling motions to vacate orders appointing receivers or trustees in 1917, and the provision remains substantially unchanged today. *See* Act of March 30, 1917, 35th Leg., R.S., ch. 168, § 1, 1917 Tex. Gen. Laws 379, 379 (now codified at TEX. CIV. PRAC. & REM. CODE § 51.014(a)(2))At no time during the statute's almost ninety-year history have we held that it applies to a motion to remove an estate's executor. Our statement in *Bailey* — that an administrator is designated trustee of estate property — referred to the administrator's obligation, as holder of legal title to the estate's property, to pay ad valorem taxes accruing during administration. *Bailey,* 862 S.W.2d at 583, 586. It did not equate an executor to a trustee for all purposes, and there is no evidence that the Legislature intended to permit immediate appeals of orders refusing to remove estate executors. Accordingly, we conclude that section 51.014(a)(2)         does not permit Ayala to pursue an interlocutory appeal of the trial court's order."[15]

# VI. CASE SUMMARIES

## a. TEXAS PROCEDURAL DUE PROCESS CONGRUENT WITH FEDERAL PROCEDURAL DUE PROCESS

# COMBINED APPELLANT REPLY BRIEF
# TO
# THREE APPELLEE REPLY BRIEFS
## CASE SUMMARIES

### Texas Procedural Due Process congruent with federal Procedural Due Process

1. In the area of procedural due process, the protections afforded under the Texas Constitution are congruent with those provided by the Federal Constitution.

See *Price v. City of Junction*, 711 F. 2d 582, 590 (5th Cir. 1983); *cf. University of Texas Med. Sch. v. Than*, 901 S.W.2d 926, 930-31 (Tex. 1995) cert. denied, 528 499, 499 U. S. 1160, 120 S. Ct. 1171, 145 L. Ed.ed 1080 (2000).

2. Generally, procedural due process requires notice and an opportunity to be heard.

*Brown v. University of Texas Health Ctr.*, 957 W.W.2d 911, 915 (Tex. App.—Tyler 1997, no writ).

3. Procedural due process involves basic notions of justice and fair play. The sufficiency of procedures must be judged in light of the parties, the subject matter and the circumstances involved.

*Id.* *Gene Harmon Ford v. David McDavid Nissan, Inc.*, 997 S.W.2d 298, 312 (Tex. App.-Austin 1999, writ denied).

The sufficiency of procedures must be judged in light of the parties, the subject matter and the circumstances involved.

*Id.* (*quoting Brewer v. Austin Indep. Sch. Dist*. 779 F.2d 260, 263 (5th Cir. 1985

## b. TEXAS DUE COURSE CLAUSE CONGRUENT WITH

## FEDERAL DUE PROCESS CLAUSE(S)

# COMBINED APPELLANT REPLY BRIEF
# TO
# THREE APPELLEE REPLY BRIEFS

## State of Texas Due Course of Law congruent with federal Due Process of Law

"While the Texas Constitution is textually different in that it refers to "due course" rather than "due process", we regard these terms as without meaningful distinction.
*Fleming v. State*, 376 S.W.3rd 854 (2012) (35)

"Due process at a minimum requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner."
*Tex. Comm. On Env. Quality v. Denbury Onshore*, LLC, Texas. App. LEXIS 7177 (41)

"The Supreme Court of Texas has stated that the language of the Due Course of Law Clause of the Texas Constitution and the Due Process Clause of the United States Constitution is nearly identical" and that there is no meaningful distinction between "due course " and "due process".
*Richard v. Dretke*, Tex. App. LEXIS 2261 2009 (20)

In analyzing a claim of deprivation of procedural due process, we apply a two-part test: we must determine (1) whether the plaintiff had a liberty or property interest entitled to procedural due process; and(2) if so, what process is due.
*Dallas County v. Gonzales*, (2006) (17)

The Due Process Clause does not mandate the parties be heard at the arbitration hearing; rather, the Due Process Clause requires that the parties be given a meaningful opportunity to be heard at the arbitration hearing.
*Ewing v. Act Catastrophe* – Texas LC, 375, S.W.2d 545 (2012) (16)

--holding that although Texas Constitution refers to "due course" rather than the U. S. Constitution's "due process", the phrases are not meaningfully distinct and federal due process are persuasive authority when interpreting Texas's "due course" guarantee.
*Brantley v. Texas Youth Commission, 2011, 365 S.W.3d 89 (2011) (17)*

The "due course" clause in our state constitution requires the same level of "due process" as the federal constitution.
*City of Fort Worth v. Park*, 2011, Tex. APP LEXIS 5725 (2011) (14)

What process is due is measured by a flexible standard that depends on the practical requirements of the circumstances.
*Collins v. Texas Natural Resource*, 2002, 94 S.W.3d 876 (2002) (16)

At a minimum, due process requires a person who may be deprived of a liberty or property interest to be provided notice and an opportunity to be heard at a meaningful time and in a meaningful manner.
*Anthony v. State*, **209 S.W.3d 296 (2006) (37)**

### c. DAVISON V. GREAT NAT'L LIFE INS. CO.

### CASE REFERENCE SUMMARIES

# COMBINED APPELLANT REPLY BRIEF
# TO
# THREE APPELLEE REPLY BRIEFS
## CASE SUMMARIES

### Davidson v. Great Nat'l Life Ins. Co. (TEX.SUP.COURT)
### Confrontation and Cross Examination

1.  Texas Employers Ins Assoc v. Garza, 308 S/W.2d 521, 527

    (TEX.CIV.APP) Amarillo 1957, writ ref'd n.r.e.

    "This court, as have many others, has held that right to cross-examine a witness is a substantial one, and it is error to so restrict it as to prevent the cross-examining party from going fully into all matters connected with the examination in chief".

2.  Texas & N.O.R. Co. v Barham, 204 S.W.2d 205, 214 (Tex.Civ.App.—Waco

    1947, no writ)

    "…prompted reversal because the trial court did not allow full development of facts which might have placed him (appellant) in a more favorable light before the jury. "

3.  Murray v. Morris, 17 S.W.2d 110, 111 (Tex. Civ.App.) –Amarillo 1928, writ dism'd

    "saying: The purpose of cross-examination is to sift and to modify and to have the witness explain what has been said on his direct examination, and if the witness by this process can be discredited and the weight of his testimony weakened, the right should not be denied.

4.  Pecos & N.T. Ry. Co. v. Porter, 156 S.W. 267, 274-275 (Tex.Civ.App.) – Amarillo 1913, no writ)).

    The court went [*479] on in Pecos to say, "A witness may be cross examined as to his examination in chief in all its bearings and as to whatever goes to explain or modify what he has stated in his examination in chief, and prejudice will be presumed where this right is denied."

**d.  TEXAS ABUSE OF DISCRETION CASES**

# COMBINED APPELLANT REPLY BRIEF
# TO
# THREE APPELLEE REPLY BRIEFS

## CASE SUMMARIES – TEXAS ABUSE OF DISCRETION

A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex.2003).

A trial court has no discretion in determining what the law is or in applying the law to the facts. *Cayton v. Moore*, 224 S.W.3d 440 Tex.App. - Dallas 2007, no pet. An abuse of discretion occurs if the trial court clearly failed to analyze and determine the law correctly or applied the law incorrectly to the facts. *Id.*

The test for abuse of discretion is whether the trial court acted without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.* 701 S.W.2d 238, 241-42 (Tex. 1985)

When we determine whether the trial court abused its discretion, we may not substitute our judgment for that of the trial court unless its decision was so arbitrary that it exceeded the bounds of reasonableness. *Clarendon Nat'l Ins. Co. v. Thompson*, 199 S.W.3d 482, 494 (Tex.App. – Houston [1st Dist. 2006, no pet].

A trial court has broad discretion and we may not disturb its ruling absent manifest abuse of discretion. *Champion Int'l Corp. v. Twelfth Court of Appeals*, 762 W.W.2d 898,899 (Tex. 1988; TEX.R. CIV.

Certiorari lies to correct proceedings erroneous upon the face of the record when there is no other adequate remedy. It is available in the exercise of super intending control over a tribunal which is proceeding illegally where no other mode of review has been provided. Certiorari lies where there is a want of jurisdiction or an act in excess in excess of jurisdiction which is apparent on the face of the record. *(State v. Nelson*, 246 Ark, 210, 438 S.W.2d (1969).

# VII.

# APPLICATION FOR APPOINTMENT OF TEMPORARY

# GUARDIAN OF THE PERSON AND ESTATE

# OF

# DORIS L. TIPPS





CAUSE NO. _PR13-3072-3_

FILED
2013 SEP -4 PM 2:04
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

| | | |
|---|---|---|
| IN THE GUARDIANSHIP OF | § | IN THE PROBATE COURT |
| | § | |
| DORIS LEE TIPPS, | § | OF |
| | § | |
| AN ALLEGED INCAPACITATED PERSON | § | DALLAS COUNTY, TEXAS |

## APPLICATION FOR APPOINTMENT OF
## TEMPORARY GUARDIAN OF THE PERSON AND ESTATE

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES **THOMAS RICHARD TIPPS** and files this Application for Appointment of Temporary Guardian of the Person and Estate of **DORIS LEE TIPPS**, an Alleged Incapacitated Person, ("Proposed Ward") and respectfully shows the Court as follows:

1. That Proposed Ward, **DORIS LEE TIPPS**, is an adult female whose date of birth is November 11, 1922. Her address is Lakeview at Josey Lane, 2105 North Josey Lane, Carrollton, Dallas County, Texas 75006-3027, and citation may be served at this address. She is a resident of Dallas County, Texas.

2. Applicant **THOMAS RICHARD TIPPS** desires to be appointed Temporary Guardian of the Person and Estate. He resides at 1 Beach Drive SE, St. Petersburg, Florida 33701. He is a son of the Proposed Ward. Applicant was named by Proposed Ward in her Declaration of Guardian, a copy of which is attached hereto.

3. Applicant seeks Temporary Guardianship of the Person and Estate of Proposed Ward as it is necessary for the protection and welfare of the Proposed Ward. Applicant believes that a Temporary Guardianship would be in the Proposed Ward's best interest and that there is imminent danger that the physical health or safety of the Proposed Ward will be seriously impaired unless the Court takes immediate action to appoint Applicant as Proposed Ward's Temporary Guardian. In

APPLICATION FOR APPOINTMENT OF TEMPORARY GUARDIANS OF THE PERSON AND ESTATE - Page 1

PR – 13 – 03072 – 3
CLG
APPLICATION (OCA – NEW CASE FILED)
264383

addition, the Proposed Ward is making poor financial decisions and said decisions are contrary to the Proposed Ward's long-standing expressed wishes. The Proposed Ward is unable to care for herself and her finances.

4.   The Proposed Ward is incapacitated. It is requested that the Proposed Ward receive such protection and assistance as necessary to protect the person of the Proposed Ward and that the all powe·s be granted to Temporary Guardian as provided in the Texas Probate Code, including the following:

To sign all medical release for the Proposed Ward;

To authorize all medical and dental treatments for Proposed Ward;

To apply for all public, private and governmental benefits available for medical care, dental care and living arrangements for Proposed Ward, and to file insurance claims for Proposed Ward;

To make all decisions regarding Proposed Ward's living arrangements and to execute all agreements, releases, authorizations and contracts necessary to provide such living arrangements; and

The power and authority to gain access to the Proposed Ward's medical records.

To take any and all actions necessary to collect, preserve and protect the estate of Proposed Ward, and to incur costs necessary and execute any contracts necessary for such collection, preservation, and protection;

To take possession of all assets of whatever kind and nature in the estate of Proposed Ward and to collect all monies due to Proposed Ward's Estate;

To gain access to Proposed Ward's home and all financial, medical, legal, and other records;

To conduct all estate, trust and financial transactions, including spending estate/trust funds, closing and opening accounts in Proposed Ward's name, closing and opening accounts held in trust for Proposed Ward, negotiating checks and instruments payable to Proposed Ward, and any other financial and estate transactions with Proposed Ward's bank, brokerage service, savings and loan, credit union or other financial institution; and

To sell, convey, or otherwise dispose of personal property in Proposed Ward's Estate.

Further, Applicant requests that the Court enter an Order that the Proposed Ward lacks the power to execute estate-planning documents pending the Temporary Guardianship.

5.     The Proposed Ward is currently incapacitated as a result of dementia of unknown diagnosis. The Proposed Ward is unable to properly care for herself and there is imminent danger that the physical health or safety of the Proposed Ward will be seriously impaired and her finances jeopardized.

6.     Applicant executed a Power of Attorney naming Applicant, **THOMAS RICHARD TIPPS**, as her Agent.

7.     Both of the Proposed Ward's parents are deceased. Proposed Ward's surviving siblings are::

**BERNICE EVERITT**
1322 Jacinth Drive
Weslaco, Texas 78596

**ELIZABETH COGDILL**
3918 Corral Canyon Road
Bonita, California 91902

8.     Her husband, **THOMAS V. TIPPS**, predeceased her, having died in October, 2005, and she is not married.

9.     The Proposed Ward has four children born to or adopted by her, as follows:

**THOMAS RICHARD TIPPS**, Applicant
DOB: October 2, 1946; Adult
1 Beach Drive SE
St. Petersburg, FL 33701

**GLENDA DELL JORDAN**
DOB: August 25, 1944; Adult
P.O. Box 792
Battle Mountain, Nevada 89820

**SALLY JOYCE FINK**
DOB: October 1, 1948; Adult
709 S. 50th Street
Renton, Washington 98055

**STEVEN VINSON TIPPS**
DOB: November 20, 1950; Adult
3210 E. Beltline Road, #146
Carrollton, Texas 75006

10.     Most of Proposed Ward's assets are held in Trust. However, there are the following assets held outside the Trust:

Cash on deposit at Bank of America as of the filing of this Petition: $500.00 (approx)

2000 Lincoln Town Car and 1998 Ford Aerostar Van

Personal Property located in apartment

Monthly income: $12,584.00 from rentals, retirement plans, annuities, social security and investments, transferred into Trust monthly

11.     This Court has venue over these proceedings because the Proposed Ward is a resident of Dallas County, Texas.

WHEREFORE, PREMISES CONSIDERED, Applicant prays that the Court consider this Application for Appointment of Temporary Guardian of the Person and Estate of **DORIS LEE TIPPS**; that notice and citation be issued as required by law; that an Attorney Ad Litem be appointed to represent the interests of the Proposed Ward; that a time for hearing on this application be set; that on hearing that **THOMAS RICHARD TIPPS** be appointed Temporary Guardian of the Person and Estate of the Proposed Ward; that Letters of Temporary Guardianship be issued to **THOMAS RICHARD TIPPS** as Temporary Guardian of the Person and Estate on taking the oath and giving bond as required by law; and Applicant prays for such other and further relief to which he may be entitled.

APPLICATION FOR APPOINTMENT OF TEMPORARY GUARDIANS OF THE PERSON AND ESTATE - Page       4

Respectfully submitted,

SULLIVAN & COOK, L.L.C.

_____

Jeffrey Cook
State Bar No. 04734495
Lisa Leffingwell
State Bar No. 12158575
2301 Cedar Springs, Suite 200
Dallas, Texas 75201
(214) 520-7494
(214) 528-6925 (fax)
ATTORNEYS FOR PLAINTIFF

**STATE OF FLORIDA** §
§
**COUNTY OF** Pinellas §

    BEFORE ME, the undersigned Notary Public, on this day personally appeared **THOMAS RICHARD TIPPS**, who, being by me duly sworn on his oath, deposed and said that he has read the above and foregoing Application for Appointment of Permanent Guardians of the Person and Estate and that the allegations contained therein are within his personal knowledge to be true and correct.



**THOMAS RICHARD TIPPS**

    **SUBSCRIBED AND SWORN TO BEFORE ME** by **THOMAS RICHARD TIPPS** on this, the _____3_____ day of _____Sept_____, 2013.

DOLORES A. PHILLIPS
MY COMMISSION # EE 867602
EXPIRES: April 8, 2017
Bonded Thru Notary Public Underwriters

Notary Public, State of Florida

APPLICATION FOR APPOINTMENT OF TEMPORARY GUARDIANS OF THE PERSON AND ESTATE - Page 6

# Declaration of Guardian in the Event of
# Later Incapacity or Need of Guardian

I, **DORIS LEE TIPPS**, make this Declaration of Guardian, to operate if the need for a guardian for me later arises.

1.  I designate my son, **THOMAS RICHARD TIPPS**, to serve as guardian of my person. In addition, I appoint my daughter, **GLENDA DELL JORDAN**, to serve as first alternate guardian of my person.

2.  I designate my son, **THOMAS RICHARD TIPPS**, to serve as guardian of my estate. In addition, I appoint my daughter, **GLENDA DELL JORDAN**, to serve as first alternate guardian of my estate.

3.  If any guardian or alternate guardian dies, does not qualify, or resigns, the next named alternate guardian becomes my guardian.

4.  I expressly disqualify the following person from serving as guardian of my person: **STEVEN VINSON TIPPS**.

5.  I expressly disqualify the following person from serving as guardian of my estate: **STEVEN VINSON TIPPS**.

I, **DORIS LEE TIPPS**, as Declarant, after being duly sworn, declare to the undersigned witnesses and to the undersigned authority that this instrument is my Declaration of Guardian in the Event of Later Incapacity or Need of Guardian, and that I have made and executed it for the purposes expressed in the declaration. I now sign this declaration in the presence of the attesting witnesses and the undersigned authority on this 19th day of July, 2012.

_____
DORIS LEE TIPPS, Declarant

The undersigned, Sari Northcutt and Robin Clarke, each being 14 years of age or older, after being duly sworn, declare to the Declarant and to the undersigned authority that the Declarant declared to us that this instrument is the Declarant's Declaration of Guardian in the Event of Later Incapacity or Need of Guardian and that the Declarant executed it for the purposes expressed in the Declaration. The Declarant then signed this declaration and we believe the Declarant to be of sound mind. We now sign our names as attesting witnesses on this 19th day of July, 2012.

_____
Witness
Print Name: Sari Northcutt

_____
Witness
Print Name: Robin Clarke

SUBSCRIBED AND SWORN TO before me by the above named Declarant and Affiants on July 19, 2012.

THEODORE S. LUSTIG
MY COMMISSION EXPIRES
MARCH 2, 2014

_____
Notary Public, State of Texas

**EXHIBIT**

_A_

# CIVIL CASE INFORMATION SHEET

CAUSE NUMBER *(FOR CLERK USE ONLY)*: PR13-3072-3    COURT *(FOR CLERK USE ONLY)*: _____

STYLED _Doris Lee Tipps_

*(e.g., John Smith v. All American Insurance Co; In re Mary Ann Jones; In the Matter of the Estate of George Jackson).*

A civil case information sheet must be completed and submitted when an original petition or application is filed to initiate a new civil, family law, probate, or mental health case or when a post-judgment petition for modification or motion for enforcement is filed in a family law case. The information should be the best available at the time of filing.

## 1. Contact information for person completing case information sheet:

| Contact Information | Names of parties in case: | Person or entity completing sheet is: |
|---|---|---|
| **Name:** Lisa Leffingwell **Email:** lleffingwell@sullivancook.com | **Plaintiff(s)/Petitioner(s):** Applicant Thomas Richard Tipps | ☑ Attorney for Plaintiff/Petitioner ☐ Pro Se Plaintiff/Petitioner ☐ Title IV-D Agency ☐ Other: _____ |
| **Address:** 2301 Cedar Springs Rd #200 **Telephone:** (214) 520-7494 | | |
| **City/State/Zip:** Dallas TX 7520 **Fax:** (214) 528-6925 | **Defendant(s)/Respondent(s):** Doris Lee Tipps | **Additional Parties in Child Support Case:** Custodial Parent: _____ Non-Custodial Parent: _____ |
| **Signature:** (signature) **State Bar No:** 12158575 | *(Attach additional page as necessary to list all parties)* | Presumed Father: _____ |

## 2. Indicate case type, or identify the most important issue in the case *(select only 1)*:

### Civil

**Contract**

*Debt/Contract*
☐ Consumer/DTPA
☐ Debt/Contract
☐ Fraud/Misrepresentation
☐ Other Debt/Contract: _____

*Foreclosure*
☐ Home Equity—Expedited
☐ Other Foreclosure
☐ Franchise
☐ Insurance
☐ Landlord/Tenant
☐ Non-Competition
☐ Partnership
☐ Other Contract: _____

**Injury or Damage**
☐ Assault/Battery
☐ Construction
☐ Defamation
*Malpractice*
☐ Accounting
☐ Legal
☐ Medical
☐ Other Professional Liability: _____
☐ Motor Vehicle Accident
☐ Premises
*Product Liability*
☐ Asbestos/Silica
☐ Other Product Liability List Product: _____
☐ Other Injury or Damage: _____

**Real Property**
☐ Eminent Domain/Condemnation
☐ Partition
☐ Quiet Title
☐ Trespass to Try Title
☐ Other Property: _____

**Related to Criminal Matters**
☐ Expunction
☐ Judgment Nisi
☐ Non-Disclosure
☐ Seizure/Forfeiture
☐ Writ of Habeas Corpus— Pre-indictment
☐ Other: _____

**Employment**
☐ Discrimination
☐ Retaliation
☐ Termination
☐ Workers' Compensation
☐ Other Employment: _____

### Other Civil
☐ Administrative Appeal
☐ Antitrust/Unfair Competition
☐ Code Violations
☐ Foreign Judgment
☐ Intellectual Property
☐ Lawyer Discipline
☐ Perpetuate Testimony
☐ Securities/Stock
☐ Tortious Interference
☐ Other: _____

### Family Law

**Marriage Relationship**
☐ Annulment
☐ Declare Marriage Void
*Divorce*
☐ With Children
☐ No Children

**Other Family Law**
☐ Enforce Foreign Judgment
☐ Habeas Corpus
☐ Name Change
☐ Protective Order
☐ Removal of Disabilities of Minority
☐ Other: _____

**Post-judgment Actions (non-Title IV-D)**
☐ Enforcement
☐ Modification—Custody
☐ Modification—Other

**Title IV-D**
☐ Enforcement/Modification
☐ Paternity
☐ Reciprocals (UIFSA)
☐ Support Order

**Parent-Child Relationship**
☐ Adoption/Adoption with Termination
☐ Child Protection
☐ Child Support
☐ Custody or Visitation
☐ Gestational Parenting
☐ Grandparent Access
☐ Parentage/Paternity
☐ Termination of Parental Rights
☐ Other Parent-Child: _____

### Tax
☐ Tax Appraisal
☐ Tax Delinquency
☐ Other Tax

### Probate & Mental Health

*Probate/Wills/Intestate Administration*
☐ Dependent Administration
☐ Independent Administration
☐ Other Estate Proceedings

☑ Guardianship—Adult
☐ Guardianship—Minor
☐ Mental Health
☐ Other: _____

PR – 13 – 03072 – 3
CISC
CASE INITIATION COVER SHEET
254384

(barcode)

## 3. Indicate procedure or remedy, if applicable *(may select more than 1)*:
☐ Appeal from Municipal or Justice Court
☐ Arbitration-related
☐ Attachment
☐ Bill of Review
☐ Certiorari
☐ Class Action
☐ Declaratory Judgment
☐ Garnishment
☐ Interpleader
☐ License
☐ Mandamus
☐ Post-judgment
☐ Prejudgment Remedy
☐ Protective Order
☐ Receiver
☐ Sequestration
☐ Temporary Restraining Order/Injunction
☐ Turnover

## 4. Indicate damages sought *(do not select if it is a family law case)*:
☑ Less than $100,000, including damages of any kind, penalties, costs, expenses, pre-judgment interest, and attorney fees
☐ Less than $100,000 and non-monetary relief
☐ Over $100,000 but not more than $200,000
☐ Over $200,000 but not more than $1,000,000
☐ Over $1,000,000

12



# CITATION IN PROBATE
THE STATE OF TEXAS
Probate Court No. 3
CAUSE NO. **PR-13-03072-3**
GUARDIANSHIP OF DORIS TIPPS, An Alleged Incapacitated Person

TO ANY SHERIFF OR ANY CONSTABLE WITHIN THE STATE OF TEXAS – GREETINGS:
YOU ARE HEREBY COMMANDED TO SUMMON:

DORIS LEE TIPPS
LAKEVIEW AT JOSEY LANE
2105 N. JOSEY LANE
CARROLLTON, TEXAS 75006

To appear before the Probate Court Probate Court No. 3 of Dallas County, Texas, on September 13, 2013 at 11:30 A. M. then and only then and there to file written answer and/or contest and show cause why this Temporary Guardianship, provided for by law in section 875(e) of the Texas Probate Code should not be allowed as stated in the attached application filed by:
THOMAS RICHARD TIPPS
filed in said Court on September 04, 2013 A.D. in the matter of the estate No. PR-13-03072-3 on the Probate Docket of said court, the nature of which petition is as follows: APPLICATION FOR APPOINTMENT OF TEMPORARY GUARDIAN OF THE PERSON AND ESTATE. You are notified that you have the right under Texas Probate Code Section 632(j) to file with the clerk a written request that you be notified of any or all specifically designated motions, applications, or pleadings filed by any person, or by a person specifically designated in your request, relating to the application for the guardianship that has been filed or relating to any subsequent guardianship proceeding involving the ward after the guardianship is created, if any. If you make such a request, you are responsible for the fees and costs associated with furnishing you the documents specified in the request. The clerk may require a deposit to cover the estimated costs of furnishing you with the required notice.

The purpose of the hearings is for the Court to act on the attached application. A possible consequence of the hearings is that DORIS LEE TIPPS may temporarily lose the right to:
1. manage personal and financial affairs;
2. possess a fire arm;
3. hold or obtain a license to operate a motor vehicle;
4. make decisions regarding marital status;
5. make personal living decisions regarding residence;
6. make medical, dental, psychological or psychiatric treatment decisions; and vote in public elections.

DORIS LEE TIPPS has the following rights:
1. The right to be represented by an attorney;
2. The right to prior notice of any hearing;
3. The right to be present at any hearing;
4. The right to present evidence and to confront and cross-examine witnesses; and
5. The right to request a closed hearing.

And you will deliver to the said DORIS LEE TIPPS, a true copy of this Citation.
FAIL NOT, but have you then and there before said Court this writ, with your return there on, showing how you executed the same.

WITNESS: *JOHN F. WARREN*, Clerk of the Probate Courts of Dallas County, Texas
GIVEN UNDER MY HAND AND SEAL OF OFFICE, at Dallas County, Texas, and issued September 05, 2013

*JOHN F. WARREN*, COUNTY CLERK
DALLAS COUNTY, TEXAS

By: *Andrea Boone*

Andrea Boone, Deputy

RETURN OF SERVICE

PR-13-03072-3          Probate Court No. 3

GUARDIANSHIP OF DORIS TIPPS

**ADDRESS FOR SERVICE:**

DORIS LEE TIPPS
LAKEVIEW AT JOSEY LANE
2105 N. JOSEY LANE
CARROLLTON, TEXAS 75006

Came to hand the _____ day of _____, 20____, at _____ o'clock ____M., and executed in _____ County, Texas by delivering to each of the within named defendants in person, a true copy of this Citation with the date of delivery endorsed thereon, together with the accompanying copy of the APPLICATION FOR APPOINTMENT OF TEMPORARY GUARDIAN OF THE PERSON AND ESTATE, at the following times and places, to-wit:

| Name | Date/Time | Place, Course and Distance from Courthouse |
|------|-----------|---------------------------------------------|
| _____ | _____ | _____ |

And not executed as to the defendant(s), _____

The diligence used in finding said defendant(s) being:

_____
and the cause of failure to execute this process is:

_____
and the information received as to the whereabouts of said defendant(s) being:

_____

Fees:
Serving Petition and Copy $ _____
TOTAL $ _____

                              _____, Officer

                              _____, County, Texas

                    By: _____, Deputy

                              _____
                                              Affiant

# XIII.

# ORDER ON MOTION FOR INDEPENDENT MEDICAL EXAMINATION

$2ᵈ



NO. PR-13-3072-3

| IN RE: ESTATE OF | § | IN THE PROBATE COURT |
| | § | |
| DORIS LEE TIPPS, | § | NUMBER THREE OF |
| | § | |
| AN ELDERLY/DISABLED PERSON | § | DALLAS COUNTY, TEXAS |

## ORDER ON MOTION FOR
## INDEPENDENT MENTAL EXAMINATION

On September 13, 2013, came on to be considered the Motion for Independent Mental Examination filed by Thomas Richard Tipps. Based on the agreement of the parties, the Court finds that it is well taken and should be granted.

IT IS THEREFORE ORDERED that Doris Lee Tipps shall, as soon as possible, undergo an Independent Mental Examination by Jaye Douglas Crowder, M.D., the court-appointed psychiatrist;

IT IS FURTHER ORDERED that the examination shall be conducted with no one else present other than Doris Lee Tipps and Jaye Douglas Crowder, M.D. and his staff and medical advisors;

IT IS FURTHER ORDERED that no one communicate with the physician or psychiatrist prior to the issuance of his report except as may be necessary to schedule the examination.

SIGNED on this ____ day of September, 2013.

_____
JUDGE PRESIDING

PR - 13 - 03072 - 3
COUR
ORDER
300055

**ORDER ON MOTION FOR INDEPENDENT MENTAL EXAMINATION - Solo Page**

# IX.

# MENTAL EXAMINATON REPORT

# J. DOUGLAS CROWDER, M.D.

# PHYSICIAN'S CERTIFICATE OF MEDICAL EXAMINATION

CAUSE NO. _PR13-3072-3_

*Revision June 1, 2013*

In the Matter of the Guardianship of

Doris L. Tipps,
an Alleged Incapacitated Person

For Court Use Only

Court Assigned: Yes

FILED

2013 NOV 15 AM 9/50

JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

The purpose of this certificate is to enable the Court to determine whether the individual identified above is incapacitated according to the legal definition, and whether a guardian should be appointed to care for him or her.

## LEGAL DEFINITION OF INCAPACITY

For purposes of this certificate, an "Incapacitated Person" is *"an adult individual who, because of a physical or mental condition, is substantially unable to provide food, clothing or shelter for himself or herself, to care for the individual's own physical health, or to manage the individual's own financial affairs."* Texas Probate Code § 601(14).

## GENERAL INFORMATION

Proposed Ward's Name Doris L. Tipps

Date of Birth November 11, 1922    Age 91    Gender ☐ M    ☒ F

Current Location of Ward: Lakeview @ Josey Ranch Retirement Center, 2105 N. Josey Lane, Apt. 320, Carrollton, Tx 75006

Physician's Name J. Douglas Crowder, MD    Phone: (469-330-7378)

Office Address 8604 Greenville Avenue, Suite 201, Dallas, Texas 75243

☒ YES    ☐ NO -- I am a physician currently licensed to practice in the State of Texas.
I have been the doctor for the Proposed Ward since 10/14/2013
I last examined the Proposed Ward on 10/14/2013    at:
☐ a Medical facility    ☐ the Proposed Ward's residence
☒ Other:  Physician's Address as noted above

☐ YES    ☒ NO -- The Proposed Ward is under my continuing treatment.

☒ YES    ☐ NO -- Prior to the examination, I informed the Proposed Ward that communications with me would not be privileged.

☐ YES    ☒ NO -- A mini-mental status exam was given.  If "YES," please attach a copy.

==============================================================================

Based upon my last examination of the Proposed Ward, I provide the following information:

## 1. EVALUATION OF THE PROPOSED WARD'S PHYSICAL CONDITION

Physical Diagnosis:  Atrial Fibrillation by patient report, otherwise as by treating physician
Conditions underlying diagnosis:
a. Prognosis:
b. Severity:  ☐ Mild    ☐ Moderate    ☐ Severe
c. Treatment:  Coumadin

## 2. EVALUATION OF THE PROPOSED WARD'S MENTAL FUNCTION

Mental Diagnosis:  Dementia
Conditions underlying diagnosis:
a. Prognosis: _
b. Severity:  ☐ Mild    ☐ Moderate    ☒ Severe
c. Treatment:

☐ YES    ☒ NO -- A summary of Proposed Ward's medical history is attached (if reasonably available).

☒ YES    ☐ NO -- Would the Proposed Ward benefit from supports and services that would allow the individual to live in the least restrictive setting?

☒ YES    ☐ NO -- Does this mental diagnosis include dementia?

PR-13-03072-3
CMRL
MEDICAL REPORT OR LETTER
369838

PAGE 1 OF 4

Exhibit A-6

## 2. EVALUATION OF THE PROPOSED WARD'S MENTAL FUNCTION, continued

☒ YES  ☐ NO -- Would the Proposed Ward benefit from placement in a secured facility for the elderly or a secured nursing facility that specializes in the care and treatment of people with dementia?

☒ YES  ☐ NO -- Would the Proposed Ward benefit from medications appropriate for the care and treatment of dementia?

☐ YES  ☒ NO -- Does the Proposed Ward have sufficient capacity to give informed consent to the administration of dementia medications?

## 3. DECISION MAKING

### Alertness, Attention, and Deficits

Alertness:  ☒ Alert     ☐ Lethargic     ☐ Stupor

Proposed Ward is oriented to the following (check all that apply):

☒ Person     ☒ Time     ☐ Place     ☐ Situation

In my opinion, the ability of the Proposed Ward to make or communicate responsible decisions concerning himself or herself is affected by the Proposed Ward's deficits and abilities as indicated:

Deficit(s) (check all that apply):  ☒ Short-term memory     ☒ Long-term memory     ☒ Immediate recall

☐ YES  ☒ NO -- Able to understand or communicate (verbally or otherwise)
☐ YES  ☒ NO -- Able to recognize familiar objects and persons
☐ YES  ☒ NO -- Able to perform simple calculations
☐ YES  ☒ NO -- Able to reason logically
☐ YES  ☒ NO -- Able to grasp abstract aspects of his or her situation or to interpret idiomatic expressions or proverbs
☐ YES  ☒ NO -- Able to break complex tasks down into simple steps and carry them out
☐ YES  ☒ NO -- The Proposed Ward's periods of impairment from the deficits indicated above (if any) vary substantially in frequency, severity, or duration

In my opinion, the Proposed Ward is able to make or communicate responsible decisions concerning himself or herself regarding the following:

### A. Business and Managerial Matters; Financial Matters

☐ YES  ☒ NO -- Contract and incur obligations; handle a bank account; apply for, consent to and receive governmental benefits and services; accept employment; hire employees; sue and defend on lawsuits; make gifts of real or personal property?

☐ YES  ☐ NO -- If "YES," should amount deposited in any such bank account be limited?
☐ YES  ☒ NO -- Execute a Durable Power of Attorney?
☐ YES  ☒ NO -- Execute a Health Care Power of Attorney?

### B. Personal Living Decisions

☐ YES  ☒ NO -- Determine own residence?
☐ YES  ☒ NO -- Safely operate a motor vehicle?
☐ YES  ☒ NO -- Vote in a public election?
☐ YES  ☒ NO -- Make decisions regarding marriage?

### C. Medical Decision-Making

☐ YES  ☒ NO -- Consent to medical, dental, psychological, and psychiatric treatment?
☐ YES  ☒ NO -- Administer own medications on a daily basis?

### D. Daily Life Activities

Administer daily life activities (e.g., bathing, grooming, dressing, walking, toileting):

☐ YES, independently     ☒ YES, with assistance     ☐ NO, requires total care



## 4. DEVELOPMENTAL DISABILITY

☐ YES  ☒ NO -- Does the Proposed Ward have developmental disability?

If "NO," skip to number 5 on the next page.
If "YES," is the disability a result of the following? (Check all that apply)

☐ YES  ☐ NO -- Autism?
☐ YES  ☐ NO -- Static Encephalopathy?
☐ YES  ☐ NO -- Cerebral Palsy?
☐ YES  ☐ NO -- Down Syndrome?
☐ YES  ☐ NO -- Intellectual Disability (MR)**?
☐ YES  ☐ NO -- Other? Please Explain

**If "the basis of a proposed ward's alleged incapacity is mental retardation"[1], please answer the questions in the box below only if you are making a "Determination of Mental Retardation" in accordance with Section 593.005, Texas Health & Safety Code. If you are not making such a determination, please skip to number 5 on the next page.

---

**"DETERMINATION OF MENTAL RETARDATION"** (It is not required that you complete this box; see ** above.)

A "Determination of Mental Retardation" made in accordance of § 593.005 of the Texas Health & Safety Code requires that the determination be based on an interview with the Proposed Ward and on a professional assessment that, at a minimum, must include:

1) a measure of the Proposed Ward's intellectual functioning;
2) a determination of the Proposed Ward's adaptive behavior level; and
3) evidence of origination during the Proposed Ward's developmental period.

*As a physician, you may use a previous assessment, social history, or relevant record from a school district, another physician, a psychologist, a public agency, or a private agency if you determine that the previous assessment, social history, or record is valid.*

By checking the boxes below, you are representing that you have made a "Determination of Mental Retardation" in accordance with § 593.005 of the Texas Health & Safety Code.

1. What is your assessment of the Proposed Ward's level of intellectual functioning and adaptive behavior?

☐ Mild (IQ of 50-55 to approx. 70)     ☐ Moderate (IQ of 35-40 to 50-55)

☐ Severe (IQ of 20-25 to 35-40)        ☐ Profound (IQ below 20-25)

2. ☐ Yes  ☐ No - Is there evidence that the intellectual disability originated during the Proposed Ward's developmental period?

---

*Note to attorneys: If a physician makes a "Determination of Mental Retardation" in accordance with Texas Health & Safety Code § 593.005 — see box above — a Court may grant a guardianship application if the "Determination of Mental Retardation" is based on an examination made not earlier than 24 months before the date of the hearing. But if a physician's diagnosis of intellectual disability is not made in accordance with Texas Health & Safety Code § 593.005 — and the above box is not filled out — the court may grant a guardianship application only if the Physician's Certificate of Medical Examination is based on an examination the physician performed within 120 days of the date the application for guardianship was filed. See Texas Probate Code § 687(c)(A) & (a).*

---

[1] *In H.B. 1481, the 2011 Legislature directed the Legislature and Texas Legislative Council to avoid using the term "mental retardation" in new statutes and to change that term as existing statutes are otherwise amended. Because the Probate Code still refers to "mental retardation" as a basis for a guardianship, and Health & Safety Code still requires a "determination of mental retardation" (§ 593.001 et seq.), this form quotes that phrase from the statutes when necessary.*

## 5. EVALUATION OF CAPACITY

☒ YES   ☐ NO -- Based on the information above, it is my opinion that the Proposed Ward is incapacitated according to the legal definition given at the top of page 1.

If "YES," please indicate the level of incapacity

☐ PARTIAL*     ☒ TOTAL

*If you answered "NO" to all of the questions regarding decision-making in Section 3 (on page 2) and believe the Proposed Ward is partially incapacitated, please explain:

If you answered "YES" to any of the questions regarding decision-making in Section 3 (on page 2) and believe the Proposed Ward is totally incapacitated, please explain: Ms. Tipps's exectutive funcitoning, concentration, memory, and general ability to protect herself from undue influence/exploitation are all deficient. She feels one of her sons took advantage of her for a substantial period of time. If true, this shows she cannot protect herself. If it is untrue, she is either deluded or has been deceived. Either way, it should be apparent she cannot look after her own interests. Regrettably, Ms. Tipps's prognosis is poor.

## 6. ABILITY TO ATTEND COURT HEARING

If a hearing on an application for the appointment of a guardian is scheduled in court:

☐ YES   ☒ NO -- The Proposed Ward would be able to attend, understand, and participate in the hearing.

☐ YES   ☒ NO -- Because of his or her incapacities, it would _not_ be advisable for the Proposed Ward to appear at a Court hearing because the Proposed Ward would not be able to understand or participate in the hearing.

☐ YES   ☒ NO -- Does any current medication taken by the Proposed Ward affect the demeanor of the Proposed Ward or his or her ability to participate fully in a court proceeding

## 7. ADDITIONAL INFORMATION OF BENEFIT TO THE COURT

If you have additional information concerning the Proposed Ward that you believe the Court should be aware of or other concerns about the Proposed Ward that are not included above, please explain:

Ms. Tipps's memory for her medications is suspect. However, for what it is worth, she did not recall taking cognitive enhnacing medications such as Aricept, Namenda, and Cerefolin NAC. If she is not, she could improve with this kind of intervention. Ms. Tipps also displayed a left upper extremity pill-rolling tremor. If not already evaluated, this may need to be looked into as well.

_[signature]_
_____      October 17, 2013
Physician's Signature      Date

J. Douglas Crowder, MD
Physician's Name Typed

₤2



NO. PR-13-3072-3

| IN RE: ESTATE OF | § | IN THE PROBATE COURT |
| | § | |
| DORIS LEE TIPPS, | § | NUMBER THREE OF |
| | § | |
| AN ELDERLY/DISABLED PERSON | § | DALLAS COUNTY, TEXAS |

## ORDER ON MOTION FOR
## INDEPENDENT MENTAL EXAMINATION

On September 13, 2013, came on to be considered the Motion for Independent Mental Examination filed by Thomas Richard Tipps. Based on the agreement of the parties, the Court finds that it is well taken and should be granted.

IT IS THEREFORE ORDERED that Doris Lee Tipps shall, as soon as possible, undergo an Independent Mental Examination by Jaye Douglas Crowder, M.D., the court-appointed psychiatrist;

IT IS FURTHER ORDERED that the examination shall be conducted with no one else present other than Doris Lee Tipps and Jaye Douglas Crowder, M.D. and his staff and medical advisors;

IT IS FURTHER ORDERED that no one communicate with the physician or psychiatrist prior to the issuance of his report except as may be necessary to schedule the examination.

SIGNED on this ___ day of September, 2013.

_____
JUDGE PRESIDING

PR – 13 – 03072 – 3
CODR
ORDER
300955

ORDER ON MOTION FOR INDEPENDENT MENTAL EXAMINATION - Solo Page

# X.

# MENTAL EXAMINATION REPORT

# KATHLEEN C. SAINE, Ph.D.

# NEURO PSYCHOLOGICAL TESTING

# DORIS L. TIPPS

# EXAMINER: DR. KATHLEEN SEINE

# North Texas Neuro-Stroke, OP

## 7777 Forest Lane, Bldg C Suite 300

## Dallas, Tx 75230

## Phone: 972-566-3472
## Fax:    972-566-3488

To: _Steve Lippi_                  From: Dr. David Isaradisaikul

Fax #: _888-661-9606_              Pages:

Phone: _____                Date: _2/5/14_

Re: _Doris Lippi_                 CC:

___URGENT    ___FOR REVIEW    ___COMMENT    ___REPLY

COMMENTS: _____

_____ _Neuropsychological Evaluation_ _____

_____

_____

**Confidentiality Notice**

The documents accompanying this transmission contain confidential privileged information. The information is the property of the sender and is intended only for use by the individual or entity named above. The recipient of this information is prohibited from disclosing the contents of the information to another party. If you are neither the intended recipient nor the employee or agent responsible for delivery to the intended recipient, you are hereby notified that disclosure of contents in any manner is strictly prohibited. Please notify me immediately if you received this information in error.

# Office of Ronald G. Paulman, Ph.D.

**Clinical Neuropsychology**

Ronald G. Paulman, Ph.D.
*Clinical Neuropsychology*

9400 N. Central Expwy., Suite 1212
Dallas, Texas 75231-5032
(214) 373-4688 · 373-9614 (Fax)

Kathleen C. Saine, Ph.D.
*Clinical Neuropsychology*

## Neuropsychological Evaluation

**Name:** Doris Tipps

**Age:** 91

**D.O.B.:** 11/11/22

**Education:** Bachelor's degree in journalism

**Handedness:** Right

**Referral Source:** David Isaradisaikul, M.D.

**Date Evaluated:** 12/2/13 & 12/16/13

**Examiner:** Kathleen C. Saine, Ph.D.

**Identification/Reason for Referral:**

Ms. Doris Tipps is a 91-year-old Caucasian female with cognitive decline of uncertain duration. Her neurologist, Dr. David Isaradisaikul, has diagnosed her with mild cognitive impairment, but psychiatrist, Dr. Jaye Crowder, has diagnosed her with severe dementia. To assist with diagnostic clarification, a neuropsychological evaluation was requested by Dr. Isaradisaikul to objectively characterize Ms. Tipps' current cognitive status. We understand that the question of competence to handle legal/financial matters has been raised as well, and according to Ms. Tipps, care providers as well as family members have offered different opinions. Currently, her younger son, Mr. Steve Tipps, who accompanied her to the evaluation, has Medical Power of Attorney. In his presence, Ms. Tipps agreed to undergo assessment of her cognitive abilities (including but not limited to attention/concentration, language, problem solving, reasoning, and memory) for the purpose of diagnostic and treatment planning, with the understanding that the findings may be subsequently introduced in court to address the question of her competence to make decisions and handle her own affairs.

**Records Reviewed:**

Relevant history was obtained from a review of records provided by Dr. Isaradisaikul's office (office notes dated 11/29/12, 5/22/13, and 8/12/13) and through interviews with Ms. Tipps and her son, Mr. Steve Tipps. Mr. Tipps also provided the following records: Office note completed by Ann Morrison PA-C and Joel Holiner, MD dated 11/26/12; and Physician's Certificate of Medical Examination completed by Dr. Jaye Crowder dated 10/17/13.

**History of Present Illness & Current Complaints:**

On initial questioning, Ms. Tipps denied cognitive changes beyond what she considers normal for her age. She also denied experiencing severe emotional distress, although she said that she was stressed about the ongoing questions about her competence. She expressed disappointment in one of her sons who had allegedly spent some of her money on a trip overseas. She said that she has changed her will and has decided to leave her estate to her other son, but her decision to do so is being contested. Specifically, she said that her older son wants to have her declared incompetent so that the recent will is made null and void.

Physically, Ms. Tipps' current complaints include numbness or loss of feelings in her fingers. She also complained of frequent left frontal headaches. When questioned about her health problems, Ms. Tipps said she did not know what she had. She knew she was taking medications, but could not recall their names. When they were read to her, she had

Neuropsychological Evaluation
Doris Tipps
- Page 2 of 7

trouble saying what each medication was for. She denied recent change in weight and appetite, and also denied sleep problems.

Currently, Ms. Tipps lives in a two bedroom two bath apartment at Lakeview, a retirement community. She said that she goes downstairs for meals, and does everything else on her own. Her medications are set out in a tray, and she believes that she is adherent to her treatment regimen; her son did not contradict her. Her son said that a nurse checks in on a weekly or bi-weekly basis. She also has aides from Mom's Best Friends who come in for 12-hour overnight shifts. She is on portable oxygen and has been using a nebulizer as well. She wears an alert button, and knows to press it if she needs help.

Medical History:

As noted above, Ms. Tipps was unable to list her health problems when questioned. According to her son and available records, medical history is remarkable for atrial fibrillation, heart failure and recurrent bronchitis/ pneumonia. She was most recently hospitalized from 10/29/13 to 11/2/13 for pneumonia and thrush. She also has arthritis, and records show a history of deep vein thrombosis.

Surgeries include placement of a pacemaker, removal of skin cancer from her upper lip, bladder suspension, and surgeries on her feet.

There is no history of significant head trauma. Ms. Tipps denied history of drug and alcohol use. She has never smoked tobacco.

Ms. Tipps denied history of treatment for psychiatric disturbance. However, her son reported that Ms. Tipps was seen by Ann Morrison, PA-C/Joel Holiner, M D (psychiatrist) on 11/26/12. Records of that visit show that she underwent clinical interview/exam and took computerized tests that screened for symptoms of depression, anxiety and post-traumatic stress disorder. The interview and test results were apparently interpreted to mean that Ms. Tipps did not meet DSM-IV criteria for depression, dysthymia, anxiety or post-traumatic stress disorder (PTSD). However, mental status exam apparently revealed abnormal immediate and recent memory, and a presumptive diagnosis of "Mental Disorder NEC" was given. She was scheduled for further testing with the Mini Mental State Exam (MMSE) on the next visit. It is unclear if she returned for follow-up testing.

A CT scan without contrast dated 7/13/12 revealed mild diffuse prominence of ventricles and extra axial space thought to be consistent with age-related atrophy. Low attenuation changes in the periventricular and deep white matter was thought suggestive of microvascular ischemia, which had progressed slightly since the previous scan of 7/13/07. CT angiography of the circle of Willis was unremarkable, but CT angiography of extra-cranial cervical circulation revealed some atherosclerotic calcification within the aortic arch.

Ms. Tipps has been followed by Dr. Isaradisaikul, neurologist, since 11/29/12. At her 5/22/13 visit, she had an MMSE score of 23/30. She was diagnosed with Mild Cognitive Impairment and prescribed Donepezil. On her subsequent visit on 8/12/13, she had an MMSE score of 26/30. She was to continue with donepezil, and because of concerns about competence, referral to a psychiatrist was recommended. According to her son, further cognitive improvement was seen in her most recent follow up with Dr. Isaradisaikul when she earned a score of 28/30 (presumably on the MMSE).

Ms. Tipps was apparently evaluated by psychiatrist, Dr. Jaye Crowder on 10/14/13. The results of that evaluation, documented in a Physician's Certificate of Medical Examination dated 10/17/13, was thought to be consistent with a severe dementia. She was deemed totally incapacitated as "her executive functioning, concentration, memory and general ability to protect herself from undue influence/exploitation are all deficient." Dr. Crowder also indicated that Ms. Tipps did not recall taking cognitive enhancers at that time, and recommended that she could benefit from these medications. He also recommended follow-up for a left upper extremity pill-rolling tremor. As noted below, she has been taking Donepezil, but it is unclear if she has undergone follow-up for the hand tremor.

Ms. Tipps was unable to list the medications she was taking at the time of this evaluation. According to her son, Mr. Steve Tipps, she was taking the following. Dosages were not specified on some of the medications:

Neuropsychological Evaluation
Doris Tipps
- Page 3 of 7

    Warfarin (Coumadin) .5 mg
    Aspirin 81 mg
    Lasix
    Benecar
    Donepezil
    Albuterol/Pulmacort

Family medical history is significant for heart problems in her father who died following a heart attack at age 69. Her mother reportedly died of "neglect" at age 87. One sister has been diagnosed with dementia; she had a stroke and suffers from heart disease. Two brothers died of Alzheimer's disease, another died from a stroke and he also had a brain tumor. The fourth brother had an aneurysm and died of a stroke.

**Developmental, Educational, Occupational & Social History:**

According to Ms. Tipps (with additional information provided by her son), she was born and raised in Denton, Texas. Her father was a farmer/jack-of-all-trades, and her mother was a homemaker. Four brothers are deceased: two were dentists, one was in insurance, and the other was in sales. Her 97-year-old sister is a retired teacher who lives in Weslaco, Texas, and her 83-year-old sister is a retired high school principle who lives in San Diego.

To her knowledge, Ms. Tipps is the product of a full-term pregnancy and uncomplicated delivery. She was prone to pneumonia in childhood, but developmental delays were not reported. She completed high school without difficulty, and subsequently earned a Bachelor's degree in Journalism from Texas Women's University in 1942. Besides raising her children, she taught at the Carrolton Independent School District from the early 1950s to 1976.

Ms. Tipps was married to an internal revenue agent, who reportedly died 6 years ago of "old age and something else." She said that they had been good friends since high school and were married for "many years." Ms. Tipps said that she has a total of 18 children, grandchildren and greatgrandchildren, all of whom she had made provisions for in a will. She gave the names of her 4 children, when they were born, where they live, and their marital status. Her son supplied medical history. Ms. Tipps said that her 69-year-old daughter is married, and lives in Nevada where she works as an artist. Her 67-year-old son is a retired marketing executive who lives in Florida with his family. He has a hard condition and had a defibrillator placed, but is otherwise healthy. Her 65-year-old daughter is a church organist who resides with her family in Washington State. She has Lymes disease and an unspecified autoimmune disorder. Her 63-year-old son who accompanied her to the evaluation is single, and described himself as an entrepreneur. He has arthritis.

Ms. Tipps' older son had been co-trustee of her assets until recently, when the court ordered appointment of a corporate trustee. Power-of-attorney has been granted to her younger son, who will assume guardianships should she be deemed incompetent to manage her affairs. She tells me that she has several rent houses in the colony, owns one tree farm, has interest in another, and owns a home on Hood Street where her younger son lives. She has some investments as well, but could not recall details.

**Clinical Presentation:**

Ms. Tipps presented to the evaluation in fashionable attire, with good hygiene and grooming. She walked slowly and for short distances using a rolling walker. She had portable oxygen, which she used throughout the evaluation. She had a mild left hand tremor, but was able to carry out hands-on tasks without significant difficulty. Vision was adequate for testing. However, she was hard of hearing, and the examiner had to raise her voice and use visual cues when appropriate and not prohibited by standardized procedures. Speech was normal for tone, volume and inflection, but noticeable for frequent word-finding difficulties. She understood instructions, but would get confused or forget what she was required to do. Mood was reported to be euthymic, while affect was congruent. Thought processes were generally logical and goal-directed, though she sometimes returned to topics that had been discussed during initial interview. Thought content was unremarkable, with no evidence of delusions or suicidal/homicidal ideations. She also denied hallucinations. Records indicate that she may have had delusions (of hanging out with the Queen of England) some time in the past.

Neuropsychological Evaluation
Doris Tipps
- Page 4 of 7

Ms. Tipps was alert and cooperative with the initial interview, but when questioned, she acknowledged that she was tired, and she was also recovering from a recent bout of pneumonia. When options were offered, she chose to defer testing to maximize possibility for giving optimal performance. She subsequently returned 2 weeks following the interview, and testing was completed without incident. Throughout the evaluation, she was pleasant and cooperative, and appeared to put forth consistent effort. We were able to obtain a valid sampling of her current functioning. However, interpretation of the results is challenging as there are limited norms for her age group. Compared to younger individuals, her results may appear severe though the level of impairment does not take into account the impact of aging.

**Tests Administered:**

Records Review
Clinical Interview
Collateral Interview
Neuropsychology Questionnaire
Neuropsychological Symptom Checklist
Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV) selected subtests
Test of Premorbid Functioning
Dementia Rating Scale – 2
Trail Making Test
Wisconsin Card Sorting Test
Controlled Oral Word Association
Category Fluency
Boston Naming Test
Clock Drawing
California Verbal Learning Test – Second Edition, Short Form
Wechsler Memory Scale – Fourth Edition (WMS-IV) Logical Memory and Visual Reproduction
Motor Programming
Tests of Praxis
Geriatric Depression Scale
Activities of daily living checklist
Texas Functional Living Scale (TFLS)

**Neuropsychological Results:**

Intellectual Functioning and Global Cognitive Abilities: Ms. Tipps' intellect was predicted to be in the Average range. Her score of 117/144 on the DRS-2 is indicative of mild impairment of global cognitive abilities for someone her age and educational background. She had particular difficulty on items assessing memory, and subtle inefficiencies on graphomotor items. These deficits were seen elsewhere in the evaluation on more comprehensive measures.

Orientation, Attention & Working Memory: Ms. Tipps was oriented to person and year, but not to day, date or month. She was fully aware that she was undergoing cognitive assessment, in particular, to characterize her attention/concentration, memory and decision-making capabilities. Span of auditory attention was low average for her age (25th percentile), with repetition of 5 digits forward. Working memory as within normal limits, with repetition of 4 digits in reverse and sequencing of 3 digits presented to her in jumbled order (63rd and 25th percentile respectively). Within the relatively quiet test setting, she still needed repetition of instructions as she forgot specifics or was confused about what she was expected to do.

Problem-Solving & Executive Abilities: On a visuomotor task requiring her to execute a simple numerical sequence, Ms. Tipps made no errors, but was very slow, earning a moderately impaired score overall (T-score = 25). However, when mental set shifting was additionally required, and she had to alternate between 2 sequences, she made numerous errors, said she was lost, expressed confusion, and slowed down considerably; the task was discontinued. Novel problem solving using a trial-and-error learning approach was borderline impaired. She lost track of what strategy she was using at the outset, generated only one of 6 possible strategies, and subsequently perseverated on that strategy

Neuropsychological Evaluation
Doris Tipps
- Page 5 of 7

despite corrective feedback (29 perseverative responses in 33 responses). In contrast, verbally mediated conceptualization/abstraction was low average and better preserved (25th percentile). Within the structure of the test setting, she was not at all impulsive or socially disinhibited/inappropriate.

Visuospatial Abilities: Ms. Tipps' freehand drawing of a clock revealed significant difficulties with spatial planning on 12/2/13, which improved with a model to copy. Her clock drawing 2 weeks later on 12/16/13 was much better, though spatial planning efficiencies remained. She was able to depict the specified time, however, suggesting broadly intact perceptual reasoning. Mild difficulties with spatial planning were also seen on her copies of simple figures. Ability to distinguish similarities and differences among geometric designs was generally intact.

Language Abilities: On a conversational level, Ms. Tipps had occasional word finding difficulties, but was able to convey her thoughts. This was reflected on formal assessment. Confrontation naming was mildly-to-moderately impaired (T-score = 34), and she tended to describe what she could not name (i.e., circumlocution). Verbal fluency was defective: Letter/phonemic fluency was mildly impaired (T-score = 38) and variable from trial to trial. Category/semantic fluency was moderately-to-severely impaired (T-score = 20). However, she was able to discern similarities among common objects/concepts, placing verbal reasoning at the low end of average for her age (25th percentile).

Learning & Memory: Memory was severely impaired for both verbal and nonverbal material. Specifically, immediate recall of structured verbal material in the form of short stories was borderline for her age (9th percentile). She did not benefit from repetition. She also tended to mix up names of people and places, and introduced information from one story into another. After a 30-minute delay, she forgot both stories and did not benefit from cues. Recognition memory assessed in a Yes/No format was not much better than chance. Learning of less structured verbal material in the form of a 9-item word list was severely impaired (T-score = 19). She only recalled one word after the list was read to her, but she improved with repetition, with 2, 3, and 5 words learned on subsequent trials. She recalled only one word after an interference task, and she could not remember any of the words after a 10-minute delay. Semantic cues did not help; instead the cues elicited 7 intrusion errors. Delayed recognition memory was defective as well: She correctly identified 8 of the 9 words, but made 10 false-positive errors, suggesting difficulty discriminating relevant from irrelevant information. Visual memory was similarly poor. Specifically, immediate recall of simple geometric figures was mildly below expectation (5th percentile), and after a 30-minute delay, she could not reproduce any of the figures. Recognition memory assessed with a multiple-choice format was similarly defective, with none of the figures correctly identified when each was shown to her along with 5 distractors. In sum, memory for both verbal and nonverbal information was severely defective. She learned minimal information, did not benefit consistently from repetition or cues, and could not recognize what she could not recall. This pattern is indicative of an amnestic disorder.

Motor Skills: Screening of motor skills revealed intact alternating hand movements, but she had difficulty executing 3-step motor sequences with either hand. She was able to do the sequences with verbal guidance. Motor inhibition to verbal commands was within normal limits, and ideomotor and ideational praxis were intact.

Emotional Functioning:

Ms. Tipps endorsed few symptoms on an inventory of depressive symptoms. This is consistent with her interview presentation. She denied experiencing significant distress. However, she reported that she has trouble with decision-making and her mind is not as clear before. On further review of her emotional status, Ms. Tipps expressed concern that questions have been raised about her capacity to make decisions and choices about what she wants to do with her possessions and assets. She expressed disappointment with one of her sons, and indicated disgruntlement with what he had supposedly done against her wishes. Mental status exam revealed no evidence of psychosis though records indicate possible delusional thinking in the past.

Functional Skills:

Ms. Tipps' ability to carry out instrumental activities of daily living (IADL) was characterized as moderately impaired (T-score = 28) on a hands-on measure of functional skills (Texas Functional Living Scale). Her skill level is slightly below that of normative samples of individuals residing in assisted living facilities and those diagnosed with probable

Neuropsychological Evaluation
Doris Tipps
- Page 6 of 7

Alzheimer's disease. Specifically, she was able to read the date and day on a calendar, but had trouble determining the specific day of the month. She was only a few minutes off when telling time or depicting a specified time on a clock drawing, but she had considerable difficulty calculating how much time would pass between time one and time two. She said that she could not keep the times in her head. She was inconsistent in her ability to count change (e.g., incorrect in counting 75 cents but correct in counting $1.53). She also asked frequently for repetition or clarification, or took a long time to do the calculations. She also said one amount, but handed over a different amount.

In contrast, Ms. Tipps was able to write out a check to pay a utility bill, and to address an envelope to send in the check. She was also able to look up phone numbers in a simulated phone book with white and yellow pages, and dialed them correctly. However, when asked what number she should call in an emergency, she gave her home number. She was also able to give verbal instructions on how to make a sandwich, but was unable to carry out written directions on making a simple meal with the microwave. After a delay, she was unable to recall information about the check she had written, specifically the payee and the amount. She also could not recall what she was to do when an alarm sounded. Five minutes before, she had been instructed to take a specific number of candies out from a bottle when the alarm sounded. Instead, when the alarm sounded, she asked if the examiner should answer the alarm, and verbal and visual cues did not help her remember what she had been instructed to do. In sum, screening revealed moderate impairment of IADL skills, suggesting that Ms. Tipps is requires more guidance, structure and assistance than she is receiving currently.

**Summary, Conclusions, Implications & Recommendations:**

Ms. Tipps intellect was predicted to be in the average range. However, most cognitive domains assessed were substantially weaker, indicating a significant decline from her previous level of functioning. Attention/concentration varied: Although intact on simple tasks and for brief periods, she tended to lose track of what she was doing or thinking over longer periods of time and when tasks involved higher level cognitive processes or integrative thinking. Speed of processing also varied from mildly to severely impaired. Aspects of executive functions, including problem solving and mental flexibility were defective. Ms. Tipps was able to carry on a conversation, but she had word-finding pauses due in part to reduced thinking speed and in part to a naming deficit (i.e., dysnomia). She was also able to comprehend and carry out simple instructions, but needed repetition as she forgot or got confused with what she had been asked to do. Ability to discern similarities and differences among simple designs was intact, but she had difficulties with spatial planning/organization. Memory was profoundly impaired. She learned minimal information, mixed up information from different contexts, did not consistently benefit from repetition, and rapidly forgot what she had learned after a brief delay. Cues did not help her recall what she had learned; instead, the cues elicited intrusion errors (semantically related but incorrect information). Recognition memory was also no better than spontaneous recall.

Overall, the cognitive profile is indicative of a mild dementia for someone her age, with milder deficits in aspects of attention, language, visuospatial abilities, and processing speed, and more severe deficits in memory and executive functions. Screening of functional skills revealed moderately impaired instrumental activities of daily living skills, reflecting impact of cognitive deficits on day-to-day functioning. She had difficulties with making change, calculating elapsed time, carrying out written instructions, and remembering to whom she had written a check and for what amount. When an alarm rang 5 minutes after instructions had been given to her, she could not remember what she had been instructed to do, specifically to take a certain number of candies out of a bottle. Neither visual cues nor questioning prompted recall.

Ms. Tipps' cognitive profile is suggestive of a mixed etiology. Most aspects of her cognitive pattern are consistent with that seen in dementia of the Alzheimer's type, although contributions of cerebrovascular disease appear present. Cognitive variability across two sessions spaced 2 weeks apart also suggests superimposed impact of serious illness, in this instance, pneumonia. Other neuromedical conditions, systemic and metabolic disturbances will need to be ruled out. Non-intellective factors such as hearing loss and mood/emotions could not account adequately for the extent and severity of her deficits.

The current cognitive findings suggest that Ms. Tipps is likely to function best in a structured setting with regular monitoring, guidance, and readily available assistance. Her functional skills are at the low end of the range seen in seniors residing in assisted living facilities. Among cognitive deficits, memory and executive impairment tend to have

Neuropsychological Evaluation
Doris Tipps
- Page 7 of 7

the greatest impact on one's ability to function independently. Additional deficits in language (in Ms. Tipps' case, dysnomia) further compromise functional skills. Cognitive debility compounds fragile health, and placement in a nursing care setting in the near future should be explored. A nurse reportedly checks in on her weekly or biweekly but she may need more frequent contact. Continuity of care and an integrated treatment team are strongly recommended.

While long-term memory remains relatively preserved until later stages of dementia, progressive decline in ability to learn and retain new information commonly interferes with daily functioning. Ms. Tipps needs supervision and prompting for all memory-dependent activities such as medication intake. She cannot be relied on to report on her health conditions, let alone changes in those conditions, or what treatments are for what conditions. She should be accompanied to doctors' appointments by family/caregivers who are familiar with her health issues, and are able to communicate relevant information and ensure follow through with recommended treatments. Consistency in her environment, activity schedule and ways of doing things would help to reduce the impact of her cognitive deficits on functioning.

Current findings also indicate that Ms. Tipps should be able to carry out well-learned and routine activities adequately. However, she will have significant difficulty in novel and changing situations. She has trouble focusing on and integrating information to generate feasible coping strategies, and tends to be inflexible in her thinking, some times in the face of corrective input. These difficulties compromise problem solving and decision making, and indicate need for someone to assume responsibility for handling financial/legal issues and addressing health matters. However, her wishes should be routinely sought. She is better able to make choices/decisions when the issues to be addressed are put in simple format, perspectives reviewed and distilled into succinct points, solutions/alternatives presented, and consequences or pros and cons reviewed with her.

Ms. Tipps is able to carry on a conversation and communicate her thoughts and feelings, although she has some word finding difficulties; she may substitute similar words or describe what she is unable to name. This may impact on her relationships with significant others, and lead to misunderstandings. Significant others should be encouraged to clarify with her what she is intending to convey. Her communication skills are likely to decline over time, and long-term planning should proceed sooner than later.

In sum, Ms. Tipps' neurocognitive findings show that she has progressed beyond Mild Cognitive Impairment to dementia. Although she displayed cognitive deficits similar to that observed by Dr. Crowder who diagnosed her with a severe dementia, her current presentation is characterized as mild, taking into account her advanced age of 91. From a functional standpoint, she is need of increased structure and guidance, and transfer to a nursing home setting in the near future should be considered. Capacity to handle financial/legal matters, make major decisions, and address health issues independently is questioned, but she should be given every opportunity to make her wishes known.

Finally, we observed that Ms. Tipps had a left hand tremor during the evaluation, and this should be assessed if not already pursued. Her current dosage of the cognitive enhancer, donepezil, is unclear. We recommend review to determine if she is taking the optimal dosage, and if addition of Namenda may be beneficial. These concerns are deferred to her referring neurologist, Dr. Isaradisaikul.

Ms. Tipps was unable to return for follow-up to review these findings. According to her son, she had developed a cough and was subsequently hospitalized and started on three antibiotics, reportedly for bronchitis and on the verge of developing pneumonia and sepsis. These results and recommendations were reviewed in greater detail with her son, Mr. Steve Tipps, in a recent feedback session.

Thank you for the opportunity to participate in Ms. Tipps' care.


Kathleen C. Saine, Ph.D.
Clinical Neuropsychology

Ronald G. Paulman, Ph.D.
Clinical Neuropsychology

**XI.  REPORTERS RECORD**

**OCTOBER 21, 2014 HEARING**

CAUSE NO. PR-13-03072-3

VOLUME 1 OF 1

In re The Estate of        )(    IN THE PROBATE COURT

Doris Lee Tipps,           )(    NUMBER THREE OF

   An Incapacitated Person)(    DALLAS COUNTY, TEXAS

_____

REPORTERS RECORD

_____

BE IT REMEMBERED THAT ON the 21st day of October, 2014, A.D. the above-entitled cause came on for hearing before the HONORABLE COURT, Michael E. Miller, Judge Presiding and the following proceedings were taken down by MACHINE SHORTHAND:

PROBATE COURT NUMBER 3
(214) 653-6166

APPEARANCES:

W. Thomas "Tom" Finley

5500 Preston Rd, Ste 390

Dallas, Texas 75205

SB: 07025500

ATTORNEY FOR DORIS LEE TIPPS, WARD

John H. Phillips

4313 W. Lovers Lane

Dallas, Texas 75209

SB: 15935500

ATTORNEY FOR SENIOR CITIZENS OF GREATER

DALLAS D/B/A SENIOR SOURCE, GUARDIAN OF THE PERSON

Mr. Alvin J. "Al" Golden

400 W. 15th Street, Ste. 975

Austin, Texas 78701

SB: 08079000

FOR CUMBERLAND TRUST & INVESTMENT COMPANY

Mr. Jeff W. Cook/Lisa Leffingwell

2301 Cedar Springs Rd, Ste. 200

Dallas, Texas 75201

SB: 04734500

SB: 12158575

ATTORNEY FOR THOMAS R. TIPPS, GUARDIAN

MR. STEVEN TIPPS, PRO SE

W-I-T-N-E-S-S   I-N-D-E-X

| | DE | CE | RD | RC | FD | FC | VOL | PAGE |
|---|---|---|---|---|---|---|---|---|
| WITNESSES: | | | | | | | | |
| KAREN ASHWORTH | 16 | 21 | -- | -- | -- | -- | 1 | |
| THOMAS R. TIPPS | 23 | -- | -- | -- | -- | -- | 1 | |
| THEODORE LUSTIG | 29 | -- | -- | -- | -- | -- | 1 | |

PROBATE COURT NUMBER 3
(214) 653-6166

P-R-O-C-E-E-D-I-N-G-S

THE COURT: Could I have all the attorneys in the case, please state your names one at a time.

MR. COOK: Jeff Cook for Tom Tipps.

MS. LEFFINGWELL: Lisa Leffingwell, Tom Tipps.

MR. GOLDEN: Alvin Golden with Cumberland Trust.

MR. PHILLIPS: John Phillips. I represent Senior Citizens of Greater Dallas, D/B/A as the Senior Source, Guardian of the Person for Ms. Tipps.

MR. FINLEY: Tom Finley representing Doris Tipps.

MR. COOK: -- And that is contested.

THE COURT: Is that what we're here for today?

MR. COOK: Well, not primarily, Your Honor, although, incidentally, it is because pleadings were filed on Friday purportedly on behalf of Ms. Tipps, so we did file a motion to show authority when that was filed Friday, so that will need to be addressed.

The court will recall, you entered an order back on February 17th determining that Doris Lee Tipps was totally incapacitated at that time.

THE COURT: Okay.

MR. COOK: And so we have a challenge of a lawyer's authority to step in on her behalf.

THE COURT: May I ask how you, in what respect you represent Ms. Tipps?

MR. FINLEY: Sure, Your Honor. As the court ordered there was a mediation, and in the mediation all of the parties agreed and the mediation settlement agreement is in the record, it was signed by all the members of the Tipps family as well as approved as to form by the attorneys. As part of the mediation settlement agreement, the claims, particularly, the claims with respect to the motion to show authority, was released and waived by all parties. Secondly -- that's point number one.

Point number two, is that the order that the court entered on February 17th, 2014 was interlineated to provide that Ms. Tipps was incapacitated within the meaning of incapacitated under the Texas Estates Code, which does not mean total incapacity, it means only substantial incapacity as defined in the statute, to do certain things.

THE COURT: What do you have to say about that?

MR. COOK: Well, Your Honor, I have this to say about that, we withdrew the motion to show authority

because at that point the case was settled --

THE COURT:  This motion, I mean --

MR. COOK:  The prior motion to show authority.

THE COURT:  -- the prior motion.

This is a subsequent motion?

MR. COOK:  Yes, Your Honor.  At that time there was a dispute about her capacity, the court appointed Dr. Crowder, he did an evaluation, found her to be totally incapacitated, we settled the dispute totally, we thought -- and part of that was Scott Weber had been appointed as her ad litem, he was authorized by this court to finalize the settlement on Ms. Tipps' behalf, he went forward and did that.  And the court entered its finding that she was totally incapacitated at that point, totally, appointed Senior Source to be the guardian of the person, and then we had an agreement with respect to a new trustee of the trusts.  That's actually what we're here on.  Because Steve Tipps, because of some interference with that corporate trustee, forced them to resign and they have resigned and now we're here to kind of clean up that mess.

The order that you entered on February 17th did not provide any provision for this lawyer to continue as her lawyer after she was found to be totally

incapacitated. In fact the court made a finding that certain documents were her trust documents, no other documents were valid, so we filed a new motion when we found out Friday that this counsel purports to continue to represent her after the court entered its order on February 17th, what happened before that went away because the settlement, what happened after that has become a big issue. He has filed a pleading opposing us, he's filed a pleading opposing Mr. Phillips' relief, allegedly on her behalf; this is new stuff.

THE COURT: Is that correct, sir?

MR. FINLEY: Well, it's partially correct. I would ask the court to consider what's happened here. We had a Rule 11 agreement that was dictated into the record on September 13th, 2013, that provided that the Tipps Living Trusts would be -- the sole trustee would be a corporate trustee. Then there was a mediated settlement agreement in which, again, all the parties agreed that the Tipps Living Trusts' trustee would be a sole trustee, would be a corporate trustee.

So now we come full circle whereby Thomas Tipps is asking to be the trustee again of the Tipps Living Trust in complete contradiction of both a Rule 11 agreement and a mediation settlement agreement. Now with respect to the --

THE COURT: We're getting ahead of ourselves.

MR. FINLEY: Okay. With respect to --

THE COURT: I'm just asking, Ms. Tipps is totally incapacitated, right?

MR. FINLEY: No, Your Honor. Your order does not say she is totally incapacitated. It says that she's incapacitated as defined within the Texas Estates Code and in the case --

THE COURT: When did she hire you?

MR. FINLEY: She hired me in, last summer.

MR. COOK: Well, 2013 summer, is what you're talking about, before your order was entered.

MR. FINLEY: Yes, the summer of 2013.

THE COURT: And you admit that at this time okay. Let me look at the -- Does anybody -- I'll have to look it up on the computer but does anybody have the order that I signed?

MR. COOK: That's it.

THE COURT: Oh, my goodness, where does it say she's incapacitated?

MR. COOK: It says it in several places, Your Honor, and if you start with page 1, paragraph D, the very first page.

THE COURT: Paragraph D?

MR. COOK: Yes, sir. You made a finding that "Doris Lee Tipps is an adult incapacitated person who is totally without capacity to care for herself because of a mental condition."

THE COURT: Okay. I'm going to sustain your motion to --

MR. COOK: Thank you, Your Honor.

THE COURT: -- in terms, I'm going to rule that this gentleman, a gentleman though he is, does not represent Ms. Tipps at this time.

MR. COOK: Thank you, Your Honor.

THE COURT: Do I need to sign an order to that he effect?

MR. FINLEY: Your Honor, I believe if I may, I believe that the Texas Rules of Civil Procedure requires that that can't be done until 10 days -- that I'm entitled to have 10 days to have a specific hearing on that motion?

MR. COOK: We're having that hearing now.

THE COURT: -- I think I just had the hearing, sir.

MR. COOK: Your Honor, we will get you an order.

THE COURT: That hearing has been held and had and you may remove yourself from the counsel table

and sit as a spectator.

MR. COOK: Your Honor, the other two motions that have been filed, one motion is a joint motion between Cumberland and Thomas Tipps, that was filed in this court on August 14th, and it's a motion basically to address the problems with Cumberland as trustee. Mr. Phillips filed, on behalf of Senior Source, the guardian of her person, a motion that predated that, that procedurally probably needs to be heard first, it was first filed, probably makes sense, and I'll defer to Mr. Phillips at that point. Those are the only two motions that need to be heard.

THE COURT: Okay. Are there fact witnesses that need to be heard?

MR. COOK: Yes, sir.

THE COURT: Please call your first witness.

Somebody call your first witness.

MR. PHILLIPS: Judge, I filed on behalf of Senior Source, a motion to suspend or revoke the medical power of attorney claim by Mr. Tipps from his mother. And, frankly, I thought long and hard about --

THE COURT: Okay.

MR. PHILLIPS: -- about whether or not to call witnesses and engage in a swearing match between the witnesses, and I've decided, Your Honor, that,

frankly, it's not necessary. The issue is, that there is a conflict between the authority of an agent under a medical power of attorney and the authority of the guardian of the person, and the court having appointed the guardian of the person and being charged with the duties and responsibilities that they are under the Estates code, it seems to me that it is a meaningless exercise to have the guardian of the person, if the court does not suspend or revoke the powers of the medical power of attorney.

THE COURT: Is there an attorney here who wishes to argue that point?

MR. COOK: Your Honor, Mr. Steve Tipps filed a response to it; it is his medical power of attorney that is the subject of Mr. Phillips' motion.

THE COURT: Whose?

MR. COOK: Steve Tipps. That gentleman right there (indicating).

MR. TIPPS: Your Honor, I'm Steven Tipps.

THE COURT: Okay.

MR. COOK: And he filed it pro se, so I don't think he's a lawyer but he is here.

THE COURT: Okay. Do you wish to present any facts or law on this issue, sir?

MR. TIPPS: Your Honor, the circumstances

that surround this for the last year, leading up until the timeframe of the Senior Source being made the guardian, and I was instrumental in bringing the guardian to the table, and those circumstances are that I am with my mother when Senior Source is not, four to five nights, we went from October 29th, 2013, just after the hearing, the 13th, on Friday the 13th, my mother became very ill and I spent the beginning of 500 hours taking care of her every single day at the Baylor --

THE COURT: Are you saying that you should be named guardian?

MR. TIPPS: No, Your Honor, I don't contest the guardianship.

THE COURT: Okay.

MR. TIPPS: I assisted this court in making sure that Senior Source was appointed but, in the fact -- due to the fact that I'm with my mother at night a lot of times and I see things happening over there, I mean, it is an amazing, egregious process of neglect, negligent endangerment by the agent of the guardian. For example, I mean, we went through -- from October 29th until November the 21st, mom was in Baylor Medical Center, fully staffed, did a great job with her, I was there every day, on weekends, two or three times a day, and as we look at this, we see that the role that I

played involved, according to the emergency situation she was in, for instance, on the 29th of October, on the 29th of October 2013, a Tuesday, I took my mother to a Dr. David Seckles' (ph) office for a psychological --

MR. COOK: Your Honor, I'm going to object to this on the basis of relevance. These are things that predate your order entered in February.

THE COURT: What I'm getting at, sir --

MR. TIPPS: Yes?

THE COURT: -- is, are you claiming that you should have a medical power of attorney even though you're not --

MR. TIPPS: My mother assigned me.

THE COURT: -- even though you're not her guardian; is that what you're claiming?

MR. TIPPS: I claim that there are unique circumstances to the care for my mother in connection with Senior Source and with the agent of Senior Source which at the present time was Prestonwood. When I go there four to five times a week at the present time, I see things we could go back until to April 24th, which is just a -- that's within the period when Senior Source has claimed to be guardian,.

MR. COOK: Your Honor, I'm going to object as this is nonresponsive to your question. I don't

think we've ever got an answer.

MR. TIPPS: The point I'm making, having a medical power of attorney that I've had, no one has objected from all of this time, I'm in a position to communicate --

THE COURT: No one has filed anything to remove Senior Source either; isn't that the point?

MR. TIPPS: I don't choose to remove Senior Source. I'm saying that my mother's care needs someone who's independent. Senior Source is not at the nursing home, especially at night. They do not see these medical mistakes, swapping medicines and other things, and the ability to talk with some authority to the Prestonwood Nursing Rehab facility, and I have not abused that power, I've only raised this question once when I showed up.

THE COURT: -- I'm going to grant your request Mr. Phillips, except that you may, you may raise this again in the context of a motion to remove Senior Source. But at this time, your request is granted, Mr. Phillips.

MR. PHILLIPS: Thank you, Judge

THE COURT: Gentlemen and ladies, I hate to do this to you: See this? This has to be done within probably about five to 10 minutes from now, and I know

you're all here waiting to go to the next stage of this but this must be done, so I am going to take a short break. And I assure you, I'm not back here -- I'll be out as soon as I can.

MR. COOK: Thank you, Your Honor.

(SHORT BREAK IN PROCEEDINGS)

THE COURT: All right. Where are we now?

MR. COOK: Your Honor, we're ready to proceed with the motion to accept resignation, discharge trustee and reinstate trustee. And I think Mr. Golden is going to call the first witness.

THE COURT: All right.

MR. GOLDEN: Yes, Your Honor, before I call the witness, I'd like to give you a little background.

MR. COOK: -- I am sorry.

Your Honor, we had a witness that we subpoenaed down here that we do not need anymore in light of the court's ruling, Angela Grover. She complied with the subpoena, and we appreciate it but we're sending her back to work, if that's okay.

THE COURT: Is there any objection to this witness being excused?

MR. GOLDEN: None.

MR. PHILLIPS: None, Your Honor.

THE COURT: You're free to go, you're free

to stay.   Thank you, ma'am.

MR. COOK:  Thank you, Your Honor.

THE COURT:  Please call your first witness.

MR. GOLDEN:  My first witness is Karen Ashworth.

THE COURT:  Ms. Ashworth, come on up.

(WITNESS SWORN)

THE COURT:  Please have a seat.

KAREN ASHWORTH

After being sworn, testified on her oath as follows:

DIRECT EXAMINATION

BY MR. GOLDEN:

Q.   Ms. Ashworth, would you state your name for the court, please.

A.   Karen Ashworth.

Q.   And during the time periods that are relevant to this controversy how were you employed?

A.   I worked with Cumberland Trust & Investment Company as Vice-President and Regional Manager.

Q.   And were you involved in the accepting and/or and resigning with respect to the Tipps Family Trusts?

A.   Yes.

Q.   Were you a party to the mediation?

A.   No, Cumberland Trust was not a party.

Q.   And after the court's order appointing you, did

you have any concerns or considerations prior to your acceptance?

A. Yes, there were multiple concerns, the assets in the trust were what we consider complex, there was a portfolio of marketable securities and annuities, at least, three or four rental properties, residential rental properties, some timberland, there was a timeshare, condo. In other words, there were multiple properties that we had multiple people looking into during the process.

Q. I want you to focus on York Street.

A. Hood Street?

Q. York Street -- Hood Street? I'm sorry.

A. That was Mrs. Doris Tipps' residence. And of course, she was ill and in a skilled nursing facility and no longer living there, and her son Steve was in the house. And it was our understanding that the house was an asset of the trust and the other three properties that had been owned by the Tipps were rented and were managed by a property management company called Pacesetters. So we contacted Pacesetters with the thought process that she's no longer living there, that house either needs to be rented for fair market value rent to the current tenant or to another tenant, and we were informed that there may be some repairs that may be

required if we were going to rent to a third party, so there were multiple issues regarding Hood Street.

Q. Were you concerned about Steven Tipps occupancy of Hood Street?

A. Yes, because I understand he had been asked to vacate the property in the past and had not done so, so as a condition to our acceptance we said he either needs to pay fair market value rent, preferably first and last months' rent, deposit, and we had some other stipulations, or, he needs to vacate the property.

Q. And what was the result of those conversations?

A. I spoke directly with Mr. Steven Tipps and he agreed to vacate the property within a reasonable period of time, and, although, we would like that in 30 days, we agreed to 60 days. And that was prior to our appointment that we agreed to all of this.

Q. So that was one of the problems you wanted resolved before you accepted, was whether he would be out of the property?

A. Absolutely. Our special assets group would not let us accept the appointment unless we had all of these details resolved in regard to the multiple, especially this particular asset.

Q. And when 60 days arrived, what happened?

A. We learned that Mr. Tipps was still in the

home, and during the process the letter that he said -- during the 60 days process he was going to allow the property management company access so they could either, one, determine if any repairs were needed and or fair market value rent, and they were not allowed to enter the property and he remained in the home after the expiration of the 60 days.

Q. And at that point did you determine that because of that it was impossible for you to -- I don't want to put words in your mouth -- it was necessary that you resign?

A. Yes, we realized that managing this asset was beyond our control.

Q. And on May 2nd of 2014, you did resign as trustee; is that correct?

A. Correct.

Q. And the trust, the Tipps Family Trust which was approved by this court allows you to resign by notification; is that correct?

A. Correct.

Q. During the period, the 60 day period where you -- between the acceptance of 75 days between the acceptance and resignation, did you take over any of the assets of the estate?

A. No, sir.

Q.   Under your general procedure do you ever custody the financial assets?

A.   No, under our model we never custody the financial assets in-house.

THE COURT:  You never do what now?

THE WITNESS:  We don't custody financial assets.

THE COURT:  What does that mean "custody"?

THE WITNESS:  That means, we don't actually hold the assets in an investment account at our trust company; it's very unique.  We use third party financial advisors.  And Mrs. Tipps account was held at Edward Jones, and then she had some annuities that created an income stream payable to bank account, so we knew that her assets were safe, they were in existing custodial arrangements with the customary, you know.

Q.   (By Mr. Golden):  And how were Mrs. Tipps income and expenses handled in this period before you resigned?

A.   Her son Thomas Tipps had been trustee with Doris prior to her incapacity, and he had kept excellent records and was very cooperative in providing us with the history and asset lists, and all the details necessary if we were to take over.

Q.   And you're asking this court today, even though

it's not necessary for the court to accept your resignation, you're asking the court to accept your resignation and discharge you as trustee; is that correct?

A. Yes, absolutely.

MR. GOLDEN: Pass the witness, Your Honor.

MR. COOK: Your Honor, I have just a couple of questions.

CROSS-EXAMINATION

BY MR. COOK:

Q. Ma'am, I'm Jeff Cook. I represent Mr. Tipps, Thomas Tipps. Did Mr. Tipps as the court order required him to do, sign the resignation form that you all tendered to him under this court's order?

A. Yes, he did.

Q. And did he cooperate fully with Cumberland on the request that you all made of him to facilitate the change in trustees?

A. Yes, he did.

Q. Did anything Thomas Tipps do cause Cumberland to feel the need to resign?

A. No.

MR. COOK: Pass the witness, Your Honor.

MR. PHILLIPS: No questions.

MR. TIPPS: I'd like to ask --

THE COURT: Okay.

MR. TIPPS: -- cross-examination of this witness, Your Honor? I had --

THE COURT: I have a concern there, you're not an attorney and --

MR. TIPPS: Your Honor, these people sued me. They are, under rule number --

THE COURT: Is that suit pending?

MR. TIPPS: Your Honor, well, this is a hearing but they required me -- I was subpoenaed here to answer it.

THE COURT: That's what I'm asking you. And my question is, is that suit pending?

MR. TIPPS: Your Honor, I have not filed the lawsuit against anyone at this stage.

THE COURT: I'm going to decline your right to cross-examine.

Any other questions of this witness?

MR. COOK: No, Your Honor.

THE COURT: You may step down.

MR. COOK: Your Honor, it's my turn now?

MR. PHILLIPS: It's your turn.

MR. COOK: Your Honor, I'll call Tom Tipps very briefly, Your Honor.

THE COURT: All right, Mr. Tipps, come on

up.

MR. COOK: He has not been sworn yet, Your Honor.

THE COURT: I know.

(WITNESS SWORN)

THE COURT: Please have a seat.

THOMAS R. TIPPS

After being sworn, testified on his oath as follows:

DIRECT EXAMINATION

BY MR. COOK:

Q. State your name, please.

A. Thomas Tipps.

Q. Mr. Tipps, you are the son of Doris Lee Tipps; is that correct?

A. That is correct.

Q. And for a period of time up until you tendered a resignation as part of this court's order dated February 17th, 2014, were you a trustee of the Tipps Family Trusts?

A. Yes.

Q. All right.

A. Co-trustee.

Q. Co-trustee. When your mother became incapacitated did you become the sole trustee?

A. Functionally, yes.

Q. All right. And that was going to be my question, were you the one that made sure the bills got paid, rents got collected, right things happened?

A. Absolutely.

Q. And have you done that for years and years?

A. Yes.

Q. All right. Now under the order appointing guardian, you were required to tender your resignation to Cumberland and essentially cooperate with them so that Cumberland could take over as trustee; is that correct?

A. Absolutely, yes.

Q. And did you as the prior witness said, cooperate fully with Cumberland?

A. Yes, absolutely, yes.

Q. Had Cumberland provided you, prior to their agreement to serve, a copy of the letter that they had with Steve Tipps, confirming he would leave the property at issue, within 60 days?

A. Yes.

Q. You understood that was one of their requirements --

A. Absolutely.

Q. -- to be trustee?

A. At some point did you learn that Mr. Tipps,

Steve Tipps, had not vacated the property and that Cumberland was tendering its resignation as the trustee of the trusts?

A.    Yes.

A.    And during that period of time, as the prior witness testified, had you functionally continued to be the person to take care of the trust business, including most importantly, make sure that your mother's bills got paid?

A.    Yes.

Q.    And did you do that to the best of your ability?

A.    I did.

Q.    As far as you know did all of her bills get paid?

A.    As far as I know, yes.

Q.    All right.  When you learned that they had resigned and after some discussion with your respective counsel, did you authorize the filing, along with Cumberland, of the motion which requests this court to accept the resignation of Cumberland and reinstate you as trustee?

A.    I did, yes.

Q.    And is that the same functional position that you've been serving for many, many years?

A. Many years.

Q. Now with respect to that, I know you're not a lawyer, do you have some familiarity with what are referred to in our court order as -- they have a special name for them, let me get it exactly right -- the Lustig Estate Planning documents that this court found were the operative documents for your mother's estate?

A. Yes.

Q. And is it your understanding that under these circumstances, where there's a corporate trustee that resigns you then if you're not incapacitated, become the person with authority to designate the new trustee?

A. Yes, that's the way I understood it.

Q. And have you agreed to that function, just like you've been doing for years, and designate yourself to do that?

A. Yes.

Q. Your sisters are present in the court room, they are beneficiaries of the trust; is that correct?

A. Yes.

Q. And is it your understanding they approve of that?

A. Yes.

Q. All right. And with respect to the relief we're requesting is it your request that the court sign

an order so there's no dispute about it, that Cumberland has been allowed to resign, confirm their resignation, and that you continue to serve in the capacity of trustee under these trusts --

A.   Yes.

Q.   -- and in accordance with the Lustig Estate Planning documents?

A.   Yes.

MR. COOK:  Pass the witness, Your Honor.

MR. GOLDEN:  I have no questions, Your Honor.

MR. PHILLIPS:  No questions, Your Honor.

THE COURT:  Sir, I am going to go ahead and let you ask a question or two.

MR. TIPPS:  Thank you, Your Honor.  Can I?

THE COURT:  -- Do you have any problem with him serving as Trustee?

MR. TIPPS:  Absolutely.  Absolutely.

THE COURT:  What's the nature of your quarrel?

MR. TIPPS:  My brother removed $200,000 from the Tipps Family Trust.

THE COURT:  Have you filed a lawsuit complaining about that?

MR. TIPPS:  Well, Your Honor, I certainly

can do that. I'm going to ask a couple of questions --

THE COURT: Until you do that, sir, I'm going to -- Is there anything else you want to ask your brother about?

MR. TIPPS: Yes. How does the court handle a life estate that is attached to 1844 Hood Street? It is not in the trust, it is not transferable under Texas law in the trusts.

THE COURT: I'm not going to give legal advice. In fact, I'm forbidden by the Judicial Cannon of Ethics to give legal advice, so I am very, very sorry that I cannot be of service to you.

MR. TIPPS: I understand. I am sorry.

THE COURT: Is there any other --

Please take your seat.

-- Is there any other witness that --

MR. COOK: Yes, Your Honor. Terry Lustig, we'll call him very briefly, Your Honor.

THE COURT: You may take your seat.

Carrie Lustig.

MR. COOK: Terry Lustig.

THE COURT: Please have a seat.

(WITNESS SWORN)

(NO OMISSIONS)

THEODORE LUSTIG

After being sworn, testified on his oath as follows:

DIRECT EXAMINATION

BY MR. COOK:

Q.   State your name, please.

A.   Theodore "Terry" Lustig.

Q.   Are you an attorney?

A.   Yes.

Q.   Are you board certified in anything?

A.   I'm board certified in Estate Planning and Probate law.

Q.   Were you the author of the Lustig Estate Planning document as the court order of February of this year referred to them?

A.   Yes.

Q.   Are you familiar with their contents?

A.   I am.

Q.   Did you draft them at the request of Mrs. Tipps and her husband when they were alive and she had capacity?

A.   Yes.

Q.   In the circumstances that we have where there was a corporate trustee appointed by agreement and that corporate trustee has resigned and Mrs. Tipps incapacitated, and Thomas Tipps was still alive and not

incapacitated, how is it supposed to work under the Lustig Estate Planning documents, as to who the new trustee is?

A. Thomas Tipps has the power to appoint any successor trustee, including himself or another person.

MR. COOK: Pass the witness, Your Honor.

MR. GOLDEN: I have no questions, Your Honor.

MR. PHILLIPS: No questions.

THE COURT: You may step down, sir.

MR. COOK: Your Honor, we rest.

MR. GOLDEN: We rest.

THE COURT: Any other witnesses?

MR. PHILLIPS: Nothing further. Rest.

THE COURT: All right. Is there any -- from the attorneys, any objection to my signing this order?

MR. COOK: No, Your Honor.

THE COURT: I am signing the order.

Thank you all for coming down.

MR. COOK: Thank you, Your Honor.

MR. PHILLIPS: Judge, if I may? I will bring the court tomorrow an order with respect to the suspension or revocation of the medical power of attorney.

THE COURT:  Thank you very much.

Do you all want me to sign this order on the motion to show authority?

MR. COOK:  Yes, I think that would be the best, so the record is clear on that.

THE COURT:  All right.  *****

REPORTER'S CERTIFICATE

THE STATE OF TEXAS        )
COUNTY OF DALLAS          )

I, MONA L. RICHARD, Official Court Reporter in and for the Probate Court Number Three of Dallas County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $320 and was paid by Steven Tipps.

WITNESS MY OFFICIAL HAND this the 3rd day of November, 2014.

S/MONA L. RICHARD
_____
Mona L. Richard, Texas CSR 2384
Expiration Date: December 2015
Official Court Reporter
Probate Court Number Three
Dallas County, Texas
Dallas, Texas

# XII. CRISES & SURVIVAL

# OCTOBER 29, 2013 THROUGH APRIL 24, 2014

Doris Lee Tipps
OCTOBER 29, 2013 thru April 24, 2014                     Part I          Page 1
Winter Exhibit A

**Crises Assistance - Winter Spring 2013-2014**

| Date | | | | Hours | Hrs Cum | Rate | ot | Cumms |
|---|---|---|---|---|---|---|---|---|
| 0 Oct | 4 | Fri | Mom to Doctor Crowder | 4 | | $ 50 | $ | 200 |
| 1 Oct | 29 | Tue | Dr. David Israediskul MD 7:00am | 9 | | $ 50 | $ | 650 |
| | | | Dr. Rai 11:45am; & 2:45 pm Developing Crises, Meds | | | | | |
| | | | Developing Crises, Meds, Bronchia Pneumonia | | | | | |
| 2 Oct | 29 | Tue | Lakeview- all night vigil - developing health care crises | 8 | | $ 50 | $ | 1,050 |
| 3 Oct | 29 | Tue | Baylor Emergency Mom (I checked Mom at 6:00am | 8 | | $ 50 | $ | 1,450 |
| | | | and she could not speak.) To Baylor immediately. | | | | | |
| 4 Oct | 29 | Tue | Baylor Emergency Mom | 12 | | $ 50 | $ | 2,050 |
| 5 Oct | 30 | Wed | Mom to Baylor 8:00AM Mom Admitted, Dr. Sohmer askec | 4 | | $ 50 | $ | 2,250 |
| | | | Dr. Sohmer asked how I knew to bring her in.? | | | | | |
| 6 Oct | 31 | Thur | Baylor Carrollton Mom | 2 | 43 | $ 50 | $ | 2,350 |
| 7 Nov | 1 | Fri | Baylor Carrollton Mom | 2 | | $ 50 | $ | 2,450 |
| 8 Nov | 2 | Sat | Baylor Carrollton Mom | 2 | | $ 50 | $ | 2,550 |
| 9 Nov | 3 | Sun | Baylor Carrollton Mom | 2 | | $ 50 | $ | 2,650 |
| 10 Nov | 4 | Mon | Baylor Carrollton Mom | 2 | | $ 50 | $ | 2,750 |
| 11 Nov | 5 | Tue | **Baylor discharge Home: mid-course pneumonia** | 4 | | $ 50 | $ | 2,950 |
| | | | **medical discharge - patient dumping, no notice, no disc.** | | | | | |
| 12 Nov | 6 | Wed | **Returned to Baylor afternoon next day:  readmitted.** | 24 | 36 | $ 50 | $ | 4,150 |
| 13 Nov | 7 | Thur | **Transfer to Accel Intensive Rehab Marsh Ln Wynn Kin** | 4 | | $ 50 | $ | 4,350 |
| 14 Nov | 8 | Fri | Baylor Carrollton SVT Rev Fac, Social Worker Physical Tl | 4 | | $ 50 | $ | 4,550 |
| 15 Nov | 9 | Sat | Baylor Carrollton SVT Rev Fac, Social Worker Physical Tl | 4 | | $ 50 | $ | 4,750 |
| 16 Nov | 10 | Sun | Move to Accel Inten RehabDr. Kim Dr. Wynn (Email: Nov | 3 | | $ 50 | $ | 4,900 |
| 17 Nov | 11 | Mon | Move to Accel Inten RehabDr. Kim Dr. Wynn (Email: Nov | 3 | | $ 50 | $ | 5,050 |
| 18 Nov | 12 | Tues | Move to Accel Inten RehabDr. Kim Dr. Wynn (Email: Nov | 3 | | $ 50 | $ | 5,200 |
| 19 Nov | 13 | Wed | Move to Accel Inten RehabDr. Kim Dr. Wynn (Email: Nov | 3 | | $ 50 | $ | 5,350 |
| 20 Nov | 14 | Thur | Move to Accel Inten RehabDr. Kim Dr. Wynn (Email: Nov | 3 | | $ 50 | $ | 5,500 |

| | | | Crises Care | Hours | Part I Rate | Page 2 Cumms |
|---|---|---|---|---|---|---|
| 21 Nov | 15 Fri | | Move to Accel Inten RehabDr. Kim Dr. Wynn (Email: Nov | 3 | $ 50 | $ 5,650 |
| 22 Nov | 16 Sat | | Move to Accel Inten RehabDr. Kim Dr. Wynn (Email: Nov | 3 | $ 50 | $ 5,800 |
| 23 Nov | 17 Sun | | Move to Accel Inten RehabDr. Kim Dr. Wynn (Email: Nov | 3 | $ 50 | $ 5,950 |
| 24 Nov | 18 Mon | | Accel: Schedule with Whitney, Dr. Paulman's office Email Reschedule Dr. Seine clinical review. | 3 | $ 50 | $ 6,100 |
| 25 Nov | 19 Tues | | Move to Accel Intensive Rehab Marsh Lane Dr. Kim Dr. V | 3 | $ 50 | $ 6,250 |
| 26 Nov | 20 Wed | | Move to Accel Intensive Rehab Marsh Lane Dr. Kim Dr. V | 3 | $ 50 | $ 6,400 |
| 27 Nov | 21 Thur | | Mom returns to Lakeview PM | 2 | $ 50 | $ 6,500 |
| 28 Nov | 22 Fri | | Mom returns to Lakeview PM | 2 | $ 50 | $ 6,600 |
| 29 Nov | 23 Sat | | Mom returns to Lakeview PM | 2 | $ 50 | $ 6,700 |
| 30 Nov | 24 Sun | | Mom returns to Lakeview PM | 2 | $ 50 | $ 6,800 |
| 31 Nov | 25 Mon | | **Lakeview Meeting with Brandi Seabold and Michelle Alexander: based on Brenda Holmes eval** | 1 | $ 50 | $ 6,850 |
| 32 Nov | 26 Tue | | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | 1 | $ 50 | $ 6,900 |
| 33 Nov | 27 Wed | | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | 3 | $ 50 | $ 7,050 |
| 34 Nov | 28 Thur | | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | 3 | $ 50 | $ 7,200 |
| 35 Nov | 29 Fri | | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | 3 | $ 50 | $ 7,350 |
| 36 Nov | 30 Sat | | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | 3 | $ 50 | $ 7,500 |
| 37 Dec | 1 Sun | | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | 3 | $ 50 | $ 7,650 |
| 38 Dec | 2 Mon | | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | 6 | $ 50 | $ 7,950 |
| 39 Dec | 3 Tue | | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | 3 | $ 50 | $ 8,100 |
| 40 Dec | 4 Wed | | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | 3 | $ 50 | $ 8,250 |
| 41 Dec | 5 Thu | | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | 3 | $ 50 | $ 8,400 |
| 42 Dec | 6 Fri | | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | 3 | $ 50 | $ 8,550 |
| 43 Dec | 7 Sat | | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | 3 | $ 50 | $ 8,700 |
| 44 Dec | 8 Sun | | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | 3 | $ 50 | $ 8,850 |
| 45 Dec | 9 Mon | | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | 3 | $ 50 | $ 9,000 |
| 46 Dec | 10 Tue | | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | 3 | $ 50 | $ 9,150 |
| 47 Dec | 11 Wed | | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | 3 | $ 50 | $ 9,300 |
| 48 Dec | 12 Thur | | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | 3 | $ 50 | $ 9,450 |
| 49 Dec | 13 Fri | | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | 3 | $ 50 | $ 9,600 |

**Crises Care - Doris L. Tipps**

| | | | | Hours | Rate | Cumms |
|---|---|---|---|---|---|---|
| 50 Dec | 14 Sat | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | | 3 | $ 50 | $ 9,750 |
| 51 Dec | 15 Sun | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | | 3 | $ 50 | $ 9,900 |
| 52 Dec | 16 Mon | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | | 3 | $ 50 | $ 10,050 |
| 53 Dec | 17 Tue | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | | 3 | $ 50 | $ 10,200 |
| 54 Dec | 18 Wed | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | | 3 | $ 50 | $ 10,350 |
| 55 Dec | 19 Thu | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | | 3 | $ 50 | $ 10,500 |
| 56 Dec | 20 Fri | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | | 3 | $ 50 | $ 10,650 |
| 57 Dec | 21 Sat | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | | 3 | $ 50 | $ 10,800 |
| 58 Dec | 22 Sun | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | | 3 | $ 50 | $ 10,950 |
| 59 Dec | 23 Mon | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | | 3 | $ 50 | $ 11,100 |
| 60 Dec | 24 Tue | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | | 3 | $ 50 | $ 11,250 |
| 61 Dec | 25 Wed | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | | 3 | $ 50 | $ 11,400 |
| 62 Dec | 26 Thur | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | | 3 | $ 50 | $ 11,550 |
| 63 Dec | 27 Fri | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | | 3 | $ 50 | $ 11,700 |
| 64 Dec | 28 Sat | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | | 3 | $ 50 | $ 11,850 |
| 65 Dec | 29 Sun | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | | 3 | $ 50 | $ 12,000 |
| 66 Dec | 30 Mon | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | | 3 | $ 50 | $ 12,150 |
| 67 Dec | 31 Tue | Lakeview Home SVT Pulmacort /Meals/ Pharm Pills Bedti | | 3 | $ 50 | $ 12,300 |

| | | | Crises Care - Doris L. Tipps | Part II Hours | Rate | Page 4 Cumms |
|---|---|---|---|---|---|---|
| 68 | Jan | 1 Wed | Lake-V Home SVT Pulmacort /Meals/ Pharm P Recovery | 3 | $ 50 | $ 12,450 |
| 69 | Jan | 2 Thr | Lakeview Home SVT Pulmacort /Meals/ Pharm Recovery | 3 | $ 50 | $ 12,600 |
| 70 | Jan | 3 Fri | Lakeview Home SVT Pulmacort /Meals/ Pharm Recovery | 3 | $ 50 | $ 12,750 |
| 71 | Jan | 4 Sat | Lakeview Home SVT Pulmacort /Meals/ Pharm Recovery | 2 | $ 50 | $ 12,850 |
| 72 | Jan | **5 Sunday** | **11:00a Call to Mom Baylor Emergency:** **Dr. Healther Harris Emerg: ~2:30p arrival, admitted** | 8 | $ 50 | $ 13,250 |
| 73 | Jan | 6 Mon | Baylor: Morning Visit, Afternoon Visit, Moved to ICU | 4 | $ 50 | $ 13,450 |
| 74 | Jan | 7 Tue | Baylor: Sepsus, Intensive Care, 8:00pm until 9:20pm, Lactate levels receding: email 01/28/14 | 4 | $ 50 | $ 13,650 |
| 75 | Jan | 8 Wed | Baylor: Sepsus, ICU, Reversal | 4 | $ 50 | $ 13,850 |
| 76 | Jan | 9 Thur | Baylor: Sepsus, ICU Dr. El Jammile. | 4 | $ 50 | $ 14,050 |
| 77 | Jan | 10 Fri | ~Baylo Select Revovery | 4 | $ 50 | $ 14,250 |
| 78 | Jan | 11 Sat | ~Baylo Select Revovery | 2 | $ 50 | $ 14,350 |
| 79 | Jan | 12 Sun | ~Baylo Select Revovery | 2 | $ 50 | $ 14,450 |
| 80 | Jan | 13 Mon | ~Baylo Select Revovery | 2 | $ 50 | $ 14,550 |
| 81 | Jan | 14 Tuesday | ~Baylo Select Revovery | 2 | $ 50 | $ 14,650 |
| 82 | Jan | 15 Wed | Select Specialty Developing Crises | 2 | $ 50 | $ 14,750 |
| 83 | Jan | 16 Thur | Select Specialty Developing Crises | 2 | $ 50 | $ 14,850 |
| 84 | Jan | 17 Fri | Select Specialty [Email: in from Baylor | 2 | $ 50 | $ 14,950 |
| 85 | Jan | 18 Sat | Select Specialty Developing Crises | 2 | $ 50 | $ 15,050 |
| 86 | Jan | 19 Sun | Select Specialty Developing Crises | 2 | $ 50 | $ 15,150 |
| 87 | Jan | 20 Mon | Select Specialty Developing Crises | 2 | $ 50 | $ 15,250 |
| 88 | Jan | 21 Tue | Select Specialty Developing Crises | 2 | $ 50 | $ 15,350 |
| 89 | Jan | 22 Wed | Select Specialty Developing Crises | 2 | $ 50 | $ 15,450 |
| 90 | Jan | 23 Thur | Select Specialty Trip made to visit visit Mom, sl **Mediation** refused to accept Senior Source as guardian. **Mediation** | 8 | $ 50 | $ 15,850 |
| 91 | Jan | 24 Fri | Select Specialty Developing Crises | 2 | $ 50 | $ 15,950 |

| | | Crises Care - Doris L. Tipps | Part II Hours | Rate | Page 5 Cumms |
|---|---|---|---|---|---|
| 92 Jan | 25 Sat | **Select Specialty Mom stopped eating, giving up, Dr. Rai, needs feeding support 3 x per day** | 6 | $ 50 | $ 16,250 |
| 93 Jan | 26 Sun | Full time support - meals+Lisa Mom's Best Friend | 6 | $ 50 | $ 16,550 |
| 94 Jan | 27 Mon | Full time support - meals+Lisa Mom's Best Friend | 6 | $ 50 | $ 16,850 |
| 95 Jan | 28 Tue | Full time support - meals+Lisa Mom's Best Friend | 2 | $ 50 | $ 16,950 |
| 96 Jan | 29 Wed | Full time support - meals+Lisa Mom's Best Friend | 2 | $ 50 | $ 17,050 |
| 97 Jan | 30 Thur | Full time support - meals+Lisa Mom's Best Friend | 2 | $ 50 | $ 17,150 |
| 98 Jan | **31 Fri** | **Friday at Select Specialty: 5:30P Pulmonary pulmonary emergency (Lisa Numerick) Bypap machine** | 5 | $ 50 | $ 17,400 |
| 99 **Feb** | **1 Sat** | **Saturday Moved to Baylor Radiology- pleural sacs drained, 600 ml of fluid off** | 7 | $ 50 | $ 17,750 |
| | Sat | **Steve at Select, Baylor Select. Mom critical** | | | |
| 100 Feb | 2 Sun | Select Specialty MBF sitters, feeding, Steve MBF | 2 | $ 50 | $ 17,850 |
| 101 Feb | 3 Mon | Select Specialty MBF sitters, feeding Steve MBF | 2 | $ 50 | $ 17,950 |
| 102 Feb | 4 Tue | Select Specialty MBF sitters, feeding Steve MBF | 2 | $ 50 | $ 18,050 |
| 103 **Feb** | **5 Wed** | **Select Specialty - Pneumonia looking better Dr. Seine Report Received.** | 2 | $ 50 | $ 18,150 |
| 104 Feb | 6 Thursday | Select Specialty Recovery | 2 | $ 50 | $ 18,250 |
| 105 Feb | 7 Fri | Select Specialty Recovery | 2 | $ 50 | $ 18,350 |
| 106 Feb | 8 Sat | Select Specialty Recovery | 2 | $ 50 | $ 18,450 |
| 107 Feb | 9 Sun | Select Specialty Recovery Brother sneezing on Mom | 2 | $ 50 | $ 18,550 |
| 108 Feb | 10 Mon | **Select Specialty Meeting DR. Seine Review** | 2 | $ 50 | $ 18,650 |
| 109 Feb | 11 Tue | Select Specialty Recovery | 2 | $ 50 | $ 18,750 |
| 110 Feb | 12 Wed | Select Specialty Recovery | 2 | $ 50 | $ 18,850 |
| 111 Feb | 13 Thur | Select Specialty Recovery | 2 | $ 50 | $ 18,950 |
| 112 Feb | 14 ~Fri | Select Specialty Recovery ; Lakeview - Senior | 2 | $ 50 | $ 19,050 |
| 113 Feb | **15 ~Sat** | **Saturday moved from Select Specialty to Accel** | 2 | $ 50 | $ 19,150 |
| 114 Feb | 16 Sun | Accel Visited Mom while brother and wife wer Email: LC Brother acting strange - offering Do Not Res Forms | 2 | $ 50 | $ 19,250 |
| 115 Feb | 17 Mon | Accel Visited Mom, e.g., pulled her up in her bed, helped with her comforts | 4 | $ 50 | $ 19,450 |
| 116 Feb | 18 Tue | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 19,550 |
| 117 Feb | 19 Wed | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 19,650 |

| | | | Crises Care - Doris L. Tipps | Part II | Rate | Page 6 Cumms |
|---|---|---|---|---|---|---|
| 118 | Feb | 20 Thur | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 19,750 |
| 119 | Feb | 21 Fri | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 19,850 |
| 120 | Feb | 22 Sat | **Accel 12:00pm to 3:40p Call button on floor, Lunch unusual wait, no oxygen, Mom gasping for air, complete indifference staff** | 7 | $ 50 | $ 20,200 |
| 121 | Feb | 23 Sun | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 20,300 |
| 122 | Feb | 24 Mon | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 20,400 |
| 123 | Feb | 25 Tue | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 20,500 |
| 124 | Feb | 26 We | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 20,600 |
| 125 | Feb | 27 Thur | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 20,700 |
| 126 | Feb | 28 Fri | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 20,800 |
| 127 | Mar | 1 Sat | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 20,900 |
| 128 | Mar | 2 Sun | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 21,000 |
| 129 | Mar | 3 Mon | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 21,100 |
| 130 | Mar | 4 Tue | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 21,200 |
| 131 | Mar | 5 Wed | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 21,300 |
| 132 | Mar | 6 Thur | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 21,400 |
| 133 | Mar | 7 Fri | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 21,500 |
| 134 | Mar | 8 Sat | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 21,600 |
| 135 | Mar | 9 Sun | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 21,700 |
| 136 | Mar | 10 Mon | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 21,800 |
| 137 | Mar | 11 Tue | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 21,900 |
| 138 | Mar | 12 Wed | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 22,000 |
| 139 | Mar | 13 Thu | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 22,100 |
| 140 | Mar | 14 Fri | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 22,200 |
| 141 | Mar | 15 Sat | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 22,300 |
| 142 | Mar | 16 Sum | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 22,400 |
| 143 | Mar | 17 Mon | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 22,500 |
| 144 | Mar | 18 Tue | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 22,600 |
| 145 | Mar | 19 Wed | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 22,700 |
| 146 | Mar | 20 Thur | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 22,800 |
| 147 | Mar | 21 Fri | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 22,900 |

| | | | | | Rate | Cumms |
|---|---|---|---|---|---|---|
| 148 | Mar | 22 Sat | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 23,000 |
| 149 | Mar | 23 Sum | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 23,100 |
| 150 | Mar | 24 Mon | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 23,200 |
| 151 | Mar | 25 Tue | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 23,300 |
| 152 | Mar | 26 Wed | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 23,400 |
| 153 | Mar | 27 Thur | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 23,500 |
| 154 | Mar | 28 Fri | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 23,600 |
| 155 | Mar | 29 Sat | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 23,700 |
| 156 | Mar | 30 Sun | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 23,800 |
| 157 | Mar | 31 Mon | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 23,900 |
| 158 | Apr | 1 Tue | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 24,000 |
| 159 | Apr | 2 Wed | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 24,100 |
| 160 | Apr | 3 Thu | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 24,200 |
| 161 | Apr | 4 Fri | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 24,300 |
| 162 | Apr | 5 Sat | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 24,400 |
| 163 | Apr | 6 Sun | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 24,500 |
| 164 | Apr | 7 Mon | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 24,600 |
| 165 | Apr | 8 Tue | Accel condition, comforts, oxy, meds, pain | 2 | $ 50 | $ 24,700 |
| 166 | Apr | 9 Wed | Moved from Accel to Prestonwood | 2 | $ 50 | $ 24,800 |
| 167 | Apr | 10 Thu | Prestonwood | 2 | $ 50 | $ 24,900 |
| 168 | Apr | 11 Fri | Prestonwood - Friday evening | 2 | $ 50 | $ 25,000 |
| 169 | Apr | 12 Sat | Prestonwood - Saturday evening late - Flow Arr | 2 | $ 50 | $ 25,100 |
| 170 | Apr | 13 Sun | Moved from Prestonwood to Presbyterian Plano, oxygen levels dangerous decline | 2 | $ 50 | $ 25,200 |
| 171 | Apr | 14 Mon | Presby Plano bronchitis, clots  heparin coumedin | 2 | $ 50 | $ 25,300 |
| 172 | Apr | 15 Tue | Presby Plano bronchitis, clots  heparin coumedin | 2 | $ 50 | $ 25,400 |
| 173 | Apr | 16 Wed | Presby Plano bronchitis, clots  heparin coumedin | 2 | $ 50 | $ 25,500 |
| 174 | Apr | 17 Thu | Presby Plano bronchitis, clots  heparin coumedin | 2 | $ 50 | $ 25,600 |
| 175 | Apr | 18 Fri | Presby Plano bronchitis, clots  heparin coumedin | 2 | $ 50 | $ 25,700 |
| 176 | Apr | 19 Sat | Presby Plano bronchitis, clots  heparin coumedin | 2 | $ 50 | $ 25,800 |
| 177 | Apr | 20 Easter Sur | Presby Plano bronchitis, clots  heparin coumedin | 2 | $ 50 | $ 25,900 |
| 178 | Apr | 21 Mon | Presby Plano bronchitis, clots  heparin coumedin | 2 | $ 50 | $ 26,000 |
| 179 | Apr | 22 Tue | Mom arrives PW,8:00p in terrible situation | 2 | $ 50 | $ 26,100 |
| 180 | Apr | 23 Wed | PW. Opened Rm 406 witnessed techs swinging Mom like a sack of potatoes, while conversing | 2 | $ 50 | $ 26,200 |
| | | | **Communications Charges** | 64.5 | $ 125 | $ 8,063 |
| | | | **Total charges** | | | $ 34,263 |

## COMMUNICATIONS WITH DORIS L TIPPS'
## ATTORNEY - NEEDED ADVERSARY

| | | | | Hours | Cum |
|---|---|---|---|---|---|
| 180 Sept | 8 | 2013 | Neurologist reports and history | | |
| 181 Sept | 17 | 2013 | Kathy Fink: Mom's neightbor stated that she was approached by my brother's attorneys for information about me. | 1 | 1 |
| 182 Sept | 17 | 2013 | Mom's explanation of Jesus story: Pill tossing ceremony, Security concerns about G&T | 2 | 3 |
| 183 Sept | 24 | 2013 | Confrontation at Lakeview: Pill tossing a: Thursday evening Sept 12, 2013 before Friday court date. | 1 | 4 |
| 184 Sept | 25 | 2013 | Met with Brenda Holmes, RN, re: unstable INR readings. | 2 | 6 |
| 185 Sept | 30 | 2013 | Arranged to get Mom's appointment with Dr. Crowder established Court ordered mental examination. | 1 | 7 |
| 186 Oct | 2 | 2013 | Dr. Crowder report to neurologist Dr. David Isaradisaikul, M.D., | 2 | 9 |
| 187 Oct | 22 | 2013 | Dr. Bennett Blum, M.D. Psychiatrist | 2 | 11 |
| 188 Oct | 2 | 2013 | Dr. David Isaradisaikul / Oleta Farrell, revocation of Tom Tipps powers | 2 | 13 |
| 189 Nov | 4 | 2013 | Referral notice to Dr. Ron Paulman and Dr. Kathleen Seine | 1 | 14 |
| 190 Nov | 5 | 2013 | Assistance from family for neuro psychology tests from my brother Thomas Tipps | nc | 14 |
| 191 Nov | 7 | 2013 | Mom readmitted to Baylor on 11-6-13 11-6-13 pm Bayor patient dumping Baylor culpable for 90 year old pneumonia patient | nc | 14 |
| 192 Nov | 11 | 2013 | Mom birthday at Accel | 1 | 15 |
| 193 Nov | 16 | 2013 | Filling out test forms for Mom | 1 | 16 |
| 194 Nov | 16 | 2013 | Mom's condition at Accel, Dr. Kim | 2 | 18 |
| 195 Nov | 19 | 2013 | Whitney at Dr. Paulman's office | 1 | 19 |

| | | | | | |
|---|---|---|---|---|---|
| 196 Nov | 19 | 2013 | Dr. Paulman conversation notes | 1 | 20 |
| 197 Dec | 12 | 2013 | Mom walking again at Lakeview | 2 | 22 |
| 198 Jan | 5 | 2014 | Called Mom on Sunday at 11:00a; heavy coughing; albuterol treatment, lunch to Baylor emergency Dr. Harris admit | 1 | 23 |
| 199 Jan | 2 | 2014 | Patricia McArdle, TDAPS Texas Dept of Adult Protective Svcs Investigation of Steve Tipps - Allegations Tossed | 2 | 25 |
| 200 Jan | 8 | 2014 | Lactate levels are falling (ICU-Baylor) Sepsus declining in blood stream | 2 | 27 |
| 201 Jan | 26 | 2014 | Worst Season for flu and respiratory illnesses in decades. | 1 | 28 |
| 202 Jan | 29 | 2014 | Mom was in a very weak state, unable to communicate with her nurses her pain issues | 1 | 29 |
| 203 Jan | 29 | 2014 | Mom's diet: assisted feeding | 1 | 30 |
| 204 Jan | 29 | 2014 | Need more help from MBF, at Select Hosp Mom's best friend, feeding, watching Mom critically ill. | 0.5 | 30.5 |
| 205 Jan | 31 | 2014 | Mom in critical condition, Bypap, Emergency Steve spoke with facility dir of nursing Dr. Sohn came, full briefing, | 1 | 31.5 |
| 206 Feb | 5 | 2014 | Dr. Torton, Dr. Rai, Dr. Wilson, Dr. Boorla, Dr. Tomkins, Dr. Sohn | 2 | 33.5 |
| 207 Feb | 9 | 2014 | Brother and wife in Mom's room with their own infectious illnesses & sneezing on Mom. | 2 | 35.5 |
| 208 Feb | 13 | 2014 | Summary | 1 | 36.5 |
| 209 Feb | 14 | 2014 | Senior Source investigating allegations of abuse alleged by Tom Tipps at Select Specialty Hospital | 2 | 38.5 |
| 210 Feb | 16 | 2014 | Accel Rehal Plano: George the nurse nurse told me that my brother was peddling another do not resucitate form | 2 | 40.5 |
| 211 Feb | 22 | 2014 | Accel. Call button on floor, oxygen in room disconnected, request service | 2 | 42.5 |

| | | | | Hours | Cum | | |
|---|---|---|---|---|---|---|---|
| | | | no response. | | | | |
| 212 | Mar | 20 | 2014 | Accel visited Mom at 9:45p, need to get together - urgent issue urgent issue on fluid buildup - lacix | 3 | 45.5 | |
| 213 | Mar | 21 | 2014 | Accel arrived Friday 5:00 am pneumonia from food aspiration | 2 | 47.5 | |
| 214 | Mar | 21 | 2014 | Accel, Mom is out of danger | 2 | 49.5 | |
| 215 | Mar | 29 | 2014 | Accel, edema, refused to disclose: edema critical, drowning in her own fluids - get after Senior Source | 0 | 49.5 | |
| 216 | Mar | 30 | 2014 | Accel, Doctor refused Lacix, need for specialists need specialists | 3 | 52.5 | |
| 217 | Apr | 4 | 2014 | Guardian plans to terminate services of MBF. if MBF, Loneliness to set in. | 2 | 54.5 | |
| 218 | Apr | 5 | 2014 | Accel, George indicates big improvement from the care and rehab at Accel on Communicaton Parkway Plano. | 2 | 56.5 | |
| 219 | Apr | 16 | 2014 | Prestonwood, swelling in Mom's feet severe, toes turnning blue | 1 | 57.5 | |
| 220 | Apr | 23 | 2014 | Prestonwood, mid evening, Nursing Staff neglecting Mom in her room. | 3 | 60.5 | |
| 221 | Apr | 24 | 2014 | 8:00pm Prestonwood, witnessed two techs throw Mom like a sack of potatoes onto hard mattress; fall risk band on her arm | 2 | 62.5 | |
| 222 | Apr | 29 | 2014 | Interaction with Prestonwood personnel concerning wreckless endangerment of Mom. | 2 | 64.5 | |

| | | Total |
|---|---|---|
| Total | 64.5 $ 125 | $ 8,063 |